# UNITED STATES DISTRICT COURT

for the

Eastern District of Louisiana

|  |  |
|---|---|
| YUE ZHAO | Case No. ___25-2474___ |
| *Plaintiff(s)* | *(to be filled in by the Clerk's Office)* |
| **-v-** | |
| | JUDGE SARAH S. VANCE |
| | MAGISTRATE EVA J. DOSSIER |
| | Jury Trial: *(check one)* ☒ Yes ☐ No |
| THE ADMINISTRATORS OF THE TULANE EDUCATIONAL FUND; DAVID CROSSLIN; HEATHER MACHADO; LEE HAMM; | |
| *Defendant(s)* | |

## COMPLAINT FOR A CIVIL CASE

Count I —ADA & Section 504 — Disability Discrimination and Failure to Accommodate
Count II — ADA & Section 504 — Retaliation
Count III —State Law— Breach of Contract
Count IV —State Law— Intentional Infliction of Emotional Distress
Count V —State Law— Fraudulent Inducement
Count VI —State Law— Negligent Supervision, Training, and Negligence
Count VII —State Law — Defamation
Count VIII —State Law — Abuse of Rights
Count IX —Title VI— National Origin Discrimination

**NOW INTO COURT**, comes the Pro Se Plaintiff, Yue Zhao, who respectfully submits this
Amended Complaint as a matter of course pursuant to Federal Rule of Civil Procedure 15(a)(1)(B).

I.    **Jurisdiction**

Plaintiff brings this action under Title III and Title V of the Americans with Disabilities Act ("ADA"), Section 504 of the Rehabilitation Act of 1973, and Title VI of the Civil Rights Act of 1964. This Court has federal question jurisdiction over these claims pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction over Plaintiff's Louisiana state law claims pursuant to 28 U.S.C. § 1367.

II.    **Parties**

1.    Plaintiff Yue Zhao, also known as "George Zhao", is an international student in the Biomedical Sciences (BMS) Ph.D. program at Tulane University School of Medicine.

2.    Defendant David Crosslin is an Associate Professor at Tulane University School of Medicine and was Plaintiff's dissertation advisor.

3.    Defendant Heather Machado is an Associate Professor and the Assistant Dean of the BMS program at Tulane University School of Medicine.

4.    Defendant Lee Hamm is the Dean of Tulane University School of Medicine.

5.    Defendant The Administrators of the Tulane Educational Fund, also known as Tulane University, is a non-profit higher education institution in New Orleans, LA.

III.    **Venue**

6.    Venue is proper in the United States District Court for the Eastern District of Louisiana pursuant to 28 U.S.C. § 1391(b) because:

(a) Defendant The Administrators of the Tulane Educational Fund resides in this District;

(b) A substantial part of the events or omissions giving rise to the claims occurred in Orleans Parish, Louisiana, within this District;

(c) All individual Defendants are residents of Louisiana and perform their duties in

Orleans Parish; and

(d) Tulane University's principal place of business is located in New Orleans,

Louisiana, within this District.

IV.    **Facts**

<u>**Narrative Summary**</u>

7.      Plaintiff performed research labor similar in nature to that of employees but at all

relevant times remained a Ph.D. student governed exclusively by academic rules and program

requirements, rather than an at-will employee. Plaintiff received a monthly stipend of

approximately $2,500 from Tulane University until Defendants terminated those payments

without notice.

8.      Prior to requesting any accommodation, Plaintiff had already obtained objective

medical evidence of liver dysfunction, including an abdominal ultrasound performed at

Ochsner Health and laboratory testing conducted at Tulane Student Health Services, both of

which documented persistently elevated ALT and AST levels and abnormal liver findings.

9.      Based on this objective medical evidence, Plaintiff was diagnosed with severe

fatty liver disease, a medical condition that substantially limits the major life activity of

digestive function.[1]  Plaintiff's Severe Fatty Liver Disease constitutes a disability under the

ADA.

10.     In February 2025, Plaintiff attempted to schedule a FibroScan examination

through Ochsner Health Hepatology Department. Plaintiff was informed that the earliest

---

[1] Major life activities also include major bodily functions such as immune system functions, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions. https://adata.org/faq/what-are-major-life-activities

available appointment was approximately four to five months away, which conflicted with the medically recommended timeframe for further diagnostic evaluation.

11.    On March 12, 2025, Plaintiff informed his supervisor, Defendant Dr. David Crosslin, of his diagnosed medical condition and requested a reasonable accommodation in the form of remote research work while receiving medical treatment. Plaintiff also informed Dr. Crosslin that a visa renewal would be required in order for Plaintiff to return to the United States.

12.    Plaintiff further notified Dr. Crosslin that, because a FibroScan examination was not reasonably available within the necessary timeframe through Tulane University's designated healthcare provider, Ochsner Health in New Orleans, he needed to travel to China, where he can use his parents' insurance policy, to obtain this medically necessary diagnostic procedure to further evaluate the severity of his condition.

13.    Because Tulane University's student health insurance plan (T-SHIP) effectively renders out-of-network providers financially and practically infeasible, Plaintiff could not reasonably access timely FibroScan testing outside the insurance network, even though FibroScan services technically existed at other facilities within the United States.

14.    Further diagnostic evaluation was medically necessary to determine whether the condition was progressing toward a more severe stage, including cirrhosis, if left untreated.

15.    Dr. Crosslin **approved** this accommodation through email, including Plaintiff's trip to China to obtain timely medical testing that Ochsner could not schedule for months.

16.    On March 14, 2025,  Plaintiff reached out to Dr. Machado to schedule a meeting regarding this trip.

17.    Email records also show that Plaintiff met with Dr. Machado on March 21, 2025

in her office.  Dr. Machado likewise acknowledged the arrangement and instructed the

Plaintiff to obtain a travel signature from the Office of International Students and Scholars

(OISS).

18.    On March 21, 2025, Plaintiff met with Dr. Machado in her office in the JBJ

Building. Plaintiff brought a folder containing medical documentation of his diagnosis. During

the meeting, Dr. Machado stated that she did not need to review the documentation and would

rely on Plaintiff's representation.

19.    No written communication shows that Dr. Machado asked the Plaintiff to seek

accommodation from the Goldman Center of Student Accessibility.

20.    On March 26, 2025, Plaintiff emailed Dr. Crosslin and Dr. Machado about the

detailed trip plan.  Dr. Machado replied "Hi George, As we discussed, please be sure to submit

to us the dates of your trip, and please notify IOSS."[2]  In addition, Dr. Machado's email was

also copied to Zylkia Lozano, Lucy Archer, Delilah Martin and Dr. Derek Pociask.

21.    Plaintiff acquired the travel signature through email with Dessa Crum,

Designated School Official (DSO) from OISS, on April 4, 2025.

22.    Dr. Crosslin's laboratory is a **dry lab** requiring no physical experiments;

students mostly work independently on computational analysis. **Students in Dr. Crosslin's

lab must work remotely** because Dr. Crosslin is rarely on campus.

23.    Plaintiff expressly communicated that his request for remote work was

**temporary and time-limited**, specifically **for a period of approximately two to three

months**, corresponding to the processing timeframe required by the U.S. Consulates for

Plaintiff's visa renewal and reentry documentation. Plaintiff did not request, and never sought,

---

[2] Dr. Machado misspelled "OISS" as "IOSS" in her email.

an indefinite or open-ended "remote from China" arrangement.

24.    Upon returning to China, Plaintiff underwent FibroScan imaging, which confirmed severe hepatic steatosis (S3) with a CAP score of 297 dB/m, thereby medically substantiating the disability that formed the basis of his original accommodation request.

25.    Plaintiff has sent multiple emails to Dr. Crosslin in June and July, 2025 regarding a form named "Individual Development Plan", which is required by the BMS program and needs signature from Dr. Crosslin, but Dr. Crosslin ignored these emails and did not reply.

26.    After Plaintiff departed for China pursuant to his approved accommodation, Dr. Crosslin abruptly reversed his position. On July 31, 2025, he authored a letter containing false allegations, in which he asserted that Plaintiff's previously approved, medically necessary travel accommodation should be revoked based on those allegations.

27.    Dr. Crosslin also falsely claimed Plaintiff failed to attend one-on-one meetings, though Dr. Crosslin himself canceled the meeting in question, as documented by Plaintiff.

28.    In the same email on July 31, Dr. Crosslin informed Plaintiff that "Your stipend was cancelled effective July 10, 2025," thereby purporting to retroactively cancel Plaintiff's stipend as of a prior date without any advance notice to Plaintiff.

29.    Dr. Crosslin clearly indicated the original travel request was initially "approved" by himself in the same email on July 31, 2025.

30.    In justifying Plaintiff's removal, Dr. Crosslin stated in the same email, "I do not consider this working remotely," invoking his personal characterization of Plaintiff's accommodation-related work arrangement as a basis for the challenged action.

31.    Moreover, the allegations Dr. Crosslin cited to justify removing Plaintiff from

the laboratory were entirely false and fabricated. Every incident he referenced as purported

"misconduct" or "performance issues" occurred, if at all, before Plaintiff ever requested his

medical accommodation. None of the stated reasons arose after Dr. Crosslin approved the

accommodation, except for the one-on-one meeting issue mentioned in paragraph 27.

32.    Without investigation, or any required BMS or university procedure, Dr.

Crosslin **removed Plaintiff from his lab unilaterally**, terminated Plaintiff's access to

research resources, and **cut off his stipend**, leaving Plaintiff stranded abroad without financial

support.

33.    As a student, not an at-will employee, Plaintiff could not be summarily removed

or terminated at the **unilateral discretion** of an individual faculty member, but was subject to

academic and institutional procedures governing graduate training and funding.

34.    Dr. Crosslin had multiple reasonable, less disruptive alternatives available to

address any concerns.

35.    Dr. Machado was also informed of the removal decision by Defendant David

Crosslin via the email on July 31, 2025.

36.    Although Dr. Machado did not originate the removal decision, she had

supervisory authority, contemporaneous knowledge, and independent reporting and

intervention obligations.

37.    Plaintiff continuously worked for Dr. Crosslin and another professor (authorized

by Dr. Crosslin), Dr. Yilin Yoshida, remotely until July 31, 2025, as documented by email

records.

38.    Plaintiff, Dr. Yilin Yoshida and Dr. Crosslin are all included in the authorship of

the abstract "Abstract 4354018: The Joint Effects of Life's Essential 8 and Genetics on

Cognitive Impairment and Dementia Risk in People with Diabetes: Findings from the UK Biobank and All of Us", published on November 3, 2025 by the American Heart Association[3], which shows the work that Plaintiff has performed.

39.    Plaintiff possesses audio evidence that, just one week before removing him from the lab, Dr. David Crosslin acknowledged Plaintiff's hard work with Dr. Yilin Yoshida and praised him for his diligence in a group meeting.

40.    On August 1, 2025, Plaintiff submitted evidence contradicting Crosslin's accusations, including screenshots showing continuous remote work and emails demonstrating Crosslin's prior approval of the trip. Plaintiff also documented that he maintained his research duties during his medical treatment abroad.

41.    On August 6, 2025, Dr. Machado sent Plaintiff an email stating that Dr. Crosslin agreed to reimburse unpaid funds, after the BMS administration intervention.  Dr. Machado also informed the Plaintiff that in order to remain in good standing, the Plaintiff must find a new mentor by September 5, 2025.

42.    On August 13, 2025,  Plaintiff renewed his visa and returned to the United States.  Plaintiff returned to the U.S. as soon as the visa was approved without delay.

43.    On **August 29**, 2025, Plaintiff sent a formal demand letter to Dean Lee Hamm and Provost Robin Forman detailing the discriminatory and retaliatory conduct and requesting an administrative hearing.  In the letter, Plaintiff's attorney specifically requested anti-retaliation measures.

44.    On August 29, 2025, Plaintiff emailed Dean Hamm stating that Plaintiff was suffering from severe depression and was under the care of a psychiatrist.

---

[3] https://www.ahajournals.org/doi/10.1161/circ.152.suppl_3.4354018

45. On August 29, 2025, Dean Hamm acknowledged receipt and told the Plaintiff he will review this case.

46. However, no hearing was conducted by Dean Hamm or Provost Forman.

47. One week after, Tulane's Associate General Counsel, Branden Greene, contacted Plaintiff's attorney David Lambert, stating that Tulane University would like to offer to extend the deadline of finding another advisor for the Plaintiff for 21 days.

48. However, due to Plaintiff's documented mental illness, Major Depressive Disorder, Plaintiff responded that the proposed accommodation was not reasonable.

49. In this particular situation, it was not Plaintiff's responsibility to secure a new mentor on his own—nor does the BMS Handbook impose such a requirement.

50. Plaintiff proposed a settlement plan, yet Tulane refused the proposed resolution.

51. Then Tulane, through Counsel Mr. Greene, threatened to **dismiss** Plaintiff from the Ph.D. program unless he found a new dissertation mentor by September 25, despite Plaintiff's documented disability-related medical crisis and prior notice of non-retaliation.

52. Only after Plaintiff warned that such dismissal would constitute unlawful retaliation did Tulane refrain from proceeding.

53. Mr. Greene, Tulane's Counsel, later instructed Plaintiff to engage with Tulane's Office of Institutional Equity (OIE) before pursuing further legal action.

54. Plaintiff reached out to Tiffany Smith, Director of OIE, and started the Equal Opportunity (EO) investigation. This matter has been under investigation by OIE; however, as of the date of this filing, OIE has not provided the Plaintiff with any conclusion, resolution, or findings.

55. BMS leadership and School of Medicine administrators—Specifically Dr.

Machado and Dean Hamm, who are **mandatory reporters** under Tulane EO policy Section

3.1—**failed to report** Crosslin's conduct to OIE.

56.    The BMS Handbook (versions before Aug 2025) does not contain any EO/anti-

discrimination procedure, omitting guidance for students on how to file discrimination or

retaliation complaints and lacking structural protections required under federal disability laws.

57.    As a direct result of Dr. Crosslin's actions, Plaintiff developed **Major**

**Depressive Disorder (MDD)**, medically diagnosed and documented. The emotional and

psychological harm was severe, impairing Plaintiff's ability to concentrate or perform

academic work.

58.    Major Depressive Disorder, which is listed on ADA's website as **an example of**

**a disability**, substantially limited Plaintiff's ability to concentrate, sleep, and perform

academic work[4].

59.    Plaintiff ultimately became unable to continue his Ph.D. studies because of the

MDD caused by Crosslin's actions and Tulane's administrative failures. His academic career,

financial stability, and mental health were severely and permanently damaged.

60.    As shown on the transcript issued by Tulane Registrar's office, Plaintiff has a

GPA of 3.788 and has completed all the required coursework for the PhD program.  Plaintiff

does not have a record of academic misconduct.

61.    Prior to Plaintiff's disability disclosure and accommodation request, no removal,

funding termination, or disciplinary action had ever been initiated against him.

62.    Tulane did not provide Plaintiff with any interim academic protections,

temporary funding support or alternative supervision during the period following his removal

---

[4] https://www.ada.gov/topics/intro-to-ada/

from the lab.

### Stranded Status

63.    At present, Plaintiff has no assigned laboratory, no stipend funding, and no viable pathway to continue his Ph.D. studies at Tulane University. Although Defendants have not issued a formal dismissal or expulsion decision, Plaintiff has been effectively excluded from meaningful participation in the Biomedical Sciences Ph.D. program.

### Dr. David Crosslin's Routine Behavior

64.    Throughout Plaintiff's enrollment, Defendant Crosslin was effectively unavailable as a supervisor. Although assigned as Plaintiff's primary advisor, Crosslin was rarely present in his office and was consistently unreachable during normal working hours. His office remained locked and unattended, and Plaintiff repeatedly encountered an empty workspace over extended periods.

65.    From August 2024 through July 2025, Dr. Crosslin was physically present in his Tidewater Building office on fewer than thirty days.

66.    As a faculty member in a medical school with supervisory responsibility over a Ph.D. student, repeated absence from campus fell outside the reasonable expectations of professional faculty conduct.

67.    During the period of Defendant Crosslin's prolonged absence from campus, no corrective measures were implemented to address his unavailability as Plaintiff's assigned advisor.

### Dean Hamm's Inaction

68.    At all relevant times, Dean Hamm possessed authority to pause adverse academic actions, appoint an interim supervisor, or direct referral to OIE.

69.   However, Dean Hamm failed to pause adverse academic actions, appoint an interim supervisor, or direct referral to OIE.

70.   Dean Hamm did not implement any anti-retaliation or protective measures after Plaintiff informed him that Dr. Crosslin's conduct had contributed to Plaintiff's Severe Depression/ Major Depressive Disorder. During this period, Plaintiff received communications from Tulane University's Office of General Counsel threatening dismissal.

<u>**Tulane's Institutional Structural Failures**</u>

71.   Tulane's Biomedical Sciences Handbook (versions pre-Aug 2025) contains no ADA grievance procedure, no mechanism for reporting or appealing faculty misconduct,  and no process for addressing situations in which an advisor effectively abandons a student.

72.   The Handbook (versions pre-Aug 2025) also provides no protocol for assigning a replacement advisor when the primary advisor is non-responsive or absent for extended periods.

73.   Moreover, the School of Medicine lacks any disability coordination framework to ensure that students with documented medical conditions receive appropriate accommodations or a functional escalation pathway when their academic progress is jeopardized.

74.   When a faculty member acts in bad faith, the School of Medicine does not have a formal process of investigation or hearing process, as indicated by Tulane's Counsel Greene.

75.   Although the University OIE Office can investigate EO-related incidents, no interim academic remedy can be provided to students.

76.   Tulane's Goldman Center for Student Accessibility is located on the Uptown Campus, which is separate from the Downtown Campus where Plaintiff was based.

77.    Goldman Center of Student Accessibility does not offer accommodation in a laboratory setting. Accommodation request needs to be made directly to the lab supervisor.

## Exhaustion of Administrative Remedies

78.    Plaintiff promptly reported the discriminatory and retaliatory conduct to Tulane's Office of Institutional Equity (OIE), which has formally opened an investigation. However, OIE has not issued any findings or taken corrective action to date, due in part to institutional delays outside Plaintiff's control.

79.    In addition, Plaintiff filed complaints with both the U.S. Department of Education's Office for Civil Rights (OCR) and the U.S. Department of Health and Human Services OCR. Although Plaintiff received confirmation of receipt, no investigator has contacted him.

80.    Plaintiff is left with no alternative but to pursue litigation.

## Plaintiff's Vulnerability as an International Student

81.    As an international student, Plaintiff's ability to remain in the United States, access educational resources, and maintain his legal immigration status was directly tied to his continued enrollment and good standing in the program.

82.    Tulane was fully aware of Plaintiff's international status and the heightened vulnerability it created, particularly during periods when Plaintiff was outside the United States for medical treatment and visa renewal.

## Dr. Crosslin's Treatment to Other Students in the group

83.    In 2025, Dr. Crosslin routinely approved students' travel request, even for those without medical need.

84.    None of the U.S.-born Ph.D. students in Dr. Crosslin's group were subjected to

adverse action as a result of travel.

## NIH Grant Requirements for Dr. David Crosslin

85.    Defendant Dr. David Crosslin, as a listed Principal Investigator on Tulane's NIH-funded P20 grant 5P20GM152305-02, was required to—and did—sign or certify compliance with these federal civil rights conditions.

86.    These certifications included obligations to maintain a non-discriminatory research environment, refrain from retaliation, ensure appropriate supervision of trainees, and report any civil-rights-related concerns, hostile conditions, or loss of supervisory capacity to the institution and, when applicable, to NIH. These federal certifications were a mandatory condition of his continued eligibility to serve as PI on an NIH award.

## International Travel Request

87.    International travel requests made by international students are routine and governed by standard procedures specified in the BMS Handbook.

## Dr. David Crosslin's Funding Status

88.    Defendant Dr. Crosslin made grant application to NIH named "NOLA-Gene" in December 2024.  This grant application was not funded.

89.    Defendant Dr. Crosslin's prior NIH funding was reduced or affected as a result of broader NIH funding cuts.

## Accessibility and Structure of the Office of Institutional Equity

90.    Tulane University Office of Institutional Equity is housed within Tulane's Human Resources department.

91.    This is a structure that is not student-centered and disadvantages students reporting faculty misconduct.

92. Tulane administrators did not disclose this information voluntarily, nor can OIE be found in the BMS handbook (Versions pre-Aug 2025).

93. Plaintiff obtained information regarding the grievance procedures of Tulane OIE only after making multiple inquiries, and only after counsel for Tulane, Mr. Greene, eventually provided that information.

### Office of Institutional Equity Neutrality

94. Tulane University claims OIE is a neutral internal investigation agency. However, it is located in the building 1555 Poydras St, which has the name Tulane University School of Medicine on the entrance.

95. Within this Court, multiple plaintiffs in other cases—including Santano, Okeke, Dennar, and Saketkoo—have raised concerns regarding the neutrality and independence of Tulane's OIE in civil actions alleging discrimination or retaliation.

### Equal Opportunity Investigation Pending

96. Tulane EO Policy requires the OIE to have the investigation complete in 60 days, but OIE failed to complete the investigation within 60 days.

97. Plaintiff's EO interview was conducted on October 24, 2025.

98. Between October 24, 2025 and December 8, 2025, including the period leading up to and during the filing of this complaint, the assigned investigator undertook no follow-up communications with Plaintiff.

99. No actual academic remedy is provided to the Plaintiff by OIE.

### Dr. Crosslin's Outside Commercial Interest and Disclosure Obligation

100. Defendant Dr. David Crosslin maintains an outside commercial entity, Sound Biology, LLC, a Louisiana limited liability company based in New Orleans, LA (LA State

Charter Number: 45659111K), formed and operated independently of Tulane University, as stated on Louisiana Secretary of State Website. [5]

101.   Tulane University's Conflict of Commitment and Interest Policy require Dr. Crosslin to submit conflict of interest / commitment report on an annual basis. As a federal funding recipient institution, Tulane University had a duty to evaluate Dr. Crosslin's outside interests and determine whether they constituted a Significant Financial Interest (SFI) or a Financial Conflict of Interest (FCOI).

## IV.    Causes of Action

### Count I— Disability Discrimination and Failure to Accommodate

### Against Defendant The Administrators of the Tulane Educational Fund

### ADA, Title III and Section 504 of the Rehabilitation Act

102.   Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

103.   Defendant The Administrators of the Tulane Educational Fund ("Tulane") owns, operates, and/or controls Tulane University and its School of Medicine, including the Biomedical Sciences (BMS) Ph.D. program. Tulane University constitutes a place of public accommodation as defined by Title III of the Americans with Disabilities Act, 42 U.S.C. § 12181(7), and is also a recipient of federal financial assistance subject to Section 504 of the Rehabilitation Act, 29 U.S.C. § 794.

104.   Under the ADA and Section 504, an individual is protected if he or she has an actual disability, has a documented history or record of such a disability, or is regarded by the covered entity as having a disability.

### <u>Two Qualified Disabilities under ADA</u>

---

[5] Louisiana Secretary of State Website,
https://coraweb.sos.la.gov/commercialsearch/CommercialSearchDetails.aspx?CharterID=1803615_A0F3181FA3

105.   Plaintiff is an individual with documented disabilities, including

    a)   Severe Fatty Liver Disease, which substantially limits one or more major

       life activities, digestive function, as defined by the ADA[6], and

    b)   Major Depressive Disorder, which is listed on ADA's website[7] as **an**

       **example of disability**, substantially limits Plaintiff's ability to

       concentrate, sleep, and perform academic work

106.   Plaintiff also has a record of such disabilities and was regarded as having such

disabilities by Defendants.

### Successful Accommodation Request

107.   In March 2025, Plaintiff requested a reasonable accommodation for his disability

a) Severe Fatty Liver Disease —temporary remote research work while undergoing necessary

medical treatment outside the United States. Tulane, acting through its faculty member and

agent Dr. David Crosslin, approved this accommodation.  The BMS administrators also

approved Plaintiff's request by email.

108.   Under Tulane's Equal Opportunity and Disability Accommodation policies, a

request for reasonable accommodation is deemed made when an individual informs a faculty

member or program administrator that a medical condition is interfering with academic

responsibilities or access to program activities, even if the individual does not use the term

"accommodation." Once a faculty supervisor or program official approves a modification to

academic or research duties, the accommodation is considered granted unless it would impose

an undue hardship or fundamentally alter the essential functions of the program.

---

[6] Major life activities also include major bodily functions such as immune system functions, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions. https://adata.org/faq/what-are-major-life-activities

[7] https://www.ada.gov/topics/intro-to-ada/

109.   Plaintiff is a Ph.D. student whose program of study requires full-time participation in a research laboratory rather than traditional classroom instruction. While Tulane maintains the Goldman Center for Student Accessibility to assist undergraduate and graduate students with classroom-based academic accommodations, the Goldman Center does not administer or implement accommodations that relate to laboratory work, research duties, or the supervisory structure of Ph.D. programs. For students in research-based graduate programs such as Plaintiff, reasonable accommodations must be approved and implemented by the faculty member who directs the laboratory and supervises the student's research activities. Accordingly, any accommodation related to Plaintiff's research duties—including remote work necessitated by medical treatment—could only be granted or effectuated through Plaintiff's lab principal investigator, Dr. David Crosslin, acting on behalf of Tulane University.

110.   Plaintiff's accommodation request consisted of three steps: Dr. Crosslin's written approval, Dr. Machado's approval, which was copied to 4 different administrators, and OISS travel signature.

111.   Tulane's initial approval of Plaintiff's requested accommodation constitutes, at a minimum, an acknowledgment that Tulane regarded Plaintiff as having a disability within the meaning of the ADA.

**Bad Faith Revocation of Disability Accommodation (Severe Fatty Liver Disease)**

112.   Shortly thereafter, Tulane, acting through Dr. Crosslin, revoked this previously-approved accommodation without any legitimate, nondiscriminatory justification, while Plaintiff was still undergoing medical treatment.

113.   After revoking the accommodation, Tulane, through Dr. Crosslin and other

agents, removed Plaintiff from his research laboratory, cut off his Ph.D. stipend and research support, and imposed an impossible condition for Plaintiff to find an alternative advisor, thereby excluding Plaintiff from and denying him the benefits of Tulane's educational program.

114.    The allegation asserted by Dr. Crosslin in his email to justify Plaintiff's removal was fabricated and cannot reasonably be characterized as an academic judgment.

115.    There was no new performance, academic, or misconduct issues involving Plaintiff between the time Tulane approved the accommodation and the time it was revoked. The only material change during that period was Plaintiff's exercise of his ADA accommodation and his continued medical treatment. The revocation of the accommodation and the resulting exclusion were therefore because of Plaintiff's disability and his need for accommodation.

116.    Even assuming, arguendo, that Defendant Crosslin's allegations regarding Plaintiff's academic performance or absence of meetings were true, **the revocation of a previously approved disability accommodation based on academic discretion remains unlawful and discriminatory**. A reasonable accommodation under the ADA and Section 504 is a statutory right designed to ensure equal access to the educational program; it is not a discretionary privilege or a 'reward' for good academic standing that can be withdrawn as a disciplinary measure. By revoking the Plaintiff's remote work arrangement—the specific modification necessary for his continued participation while medically vulnerable—as a punishment for alleged performance issues, Defendants impermissibly conditioned Plaintiff's civil rights on his academic compliance.

117.    If Defendants believed Plaintiff had performance deficiencies, the lawful

remedy was academic guidance, grading, or standard disciplinary procedures, not the retaliatory weaponization and withdrawal of his medically necessary accommodation.

### Non-Academic Basis for Dr. Crosslin's Conduct

118.    Dr. Crosslin's removal of Plaintiff from the research arrangement was not an exercise of academic discretion, but was instead based on non-academic considerations, including extrinsic factors such as his obligation to manage outside interests related to Sound Biology, LLC and the loss of funding for the NOLA-Gene project in the prior year.

### Failure to Engage in the Interactive Process

119.    After receiving notice of Plaintiff's disability and accommodation needs, Dr. Crosslin, acting as the agent of Tulane University, failed to engage in any meaningful interactive process. He routinely failed to respond to Plaintiff's emails concerning accommodation-related issues, academic requirements, and required program forms, including repeated requests for discussion and clarification.

120.    In addition, Tulane's Agent, Dr. Crosslin, was frequently unavailable in person, rarely present in his office during normal working hours, and provided no reliable opportunity for Plaintiff to communicate regarding accommodation implementation or concerns. This pattern of non-responsiveness and unavailability foreclosed any good-faith dialogue regarding Plaintiff's disability-related needs and prevented the continuation or adjustment of the approved accommodation.

### Disparate Treatment based on Medical Status and Disability

121.    In 2025, Dr. Crosslin, acting as the agent of Tulane, routinely approved students' travel request, even for those without medical need.

122.    None of the other students who requested travel accommodations without

medical needs were subjected to adverse actions.

<u>**Disability and Anti-Discrimination Grievance Procedures Failed**</u>

123.   Further, Tulane failed to maintain or communicate any accessible grievance procedures that would allow graduate students in the Biomedical Sciences (BMS) program to challenge this revocation, report disability discrimination, or seek timely institutional intervention.

124.   The BMS Policy Handbook (pre-Aug 2025) contains no mention of ADA or §504 rights, grievance procedures, or reporting pathways for disability-related harm. It merely addresses academic appeals and directs students to raise complaints with supervisors—individuals who may themselves be the source of discrimination or retaliation. It does not mention the Office of Institutional Equity (OIE) or anybody authorized to receive disability-based complaints.

125.   OIE's neutrality is reasonably in doubt because it is physically located within the School of Medicine building, while the incident concerns a faculty member in the School of Medicine.  Within this Court, multiple plaintiffs in other cases—including Santano, Okeke, Dennar, and Saketkoo—have raised concerns regarding the neutrality and independence of Tulane's OIE in civil actions alleging discrimination or retaliation.

126.   OIE did not finish the investigation within 60 days, which was specified in the EO policy.

<u>**Failure to Reasonably Accommodate Disability (Major Depressive Disorder)**</u>

127.   As a result of Dr. Crosslin's conduct, Plaintiff suffered **Major Depressive Disorder, a clinically diagnosed disability defined on ADA's website.**

128.   After Plaintiff disclosed Major Depressive Disorder to Dean Hamm and

requested grievance, through counsel Greene, Tulane University offered Plaintiff an additional 21 days to secure a new advisor. This proposed accommodation is **not reasonable.** Given Plaintiff's documented physical and mental disabilities, requiring Plaintiff to identify and obtain a new mentor within that timeframe is unduly burdensome.

129.   In light of Plaintiff's wrongful removal by his advisor and Plaintiff's multiple documented disabilities, it was **not Plaintiff's responsibility** to secure a new mentor on his own—nor does the BMS Handbook impose such a requirement; a more reasonable accommodation would have been for Tulane to assign Plaintiff to a laboratory and advisor directly. But Tulane failed to offer such accommodation.

### Tulane University Agents

130.    At all relevant times, Dr. David Crosslin was an Associate Professor at Tulane University and Plaintiff's dissertation advisor, acting as Tulane University's agent in administering its doctoral program. Tulane University placed Dr. Crosslin in a position of supervisory and evaluative authority over Plaintiff, and is therefore responsible for acts undertaken under that authority. Accordingly, although Dr. Crosslin's actions violated multiple internal Tulane policies, which are specified in the Breach of Contract Count, **Tulane University may not disclaim, disavow, or exclude responsibility for Dr. Crosslin's adverse actions toward Plaintiff.**

### Harms Caused and Requested Relief

131.   As a direct and proximate result of Tulane's discriminatory conduct, Plaintiff suffered academic, financial, and emotional damages, including loss of stipend and research opportunities, derailment of his Ph.D. trajectory, and severe emotional distress. **Defendant's conduct denied Plaintiff equal access to program benefits and services, rather than**

**involving discretionary academic evaluation.**

132.   Plaintiff requests declaratory and injunctive relief declaring that Defendant's revocation of Plaintiff's approved disability accommodation violated Title III of the ADA and Section 504, reinstate reasonable modifications, restore Plaintiff's equal access to program benefits (including laboratory/research participation or a substantially equivalent placement), and implement ADA/§504-compliant interactive and grievance procedures; Plaintiff further seeks compensatory damages to the extent available under Section 504, declaratory relief, plus costs, fees (if authorized), interest, and such other relief as the Court deems just and proper.

**Count II— Retaliation**

**Against Defendant The Administrators of the Tulane Educational Fund**

**ADA, Title V and Section 504 of the Rehabilitation Act**

133.   Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

134.   At all relevant times, Defendant The Administrators of the Tulane Educational Fund ("Tulane") operated Tulane University and its graduate biomedical sciences program. Tulane receives federal financial assistance within the meaning of Section 504 of the Rehabilitation Act, 29 U.S.C. §794, including but not limited to federal research grants, student financial aid programs, and federally funded training awards.

135.   Plaintiff engaged in protected activity within the meaning of the ADA and Section 504 when he:

(a) requested a disability accommodation for his documented medical condition, and

(b) reported discrimination and retaliation to Tulane University, including through a formal grievance submitted by counsel.

**Adverse actions taken by University Agent after requesting accommodation for disability (Severe Fatty Liver Disease)**

136.   Defendant Tulane, acting through faculty member Dr. David Crosslin, was aware of Plaintiff's protected activity.

137.   Soon after Plaintiff engaged in protected activity: Travel Accommodation Request based on Medical Needs, Tulane—acting through Dr. Crosslin—retaliated against Plaintiff by:

(a) removing Plaintiff from his laboratory and research position,

(b) terminating all research and facility access,

(c) making knowingly false allegations of misconduct against Plaintiff,

(d) cutting off Plaintiff's stipend support while he was undergoing medical treatment

138.   There was no new performance, academic, or misconduct issues involving Plaintiff between the time Tulane approved the accommodation and the time it was revoked. The only material change during that period was Plaintiff's exercise of his ADA accommodation and his continued medical treatment. The revocation of the accommodation and the resulting exclusion were therefore because of Plaintiff's disability and his need for accommodation.

139.   As a result of this retaliation, Plaintiff suffered severe academic disruption, loss of research standing, financial harm, and the development and worsening of medically documented Major Depressive Disorder, a **disability** defined by ADA on its website.

**Threat of Dismissal after disclosing Disability (Major Depressive Disorder) and requesting grievance**

140.   After Plaintiff submitted a written grievance through counsel reporting discrimination and retaliation, Tulane—through its Counsel Greene and BMS program leadership—issued an ultimatum threatening to dismiss Plaintiff from the Ph.D. program if he did not secure a new dissertation advisor by September 25.  This threat was issued despite Tulane's actual knowledge that Plaintiff was medically disabled and suffering from Major Depressive Disorder.

141.   The temporal proximity between Plaintiff's protected activity and Tulane's adverse actions, combined with the absence of any legitimate academic or disciplinary basis, establishes a direct causal connection between Plaintiff's protected activity and the retaliation he suffered.

## Tulane University Agents

142.   Dr. David Crosslin is an associate professor at the School of Medicine and was Plaintiff's advisor.  Counsel Greene is an agent of Tulane University Office of the General Counsel.  **Tulane University may not disclaim, disavow, or exclude responsibility for Dr. Crosslin's adverse actions toward Plaintiff.**

143.   Counsel Greene acted solely as Tulane's legal representative relaying and communicating Tulane's institutional decisions.

## Requested Relief

144.   By engaging in the retaliatory conduct described above, Defendant Tulane violated the ADA's anti-retaliation provision, 42 U.S.C. §12203, and Section 504 of the Rehabilitation Act, 29 U.S.C. §794.

145.   As a direct and proximate result of Defendant's retaliation, Plaintiff has suffered academic, financial, emotional, and professional harm and is entitled to declaratory relief,

compensatory damages, injunctive relief, and any other relief deemed appropriate by the Court.

**Count III— Breach of Contract**

**Against The Administrators of the Tulane Educational Fund**

**Louisiana Civil Code art. 1906, 1927, 1983, 1994, 1995**

146.    Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

147.    Under Louisiana law, a valid and enforceable contract may arise through written policies, handbooks, or specific written commitments when a student reasonably relies on the promises made by an educational institution. Louisiana Civil Code art. 1906 defines a contract as "an agreement by two or more parties whereby obligations are created." Article 1927 further provides that a contract is formed by the consent of the parties, and that consent may be expressed not only in writing but also through conduct clearly indicative of agreement. Article 1983 states that contracts "have the effect of law for the parties" and must be performed in good faith.

148.    Louisiana courts consistently recognize that university handbooks, catalogs, written academic policies, and specific written commitments form part of the contractual relationship between a student and the institution.

149.    In Jones v. Administrators of the Tulane Educational Fund, the Fifth Circuit held that students plausibly alleged an implied-in-fact contract with Tulane arising from the university's representations and policies governing the educational experience. Although decided at the pleading stage, Jones squarely rejected the notion that student breach-of-contract claims against Tulane are categorically barred, and instead recognized that specific promises and reasonable reliance may give rise to enforceable contractual obligations.

150.   Tulane, the same Defendant in the above paragraph, made contractual commitments to Plaintiff through:

(a) the BMS Program Handbook, which sets forth binding expectations for laboratory placement, stipend eligibility, academic progress, and grievance procedures;

(b) Tulane's written disability accommodation policies, which promise a defined process for granting and maintaining medical accommodations; and

(c) Dr. David Crosslin's written approval of Plaintiff's disability accommodation, issued in his capacity as a faculty member and agent of Tulane University, and constituting an express written promise upon which Plaintiff reasonably relied.

(d) Tulane University Equal Opportunity Policy;

151.   Plaintiff fully complied with all academic and procedural requirements, including maintaining a GPA of 3.788, successfully completing all required Ph.D. coursework, and following Tulane's procedures for requesting disability accommodation.

152.   Tulane and its agents breached its contractual obligations by:

**Tulane's Agent Crosslin's Breach of BMS Handbook**

(a) Under the BMS Policy Handbook, a Dissertation Advisor is required to provide continuous academic supervision, participate in annual progress evaluation, and actively guide the student's research and training throughout the doctoral program. See BMS Handbook §II.B.8 (Ph.D. Milestones and Timelines); §II.B.7 (Individual Development Plan and Student Tracking Record).

Contrary to these obligations, Defendant Crosslin was repeatedly absent from campus, failed to maintain regular supervisory contact, and effectively abandoned

his role as Plaintiff's assigned Dissertation Advisor. His prolonged unavailability and lack of engagement constituted a failure to discharge the core mentoring and supervisory duties mandated by the BMS Handbook.

(b) the BMS Handbook requires that Ph.D. students complete an Individual Development Plan ("IDP") and Student Tracking Record annually, with meaningful participation and review by the Dissertation Advisor. Failure to complete these materials may result in disciplinary consequences only after proper academic process. *See* BMS Handbook §II.B.7. Plaintiff repeatedly requested Defendant Crosslin's participation and signature on the required IDP documentation.

Defendant Crosslin ignored these requests and failed to fulfill his supervisory obligations, thereby obstructing Plaintiff's compliance with program requirements. Defendant Crosslin may not rely on deficiencies he himself caused as a pretext for adverse academic action.

(c) the BMS Handbook mandates that a Ph.D. student's progress be reviewed through regular Dissertation Committee meetings, at which the Dissertation Advisor must candidly discuss the student's progress with the committee before any adverse academic determination. *See* BMS Handbook §II.B.8(a).

Defendant Crosslin bypassed all required committee review mechanisms and unilaterally determined Plaintiff's removal from the laboratory without convening a Dissertation Committee meeting, soliciting committee input, or involving BMS leadership. Such unilateral action directly contravenes the academic review structure established by the BMS Handbook.

(d) the BMS Handbook provides that academic probation, dismissal, or other

serious adverse actions may be imposed only through established institutional procedures, which include administrative review and access to appeal and grievance mechanisms. *See* BMS Handbook §IV.G.9–11 (Academic Probation, Dismissals, Student Appeals and Grievances).

Defendant Crosslin imposed severe adverse academic consequences—removal from the laboratory, loss of research access, and termination of financial support—without notice, hearing, committee review, or appeal. As an individual faculty member, Defendant Crosslin lacked authority to impose such sanctions outside the prescribed institutional process.

(e) the BMS Handbook characterizes doctoral stipends as programmatic financial support administered by the institution, not as discretionary benefits subject to unilateral withdrawal by an individual advisor. *See* BMS Handbook §III.E (Stipends).

Defendant Crosslin nevertheless purported to retroactively terminate Plaintiff's stipend without prior notice or institutional authorization. Such unilateral deprivation of programmatic financial support exceeded Defendant Crosslin's authority and violated the financial governance structure established by the BMS Handbook.

### Tulane's Agent Machado and Dean Hamm's Breach of Tulane's EO Policy

153.   At all relevant times, Defendants Lee Hamm and Heather Machado occupied senior administrative roles within Tulane University and were expressly designated as mandatory reporters under Section 3.1 of Tulane University's Equal Opportunity ("EO") Policy. Section 3.1 imposes a non-discretionary duty on designated administrators to promptly report to the Office of Institutional Equity ("OIE") any information suggesting discrimination,

harassment, retaliation, or other conduct implicating EO protections involving students.

154.   Both Defendants had actual notice of Plaintiff's disability, his approved accommodation, and the subsequent adverse academic and financial actions taken by Plaintiff's advisor. Despite the clear reporting obligation imposed by EO Policy §3.1, neither Defendant Hamm nor Defendant Machado reported the matter to OIE, initiated an EO referral, or ensured that anti-retaliation safeguards were implemented. Their failure to comply with Section 3.1 deprived Plaintiff of the procedural protections guaranteed under Tulane's EO framework and allowed the challenged conduct to proceed without institutional oversight.

### Tulane's Office of Institutional Equity's Breach of EO Policy

155.   Under Tulane University's Equal Opportunity ("EO") Policy, the Office of Institutional Equity ("OIE") is required to conduct and complete EO investigations within sixty (60) days. Plaintiff timely initiated the EO process and participated in an interview conducted by OIE on October 24, 2025.

156.   However, more than sixty days elapsed without any investigative findings, resolution, or corrective action being issued. OIE failed to complete the investigation within the timeframe mandated by the EO Policy.

157.   At present, it remains unclear whether this failure resulted from administrative negligence, lack of reasonable diligence, or from obstruction or noncooperation by Defendant Crosslin. Regardless of the underlying cause, OIE's failure to comply with the EO Policy's mandatory timeline deprived Plaintiff of the prompt and effective remedial process promised under Tulane's EO framework.

### Requested Relief

158.   Under Louisiana Civil Code arts. 1994 and 1995, an obligor who fails to perform

a conventional obligation is liable for damages, including losses sustained and lost benefits.

Tulane's breach of its contractual obligations directly caused Plaintiff to suffer significant

financial loss (including loss of stipend), interruption of academic progress, loss of research

and professional opportunities, and substantial emotional harm.

### COUNT IV —Intentional Infliction of Emotional Distress

### Against Defendant David Crosslin

### Louisiana Civil Code art. 2315

159.   Plaintiff incorporates all prior paragraphs as though fully set forth herein.

160.   Under Louisiana Civil Code art. 2315, any person whose intentional or reckless

conduct causes harm to another is liable for all resulting damages. Louisiana law recognizes

the tort of Intentional Infliction of Emotional Distress ("IIED"), which requires: (1) extreme

and outrageous conduct; (2) severe emotional distress; and (3) intent to cause emotional

distress or reckless disregard of the probability of causing such distress.

White v. Monsanto Co., 585 So.2d 1205 (La. 1991)

### <u>Why is Dr. Crosslin's conduct so outrageous?</u>

### <u>Comparison of This Case and White v Monsanto</u>

### <u>Supervisory Duty</u>

White v. Monsanto: Work Supervision

Zhao v Tulane: PhD Advisor- Student Supervision

161.   In White v Monsanto, the Louisiana Supreme Court evaluated IIED allegations

arising in a conventional workplace setting involving a supervisor–employee relationship.

While supervisory authority existed, the defendant in White v Monsanto did not control the

Plaintiff's livelihood in a manner comparable to the authority exercised here.

162.   By contrast, Defendant Crosslin was Plaintiff's Ph.D. advisor and NIH-funded Principal Investigator, occupying a position of far greater power and dependency. As Plaintiff's sole research supervisor, Crosslin possessed decisive control over Plaintiff's funding, laboratory access, academic standing, and ultimate ability to complete the Ph.D. program. Unlike an ordinary employment supervisor, Crosslin's authority extended to whether Plaintiff could graduate at all—an imbalance of power that exceeds the supervisory duty analyzed in White v Monsanto and heightens the outrageousness inquiry under Louisiana law.

### The Nature of the Action

White v. Monsanto: A Single Incident

Zhao v Tulane: A Series of Deceptive and Exploitative Conduct

163.   In White v Monsanto, the court addressed a discrete episode of verbal abuse occurring in the workplace. Here in Zhao v Tulane, Plaintiff alleges a course of conduct: Defendant Crosslin approved a disability accommodation, waited until Plaintiff was abroad and medically vulnerable, then revoked that accommodation; fabricated allegations to justify punitive action; terminated Plaintiff's funding without process; and escalated retaliatory measures aimed at exploiting Plaintiff's medical, financial, and immigration vulnerability.

### Plaintiff's Vulnerability

White v Monsanto: No vulnerability before the incident

Zhao v Tulane: Medically Diagnosed Liver Disease/ Disability

164.   In White v. Monsanto, the Louisiana Supreme Court evaluated alleged misconduct that occurred without any allegation that the Plaintiff was medically vulnerable or otherwise uniquely susceptible to severe emotional harm at the time of the incident.

165.   By contrast, in this case, Defendant Crosslin was fully aware that Plaintiff

suffered from a medically diagnosed liver disease and had requested, and received, a disability-related accommodation on that basis. Plaintiff's medical condition was not latent or speculative; it was documented, disclosed, and acknowledged before Defendant undertook the challenged actions.

## Major Depressive Disorder Suffered by Plaintiff

166. As a direct and foreseeable result of Defendant's actions, Plaintiff suffered severe emotional distress, including medically documented **Major Depressive Disorder (MDD)**. Plaintiff's emotional distress was profound and far exceeded the type of distress that accompanies ordinary academic disputes.

167. **Major Depressive Disorder is a disability** clearly defined on ADA's website.

## Crosslin's Action is far beyond Academic Discretion

168. Defendant Crosslin's conduct went beyond any legitimate academic or supervisory dispute and consisted of deliberate, malicious actions designed to exploit Plaintiff's medical, financial, and immigration vulnerability, conduct that cannot be characterized as mere academic discretion or contractual disagreement.

## Intent To Cause Emotional Distress

169. Defendant Crosslin acted with intent to cause emotional distress, or at minimum with reckless disregard of the probability of causing such distress. At the time of the challenged actions, Defendant Crosslin knew that Plaintiff was a medically vulnerable, international Ph.D. student whose enrollment, funding, and immigration status depended on continued laboratory placement and accommodation.

170. Nevertheless, Defendant Crosslin deliberately revoked the approved accommodation, fabricated academic justifications, retroactively terminated Plaintiff's stipend

without notice, ceased communication, and removed Plaintiff from the laboratory while Plaintiff was abroad. These actions were undertaken in circumstances where severe emotional distress was not merely foreseeable, but highly probable.

### The Fifth Circuit's IIED Standard Is Satisfied—And Exceeded

171.   Under Fifth Circuit precedent, including *White v. Monsanto Co.*, intentional infliction of emotional distress is established where conduct is extreme and outrageous, exceeds all possible bounds of decency, and is calculated to cause—or recklessly disregards the likelihood of causing—severe emotional harm.

172.   From Defendant's breach of a heightened **supervisory duty**, to his **exploitation of Plaintiff's known vulnerability**, to a **sustained series of deceptive actions** rather than an isolated incident, and ultimately to the severe consequences that resulted in **the development of a new, clinically diagnosed disability in addition to Plaintiff's preexisting disability**, Defendant's conduct was substantially more outrageous than that found sufficient for IIED liability in White v. Monsanto.

### Requested Relief

173.   Defendant Crosslin's extreme and outrageous conduct was a substantial factor in causing Plaintiff's severe emotional distress, academic derailment, financial loss, and personal suffering. Plaintiff is entitled to all damages available under Louisiana Civil Code art. 2315.

### COUNT V—Fraudulent Inducement

**Against Defendant Administrators of the Tulane Educational Fund**

**(By and Through Its Agent, Dr. David Crosslin)**

**La. Civil Code art. 1953, 1954 and 2315**

174.   Plaintiff re-alleges and incorporates all preceding paragraphs as though fully set

forth herein.

175.   Under La. Civil Code art. 1953, fraud is a misrepresentation or suppression of the truth made with the intention either to obtain an unjust advantage for one party or to cause a loss or inconvenience to another. Fraud may result from misrepresentation, silence, or inaction.  Under La. Civil Code art. 1954, fraud is not excused by a claim that the other party could have discovered the truth; nor does the possibility of verification bar a fraud claim. Fraud is also actionable as a tort under La. Civil Code art. 2315, which obligates individuals to repair damages caused by their intentional fault.

**The inducement: specific promises and concealment that Plaintiff reasonably relied upon**

176.   At all relevant times, Dr. David Crosslin acted as Tulane's agent and apparent agent with respect to Plaintiff's graduate training, supervision, funding, laboratory access, and accommodation-related arrangements. Crosslin exercised delegated institutional authority over matters integral to Plaintiff's contractual relationship with Tulane, including continuation in the Ph.D. program, stipend support, and compliance with disability accommodations.

177.   On March 12, 2025, Plaintiff disclosed his disability and requested a reasonable accommodation from Tulane: temporary remote research work while undergoing medical treatment, including travel to China for necessary testing and visa renewal. Defendant Crosslin, acting within the scope of his supervisory authority on Tulane's behalf, knew that Plaintiff's travel and visa renewal were integral to maintaining Plaintiff's contractual academic standing and lawful ability to return to the United States to continue the program.

178.   Between March 12 and March 26, 2025, Defendant Crosslin, acting as Tulane's agent, affirmatively represented—through written communications approving the requested arrangement—that Plaintiff's disability-related remote-work accommodation and medical

travel plan were approved by Tulane and would be honored. These approval communications were known to, copied to, or ratified by program administration and were consistent with Tulane's subsequent issuance of the required travel signature through OISS on April 4, 2025.

179.   At the time these representations were made, Defendant Crosslin, as Tulane's agent, suppressed material truths and failed to disclose facts he had a duty to communicate— namely, that Tulane did not intend to honor the approved accommodation and that Crosslin intended, or was substantially certain, to later recharacterize Plaintiff's approved arrangement as "not working remotely" and to revoke the accommodation after Plaintiff had departed the United States and become practically unable to protect his contractual and academic interests.

**Reliance: Plaintiff Was Induced to Enter Tulane's Contractual Relationship**

180.   In reasonable reliance on the representations made by Tulane through its agent Crosslin, Plaintiff consented to and continued his contractual relationship with Tulane and took critical, foreseeable actions, including:

(a) departing the United States for China to obtain medically necessary testing (including FibroScan), as represented to Crosslin;

(b) continuing to perform research work remotely during treatment abroad, as Crosslin had approved;

(c) proceeding with visa renewal steps to return to the United States promptly; and

(d) foregoing alternative protective actions that a reasonable student would otherwise pursue absent such approval—such as delaying travel, seeking immediate reassignment to another mentor before departing, escalating to institutional grievance channels as an emergency matter, or securing alternative

funding arrangements before leaving the country.

181.    Plaintiff's reliance was concrete and objectively reasonable. Plaintiff continued remote research work through July 31, 2025, and his documented work activity and research output confirm that he performed in accordance with the contractual arrangement Tulane, through its agent, induced him to accept.

**The Bait-and-Switch:Tulane's Nonperformance Revealed After Plaintiff Became Vulnerable**

182.    After Plaintiff departed for China pursuant to the approved accommodation, Defendant Crosslin—still acting under Tulane's authority—reversed course and, on July 31, 2025, issued communications asserting that Plaintiff's previously approved travel and remote-work arrangement would be revoked and recharacterized as "not working remotely."

183.    In the same July 31 communication, Crosslin retroactively terminated Plaintiff's stipend effective July 10, 2025, without advance notice. This action revealed Tulane's lack of intent to perform the contractual commitments it had induced Plaintiff to rely upon and foreseeably stranded Plaintiff abroad without financial support and with acute immigration and academic vulnerability.

184.    Crosslin's July 31 letter contained materially false statements and omissions, including pretextual allegations of misconduct or performance deficiencies that did not exist at the time of approval and that contradicted Crosslin's contemporaneous acknowledgments of Plaintiff's satisfactory work shortly before the adverse actions. These misrepresentations were employed to justify Tulane's nonperformance of the very arrangement used to induce Plaintiff's consent and reliance.

**Scienter and Intent — Tulane's Fraudulent Inducement Through Its Agent**

185.    The sequence and timing of events support a strong inference of scienter and

fraudulent intent attributable to Tulane through its agent Crosslin. Tulane approved Plaintiff's accommodation and travel plan, permitted Plaintiff to depart and remain abroad under that approval, and then repudiated the arrangement at a moment calculated to maximize Plaintiff's vulnerability and losses.

186.   The retroactive termination of Plaintiff's stipend—effective July 10, 2025, but disclosed only on July 31—demonstrates knowing and intentional conduct undertaken with awareness of Plaintiff's reliance and the foreseeable harm that Tulane's nonperformance would cause.

<u>**Causation and damages: reliance losses flowing from the inducement**</u>

187.   As a direct and proximate result of Tulane's fraudulent inducement, effected through its agent Crosslin, Plaintiff suffered substantial reliance-based and consequential damages, including loss of stipend and financial support; loss of laboratory access and research continuity; derailment of Plaintiff's Ph.D. trajectory; reputational injury within the program; and severe emotional distress, including medically diagnosed Major Depressive Disorder, **a disability defined by ADA** on its website.

188.   Plaintiff seeks all damages and relief available under Louisiana law for fraud and tortious fault, including compensatory damages for reliance losses, emotional distress damages, pecuniary losses, and all other relief the Court deems just and proper.

**COUNT VI—Negligent Supervision, Training, and Negligence**

**Against Defendants The Administrators of the Tulane Educational Fund, Lee Hamm, and**

**Heather Machado**

**Louisiana Civil Code art. 2315, 2316**

189.   Plaintiff re-alleges and incorporates all preceding paragraphs as though fully set

forth herein.

190.    Under Louisiana Civil Code arts. 2315 and 2316, a defendant is liable for damages caused by negligence, imprudence, or failure to act with reasonable care. Negligence under Louisiana law requires: (1) a duty owed by the defendant; (2) breach of that duty; (3) cause-in-fact; (4) legal causation (scope of duty); and (5) actual damages. Boykin v. La. Transit Co., 707 So.2d 1225 (La. 1998).

191.    Louisiana law further recognizes claims for negligent supervision and training, where an employer or supervising authority fails to exercise reasonable care over employees who wield discretionary authority over vulnerable individuals, and where such failures create a foreseeable risk of harm. Roberts v. Benoit, 605 So.2d 1032 (La. 1991).

### Duties Owed by Tulane University

192.    Defendant The Administrators of the Tulane Educational Fund ("Tulane") owed Plaintiff multiple, overlapping duties arising from its role as:

(a) an educational institution responsible for graduate student training;

(b) an employer of faculty and administrators; and

(c) a recipient and administrator of federally funded graduate and research programs.

193.    These duties included, but were not limited to:

(a) exercising reasonable care in the supervision of faculty and administrators who exercised control over graduate students' funding, research access, and academic standing;

(b) providing adequate training on ADA and Section 504 compliance, anti-retaliation obligations, and accommodation implementation;

(c) monitoring faculty conduct for warning signs of misconduct or civil-rights violations; and

(d) taking reasonable corrective or protective action when on notice of foreseeable risks to students; and

(e) managing and reporting faculty member's outside conflict of interest

## Duties Owed by Defendants Hamm and Machado

194.   Defendants Dean Lee Hamm and Dr. Heather Machado owed Plaintiff independent, non-discretionary duties arising from their administrative positions and Tulane's published policies, including mandatory reporting obligations under Tulane's Equal Opportunity Policy, which required supervisors and administrators to report allegations of discrimination, retaliation, or civil-rights violations to the Office of Institutional Equity ("OIE").

195.   Hamm and Machado further owed duties to intervene, escalate concerns, and implement interim protections when notified that a student was facing disability-related discrimination, retaliation, or academic harm.

## Tulane's Breach: Negligent Supervision and Training

196.   Tulane breached its duties by failing to reasonably supervise Dr. David Crosslin despite clear warning signs, including:

(a) revocation of an approved disability accommodation;

(b) fabrication or misrepresentation of academic allegations;

(c) unilateral removal of Plaintiff from the laboratory without process; and

(d) retroactive termination of Plaintiff's stipend while Plaintiff was medically vulnerable and abroad

197.   Tulane further breached its duties by failing to provide adequate training to faculty and administrators—including Crosslin, Machado, and Hamm—regarding disability accommodation requirements, anti-retaliation protections, and mandatory reporting obligations, thereby creating a systemic risk of civil-rights violations against disabled students.

**<u>Tulane's Breach: Institutional Failure to Enforce and Apply Existing Policies</u>**

198.   Tulane maintained written policies and governing documents, including the BMS Handbook and Equal Opportunity policies, which regulated faculty conduct, disability accommodations, academic supervision, and student protections. Dr. Crosslin's actions—including the revocation of an approved disability accommodation, unilateral removal of Plaintiff from laboratory activities, and retroactive termination of stipend support—were contrary to and outside the bounds of those established policies and norms.

199.   Once Dr. Crosslin acted in violation of Tulane's own rules, Tulane's existing policies provided no mechanism to protect Plaintiff, remediate the harm, or ensure continuity of supervision and funding. Instead of enforcing its policies or initiating corrective procedures, Tulane permitted the situation to be governed by ad hoc administrative discretion, leaving Plaintiff without any effective institutional remedy.

200.   In particular, after Plaintiff submitted grievance request through counsel, Tulane required Plaintiff to secure a new faculty advisor within twenty-one (21) days as a condition of continuing in the program. This requirement is not set forth in any written Tulane or BMS policy and was described by Defendant Machado as a matter of "discretion," rather than rule-based process. The imposition of an unwritten, discretionary requirement in response to faculty misconduct constituted an institutional failure to enforce Tulane's own policies and breached Tulane's duty of reasonable care to Plaintiff.

**Hamm and Machado's Breach: Failed to Report the Incident to OIE**

201.  Defendants Hamm and Machado were directly notified of Crosslin's discriminatory and retaliatory conduct, including revocation of accommodation, false accusations, stipend termination, and laboratory removal.

202.  Despite mandatory obligations under Tulane's Equal Opportunity Policy Section 3.1, Hamm and Machado failed to report the conduct to OIE, failed to pause adverse academic actions, and failed to implement any interim protections or alternative supervision. **Plaintiff was informed of the Office of Institutional Equity (OIE) by Tulane's counsel Greene.**

203.  Dean Hamm failed to appoint an alternative advisor to Plaintiff, while he possesses this right at all times.

**Causation and Foreseeability**

204.  Defendants' failures created a foreseeable and unreasonable risk of harm to Plaintiff, a medically vulnerable international Ph.D. student whose academic status, funding, and immigration stability depended on institutional oversight and protection.

205.  But for Defendants' negligent supervision, training, and failure to act, Plaintiff would not have suffered the academic disruption, financial loss, psychological injury, and professional harm described herein.

**Actual Damages**

206.  As a direct and proximate result of Defendants' negligence, Plaintiff suffered:

> (a) financial harm, including loss of stipend and support;
>
> (b) academic harm, including disruption and derailment of his Ph.D. training;
>
> (c) emotional and psychological harm, including medically diagnosed Major
>
> Depressive Disorder, **a disability defined on ADA's website**; and

(d) professional harm, including loss of research opportunities and career

prospects.

207.   Plaintiff seeks all remedies available under Louisiana law for negligent

supervision, training, and negligence.

### COUNT VII— Defamation

### Against Defendant David Crosslin

### Louisiana Civil Code art. 2315

208.   Plaintiff re-alleges and incorporates all preceding paragraphs as though fully set

forth herein.

209.   Under Louisiana law, defamation consists of: (1) a false and defamatory

statement concerning another; (2) an unprivileged publication to a third party; (3) fault on the

part of the speaker; and (4) resulting injury. Fitzgerald v. Tucker, 737 So.2d 706 (La. 1999).

### <u>False and defamatory statement concerning the Plaintiff</u>

210.   Defendant Dr. David Crosslin authored written communications containing false

statements of fact concerning Plaintiff, including falsely asserting that Plaintiff "was not

working remotely" during a medically necessary and previously approved accommodation

period, despite Crosslin's prior written approval of Plaintiff's remote work and medical travel

and despite objective evidence of Plaintiff's diligent remote research activity, including

contemporaneous email outputs and the publication of Plaintiff's research abstract on the

American Diabetes Association website.

211.   Crosslin falsely alleged that Plaintiff failed to attend a required one-on-one

meeting when, in fact, the meeting had been canceled by Crosslin himself, to justify the

statement that Plaintiff "was not working remotely".

212.   Approximately one week before authoring the false email accusing Plaintiff of not working remotely, Dr. Crosslin publicly praised Plaintiff's diligence and work performance during a group meeting. This stark temporal contradiction demonstrates that Dr. Crosslin knew, or at minimum recklessly disregarded, the falsity of his subsequent written statements when he later accused Plaintiff of failing to work remotely. Plaintiff possesses an audio recording of the group meeting confirming Dr. Crosslin's contemporaneous praise of Plaintiff's diligence and productivity.

213.   These statements were false, fabricated, and made with knowledge of their falsity or with reckless disregard for the truth.

### Unprivileged Publication to Third Party

214.   Dr. Crosslin published these false allegations to at least one third party—specifically Dr. Machado, a senior administrator within the BMS program—thereby satisfying the publication requirement under Louisiana law. Communication to a university administrator constitutes publication.

### Qualified Privilege Is Defeated by Malice

215.   Dr. Crosslin's statements are not protected by any qualified or conditional privilege. The allegations were not made in good faith, were not based on reasonable investigation, and were knowingly false or recklessly made. Moreover, the statements were communicated for the improper purpose of justifying adverse and retaliatory actions against Plaintiff, rather than for any legitimate academic or administrative review. Such conduct falls outside the scope of any recognized academic privilege under Louisiana law.

### Malicious, Deceptive and Illegal Action

216.   Dr. Crosslin made these false statements for the purpose of justifying his

unlawful revocation of Plaintiff's previously-approved disability accommodation, removal of Plaintiff from the research laboratory, and elimination of Plaintiff's stipend and academic standing.

217.   At the time Dr. Crosslin made these allegations, every incident he cited as purported misconduct occurred, if at all, before Plaintiff ever requested his accommodation, and none arose after Dr. Crosslin granted it, except for the one-on-one meeting in question. The allegations were pretextual, retaliatory, and malicious.

218.   Even if the academic allegations asserted against Plaintiff were true—which Plaintiff denies—such allegations cannot lawfully serve as a basis to rescind a disability accommodation. Under the ADA and Section 504, an institution may not withdraw an approved accommodation as punishment, as a disciplinary measure, or in response to unrelated academic disputes. Revoking an accommodation on these grounds is per se discriminatory and unlawful, because it conditions a student's disability-related rights on academic compliance and weaponizes necessary medical accommodation as leverage. Tulane's withdrawal of Plaintiff's accommodation was therefore unlawful regardless of the underlying academic accusations.

### Severe Harm Suffered

219.   As a direct and proximate result of Dr. Crosslin's defamatory statements, Plaintiff suffered severe harm, including but not limited to: loss of stipend, loss of research and academic opportunities, reputational damage within the program, Major Depressive Disorder, **a disability defined on ADA's website**, and damage to future academic and professional prospects.

220.   Plaintiff is entitled to all damages permitted under Louisiana law for defamation,

including general damages, special damages, emotional distress damages, and all other relief
the Court deems proper.

### COUNT VIII— Abuse of Rights

### Against Defendant David Crosslin

### La. Civil Code art. 2315

221.   Plaintiff re-alleges and incorporates all preceding paragraphs as though fully set
forth herein.

222.   Louisiana recognizes the civil doctrine of Abuse of Rights, which imposes
liability when a person exercises an otherwise valid right (a) with the predominant motive to
harm another, (b) without any legitimate or serious interest, (c) in a manner that is
unreasonable or excessive, or (d) in violation of moral rules, good faith, or elementary
fairness.

### Abusive Exercise of Supervisory and Academic Authority

223.   At all relevant times, Defendant Crosslin possessed delegated supervisory and
academic authority over Plaintiff's funding, laboratory access, research supervision, and
academic standing. That authority was granted for the legitimate purposes of mentoring,
academic evaluation, and ensuring the orderly progress of Plaintiff's Ph.D. training.

224.   Rather than exercising this authority in furtherance of those legitimate academic
purposes, Defendant Crosslin engaged in a sustained and bad-faith pattern of conduct that
departed from institutional norms and served retaliatory and punitive objectives unrelated to
any bona fide academic interest.

### Predominant Motive to Cause Harm / Absence of Legitimate Purpose

225.   The facts alleged herein support a reasonable inference that Defendant Crosslin's

predominant motive was to harm Plaintiff and force his removal from the program after Plaintiff sought and obtained disability-related accommodations, rather than to address any genuine academic concern.

226.   Defendant Crosslin approved Plaintiff's disability-related remote-work and medical travel accommodation, induced Plaintiff to rely on that approval, and permitted Plaintiff to depart the United States. Only after Plaintiff became medically vulnerable and practically unable to protect his interests did Crosslin reverse course, revoke the accommodation, retroactively terminate Plaintiff's stipend, and remove Plaintiff from laboratory access.

227.   These actions were not taken to advance any legitimate academic objective. No new performance issues arose after the accommodation was approved, and Crosslin's post hoc allegations directly contradicted his own prior acknowledgments of Plaintiff's diligence and satisfactory work.

## Bad Faith, Pretext, and Deviation from Institutional Norms

228.   Defendant Crosslin further abused his rights by fabricating or exaggerating academic allegations as pretext to justify adverse actions already decided upon, including falsely asserting that Plaintiff "was not working remotely" despite written approval and objective evidence of Plaintiff's continued research output.

229.    Defendant Crosslin's conduct violated principles of good faith and elementary fairness by imposing the most severe possible consequences—loss of funding, loss of laboratory access, and effective derailment of Plaintiff's Ph.D. trajectory—without notice, proportionality, or procedural safeguards, and at a time calculated to maximize Plaintiff's vulnerability.

## Use of Authority for an Improper Purpose

230.   Defendant Crosslin exercised supervisory and academic authority for purposes wholly divorced from those for which such authority was granted, including to retaliate against Plaintiff for seeking disability accommodations, to punish Plaintiff for asserting protected rights, and to construct a post hoc narrative to shield himself from institutional scrutiny.

## Harms Caused

231.   As a direct and proximate result of this abuse of rights, Plaintiff suffered substantial damages, including loss of stipend, disruption of academic progress, reputational harm, emotional distress, development of Major Depressive Disorder (MDD), **a disability defined on ADA's website**, and the ultimate loss of the opportunity to complete his Ph.D. program.

232.   Plaintiff seeks all available damages under Louisiana law for abuse of rights, including economic damages, general damages, emotional distress damages, and any additional relief the Court deems appropriate.

## COUNT IX— National Origin Discrimination

### Against Defendant The Administrators of the Tulane Educational Fund

### Title VI of the Civil Rights Act of 1964

233.   Defendant The Administrators of the Tulane Educational Fund ("Tulane") receives federal financial assistance and is therefore subject to Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d et seq., which prohibits discrimination based on race, color, or national origin under any program or activity receiving such assistance.

## Protected Class Based On National Origin

234.   Plaintiff is a Chinese national and graduate student in Tulane's Biomedical

Sciences Ph.D. program. His national origin is protected under Title VI.

235.   In March 2025, Plaintiff requested a reasonable accommodation to conduct research remotely while undergoing necessary medical treatment and visa renewal in China. Tulane, acting through its agent and faculty member Dr. David Crosslin, initially approved this accommodation.  The BMS administrators were also informed of this approval on March 26, 2025.

### Direct Adverse Action Regarding Plaintiff's National Origin

236.   After Plaintiff traveled to China and began medical treatment, Dr. Crosslin— acting on behalf of and with authority from Tulane—abruptly revoked the previously approved accommodation, removed Plaintiff from his lab, and terminated his stipend and research access.

237.   This revocation occurred while Plaintiff was abroad and at a particularly vulnerable time, as he was undergoing medical treatment and renewing his F-1 visa. The abrupt reversal placed Plaintiff at serious academic, financial, and immigration risk, despite his compliance with program obligations and documentation of medical need.

### Intentional Discrimination and Proxy

238.   The facts alleged support a plausible inference of intentional discrimination based on national origin. Defendant Crosslin, Tulane's agent, acted with actual knowledge of Plaintiff's status as a Chinese national, his dependence on lawful immigration status, and the heightened risks associated with being outside the United States during visa renewal.

239.   Rather than acting pursuant to neutral academic considerations, Tulane's Agent, Defendant Crosslin deliberately selected the timing and manner of the adverse actions to exploit Plaintiff's immigration-related vulnerability while he was abroad and undergoing

medical treatment. This purposeful targeting, coupled with disparate treatment of U.S.-born students who did not face comparable immigration exposure, supports the inference that national origin was a motivating and substantial factor in the challenged conduct, satisfying the intent requirement under Title VI.

240.   Dr. Crosslin used the immigration status exploitation as a proxy to discriminate against the Plaintiff based on National Origin.

### Disparate Treatment based on National Origin

241.    Defendant, acting through Dr. David Crosslin, granted academic and travel accommodations and flexibility to U.S. born students under comparable circumstances, yet denied such accommodations to Plaintiff.

242.    None of the U.S.-born Ph.D. students in Dr. Crosslin's group were subjected to adverse action as a result of travel.

### Plaintiff Was Otherwise Qualified For The Academic Goal Pursued

243.   Plaintiff had no academic deficiencies and was meeting all programmatic expectations at the time of the adverse actions, maintaining a GPA of 3.788 and completing all required Ph.D. coursework. Accordingly, the adverse actions taken against Plaintiff cannot be explained by academic performance and instead support an inference of discriminatory motive.

### Tulane's Agent Dr. Crosslin

244.   At all relevant times, Dr. David Crosslin was an Associate Professor at Tulane University and Plaintiff's dissertation advisor, acting as Tulane University's agent in administering its doctoral program. Tulane University placed Dr. Crosslin in a position of supervisory and evaluative authority over Plaintiff, and is therefore responsible for acts

undertaken under that authority. Accordingly, although Dr. Crosslin's actions violated multiple internal Tulane policies, which are specified in the Breach of Contract Count, **Tulane University may not disclaim, disavow, or exclude responsibility for Dr. Crosslin's adverse actions toward Plaintiff.**

<u>**Severe Consequences Suffered**</u>

245.    As a direct and proximate result of this discriminatory conduct, Plaintiff suffered:

    a)   Loss of access to federally funded education programs and benefits;

    b)   Documented Major Depressive Disorder**, a disability defined on ADA's website**;

    c)   Financial losses due to lost stipend and treatment-related travel;

    d)   Damage to academic and professional advancement.

246.   Plaintiff seeks all remedies available under Title VI, including compensatory damages, injunctive and declaratory relief, and any further relief deemed just and proper by the Court.

**V.    Prayer for Relief**

1.    **<u>Compensatory damages</u>** for emotional distress, financial losses, loss of educational opportunity, medical expenses, and all other damages sustained as a result of Defendants' conduct;

2.    **<u>Back pay</u>** and restitution of all stipend payments, benefits, or financial support wrongfully withheld or terminated by Defendants;

3.    **<u>Front pay</u>** or equivalent educational/financial remedies to compensate Plaintiff for the disruption of his doctoral degree and professional trajectory;

    4.      **Injunctive relief** requiring Defendant Tulane University to:

        a. restore Plaintiff's program standing if Plaintiff elects to continue,

        b. implement and enforce ADA/§504–compliant accommodation procedures,

        c. implement anti-retaliation safeguards and training for faculty and administrators;

    5.      **Declaratory relief** affirming that Defendants' actions violated Plaintiff's rights under the ADA, Rehabilitation Act, Title VI, and Louisiana State laws;

## VI.    Jury Trial Is Demanded

## VII.    Certification and Closing

Respectfully Submitted,

Date of signing:    2/4/2026

Signature of Plaintiff:    _Yuezhao_

Printed Name of Plaintiff___ Yue Zhao

Address:  500 Aries Dr Apt 5A

Mandeville, LA 70471

Tel: 504-261-1861 (Counsel May Reach me at this number)

Certification of Service

I hereby certify that on this 4th day of February, 2026, a true and correct copy of the foregoing filing was submitted by the Pro Se Plaintiff through the Court's **Electronic Document Submission System (EDSS)** for filing with the Clerk of Court for the United States District Court for the Eastern District of Louisiana. Upon filing by the Clerk on the Court's CM/ECF system, service was thereby effected upon all counsel of record for Defendants, each of whom is registered to receive electronic service through CM/ECF.