## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

**YUE ZHAO**

**VERSUS**

**THE ADMINISTRATORS OF THE TULANE EDUCATIONAL FUND; DAVID CROSSLIN; HEATHER MACHADO; LEE HAMM**

**CIVIL ACTION NO.  2:25-cv-2474**

**JUDGE SARAH S VANCE**

**MAGISTRATE JUDGE EVA J. DOSSIER**

### MEMORANDUM IN SUPPORT OF DEFENDANTS' RULE 12(B)(6) MOTION TO DISMISS

**MAY IT PLEASE THE COURT:**

Defendants David Crosslin ("Dr. Crosslin"), Heather Machado ("Dr. Machado"), and Lee Hamm ("Dr. Hamm") (collectively, the "Individual Defendants"), and The Administrators of the Tulane Educational Fund ("Tulane") respectfully submit this Memorandum in Support of their Motion to Dismiss all claims against them in the Amended Complaint filed by Pro-Se Plaintiff, Yue Zhao ("Plaintiff"). As shown below and in the original Motions to Dismiss filed by Defendants,[1] Plaintiff's Amended Complaint fails to sufficiently allege essential facts in support of his claims against Defendants, including Discrimination and Failure to Accommodate under the Americans with Disabilities Act ("ADA") and the Rehabilitation Act ("Section 504") (Count I), Retaliation under the ADA and Section 504 (Count II), Breach of Contract (Count III), Intentional Infliction of Emotional Distress (Count IV), Fraudulent Inducement (Count V), Negligent Supervision, Training, Retention, and Gross Negligence (Count VI), Defamation (Count VII), Abuse of Rights (Count VIII), and National Origin Discrimination under Title VI of the Civil Rights Act of 1964 ("Title VI") (Count XII), as a matter of law. Therefore, for the reasons herein

---

[1] R. Doc. 6, R. Doc. 7. As discussed herein, Defendants incorporate and adopt all arguments made in the original Motions to Dismiss. Where Plaintiff has failed to remedy his original pleading deficiencies with this amendment,

and in the original Motions to Dismiss, all claims asserted in the Amended Complaint should be dismissed, *with prejudice*.

## I.    PROCEDURAL HISTORY AND FACTUAL ALLEGATIONS

### A.    Relevant Procedural History

Plaintiff commenced this action on December 9, 2025 with a 184-paragraph, 46-page complaint alleging numerous conclusory, repetitive, and contradictory allegations against Defendants. The Individual Defendants and Tulane each filed Motions to Dismiss pursuant to Rule 12(b)(6) on January 30, 2026.[2]  The original Complaint included twelve causes of action, discussed in detail in Defendants' original Motions to Dismiss. On February 6, 2026, Plaintiff amended his allegations with the operative Amended Complaint of 246 paragraphs over 52 pages, removing two of Plaintiff's former claims for relief entirely.[3] Both Tulane's Motion to Dismiss and the Individual Defendants' original Motions to Dismiss remain pending, and Plaintiff has not opposed either motion; accordingly, both are fully submitted before the Court.[4] Plaintiff's amendments infuse elements of Plaintiff's Detrimental Reliance claim into his Breach of Contract claim and reframe his Fraud claim as "Fraudulent Inducement." Plaintiff also adds some new, conclusory facts, detailed herein, to attempt to remedy his pleading deficiency. Defendants adopt and maintain all arguments made in their original Motions to Dismiss and file this additional Motion to Dismiss with respect to the new and supplemental arguments asserted in the Amended Complaint.

### B.    Factual Allegations

This is the case of an international graduate student who, while remaining enrolled in his Ph.D. program at Tulane, disagrees with the academic and administrative decisions of the

---

[2] R. Doc. 6 (Tulane's Motion to Dismiss); R. Doc. 7 (Individual Defendants' Motion to Dismiss).
[3] Plaintiff removed his claims for Hostile Educational Environment (original Count III) and Failure to Provide Accommodation Procedures (original Count XI).
[4] R. Doc. 6, R. Doc. 7.

2

university. Plaintiff is an international student in the Biomedical Sciences Ph.D. program at Tulane.[5] He is not an employee of Tulane.[6] He is a citizen of China and is participating in the Ph.D. program as an F-1 visa holder.[7] As a Ph.D. student, Plaintiff is enrolled in a program of study that requires participation in a research laboratory.[8] His supervisor in the dry laboratory where he worked on computational analysis, as well as his dissertation advisor, was defendant Dr. David Crosslin.[9] Plaintiff contends that he was wrongly removed from Dr. Crosslin's laboratory after he submitted an "Individual Development Plan" in June/July 2025, which Dr. Crosslin did not approve.[10]  Instead, on July 31, 2025, Plaintiff was cited for "misconduct" and "performance issues" occurring during his tenure in the dry lab and his failure to attend meetings, one of which Plaintiff alleges Dr. Crosslin canceled without notice.[11] Plaintiff alleges that these cited issues by Dr. Crosslin, with the exception of the referenced canceled meeting, occurred prior to when he purportedly requested and obtained an "accommodation" to work remotely in China.[12]

According to Plaintiff, at an unspecified time, he began experiencing liver dysfunction and was diagnosed with "Severe Fatty Liver Disease," which he concludes "constitutes a disability under the ADA."[13] He alleges this condition required him to undergo a diagnostic procedure not readily available to him in the United States within "four to five months," which was not within

---

[5] R. Doc. 13 at ¶ 1. Defendants' statement of facts assumes Plaintiff's allegations are true for the purposes of this Motion to Dismiss only and does not otherwise concede the validity of any of Plaintiff's assertions.
[6] R. Doc. 13 at ¶ 7.
[7] R. Doc. 13 at ¶¶ 12, 177, 237.
[8] R. Doc. 13 at ¶¶ 7, 109.
[9] R. Doc. 13 at ¶¶ 2, 11, 22.
[10] R. Doc. 13 at ¶ 25.
[11] R. Doc. 13 at ¶¶ 26-31 .
[12] R. Doc. 13 at ¶ 31. Of note, and discussed further herein, the BMS Policy Handbook, attached hereto as Exhibit A by virtue of Plaintiff's incorporation of the document into his Amended Complaint by reference, provides that students seeking medical leave should request such leave from Student Resources and Support Services. Exhibit A, p. 36. Students seeking accommodations based on disability may request the same through the Goldman Center. Exhibit A, p. 37. Plaintiff did not use either of these avenues when seeking his "accommodation."
[13] R. Doc. 13 at ¶¶ 8-9.

the "medically recommended timeframe for further diagnostic evaluation."[14] On March 12, 2025, he alleges that he notified Dr. Crosslin of his condition and that he needed to work remotely while receiving medical treatment, requiring him to return to China for insurance purposes.[15] Dr. Crosslin approved this request on Plaintiff's representation that the arrangement was "**temporary and time-limited**, specifically **for a period of approximately two to three months**"[16] (emphasis original).[17] On March 14, 2025, Plaintiff alleges that he notified Dr. Heather Machado, the Assistant Dean of the program, who acknowledged his temporary remote work arrangement on March 21, 2025, relying on Plaintiff's representation about his condition.[18] She instructed him to submit the dates of his trip, which he does not specify in the Amended Complaint, and to notify the Office of International Students and Scholars, which approved his travel on April 4, 2025.[19] Plaintiff does not allege that he requested medical leave nor that he engaged in any process to request or obtain an accommodation for this alleged disability. In China, Plaintiff's diagnostic treatment allegedly showed "severe hepatic steatosis."[20] During his time in China, Plaintiff worked remotely for Dr. Crosslin and Dr. Yilin Yoshida.[21] Plaintiff did not return to the United States after "two to three months;" he remained in China until August 13, 2025.[22]

According to Plaintiff, he was advised on July 31, 2025, over three months after the approval of his travel on April 4, 2025, that due to his previously-cited performance and attendance issues, he would be removed from his laboratory assignment with Dr. Crosslin.[23] Following this,

---

[14] R. Doc. 13 at ¶ 10.
[15] R. Doc. 13 at ¶¶ 11-12. Notably, Plaintiff refers to "medical treatment" in his description of the request but only identifies "diagnostic evaluation" as the reason for his departure.
[16] R. Doc. 13 at ¶ 23.
[17] R. Doc. 13 at ¶¶ 15, 23.
[18] R. Doc. 13 at ¶¶ 17-18.
[19] R. Doc. 13 at ¶¶ 20-21.
[20] R. Doc. 13 at ¶ 24.
[21] R. Doc. 13 at ¶ 37.
[22] R. Doc. 13 at ¶ 42.
[23] R. Doc. 13 at ¶ 26.

4

on August 1, 2025, Plaintiff alleges that he "submitted evidence" to an unspecified entity to rebut his removal from the laboratory role.[24] On August 6, 2025, Dr. Machado notified him that Tulane would reimburse unpaid funds from the canceled stipend, but that to remain in good standing, he needed to find a new mentor by September 5, 2025.[25] Plaintiff acknowledges that he was able to continue participating in the Ph.D. program; he was not and has never been dismissed.[26]

On August 29, 2025, Plaintiff sent a demand letter to Dr. Hamm and the university "detailing the discriminatory and retaliatory conduct and requesting an administrative hearing."[27] He also emailed Dean Hamm of a second alleged disability, stating that he was now suffering from "severe depression and was under the care of a psychiatrist."[28] Tulane offered to extend his deadline to find another advisor through September 25, 2025.[29] Plaintiff refused this proposed accommodation, claiming it was not reasonable and that he should not be required to secure his own new mentor.[30] He was instructed to engage with Tulane's Office of Institutional Equity ("OIE"), which remains in the process of investigating his allegations.[31]

### C.    Plaintiff's Amended Theories of Law

Plaintiff's Amended Complaint leaves nine active claims against Defendants. The Individual Defendants and Tulane adopt and maintain all arguments made in their original Motions to Dismiss.[32] For the Court's ease of reference, this section provides an overview of the new and amended allegations in each Count contained in the Amended Complaint.

---

[24] R. Doc. 13 at ¶ 40.
[25] R. Doc. 13 at ¶ 41.
[26] R. Doc. 13 at ¶ 63.
[27] R. Doc. 13 at ¶ 43.
[28] R. Doc. 13 at ¶ 44.
[29] R. Doc. 13 at ¶ 47.
[30] R. Doc. 13 at ¶¶ 48-49.
[31] R. Doc. 13 at ¶¶ 53-54.
[32] R. Docs. 6, 7.

Count I (Discrimination and Failure to Accommodate) against Tulane alleges that Tulane violated Title III of the ADA, 42 U.S.C. § 12181(7), and Section 504, 29 U.S.C. § 794, of the Rehabilitation Act. In the original Complaint, Plaintiff only alleged his fatty liver disease as a "disability" and that Tulane was vicariously liable for Dr. Crosslin's initial approval of the "accommodation," resulting in a constructive expulsion.[33] The Amended Complaint removes references to a constructive expulsion and lists the revocation of his travel to China, alleged failure to engage in the interactive process, alleged disparate treatment, and failure of grievance procedures as the discriminatory conduct related to his liver disease.[34] He now also asserts that his alleged major depressive disorder developed after his removal from Dr. Crosslin's lab (previously a category of damages) is a second disability, and that Tulane failed to reasonably accommodate him based on this disability.[35] He seeks declaratory and injunctive relief in the form of reasonable modifications, access to program benefits, and implementation of grievance procedures, as well as compensatory damages under Section 504, costs, fees, and interest.[36]

Count II (Retaliation) against Tulane alleges that Plaintiff engaged in protected activity by requesting accommodations and reporting the alleged discrimination to Tulane, and that Tulane retaliated in violation of 42 U.S.C. § 12203 of the ADA and Section 504. He expands on the Complaint by alleging two forms of protected activity: (1) a request for accommodation; and (2) submission of a formal grievance regarding discrimination.[37] He alleges that Tulane retaliated by removing him from his research position after his request for accommodation, cancelling his stipend, and by issuing an "ultimatum threatening to dismiss Plaintiff from the Ph.D. program" if

---

[33] R. Doc. 1 at ¶¶ 51-59.
[34] R. Doc. 13 at ¶¶ 112-126.
[35] R. Doc. 13 at ¶¶ 123-129.
[36] R. Doc. 13 at ¶ 132.
[37] R. Doc. 13 at ¶ 135.

PD.61071327.1

he did not secure a new dissertation advisor by September 25 after his formal grievance.[38] In connection, he claims entitlement to declaratory, compensative, and injunctive relief.[39]

Count III (Breach of Contract) against Tulane is amended to allege four contracts, incorporated by reference in the Amended Complaint: (1) the BMS Program Handbook; (2) written disability accommodation policies; (3) Dr. Crosslin's approval of the "accommodation;" and (4) Tulane's Equal Opportunity Policy.[40] The specific alleged breaches are discussed in detail herein, but none of them meet the standard for alleging a breach of contract based on the actual terms of the referenced documents and Plaintiff's own allegations defeat any such breach of contract claim. For these breaches, Plaintiff claims entitlement to damages for financial loss, interruption of academic progress, loss of research and professional opportunities, and emotional harm.[41]

Count IV (Intentional Infliction of Emotional Distress) against Dr. Crosslin is largely unchanged from the Complaint. Plaintiff attempts to add detail implicating Dr. Crosslin's "decisive control" over Plaintiff's academic success to constitute a level of unreasonableness greater than that set forth by *White v. Monsanto Co.*,[42] failing to remedy that his allegations are conclusory and do not meet the high standard for proving IIED under Louisiana law.[43]

Count V (Fraudulent Inducement) is a new cause of action alleging similar facts to his original claim for fraud under Louisiana state law, with elements of his original detrimental reliance claim. Plaintiff alleges that Tulane, through Dr. Crosslin, made material misrepresentations of the truth regarding his accommodation request because "Tulane did not intend to honor the approved accommodation and . . . was substantially certain to later

---

[38] R. Doc. 13 at ¶¶ 137, 140.
[39] R. Doc. 13 at ¶ 145.
[40] R. Doc. 13 at ¶ 150.
[41] R. Doc. 13 at ¶ 158.
[42] 585 So. 2d 1205, 1209 (La. 1991).
[43] R. Doc. 13 at ¶¶ 161-165. R. Doc. 7, p.

recharacterize Plaintiff's approved arrangement" by revoking it.[44] He alleges that he relied on this representation by returning to China for medical purposes and that the "sequence and timing of events" related to the July 31, 2025 email removing him from the laboratory assignment constituted intent.[45] For this alleged fraudulent inducement, Plaintiff claims he is entitled to compensatory damages for reliance losses, emotional distress damages, and pecuniary losses.[46]

Count VI (Negligent Supervision, Training, Retention, and Gross Negligence), against Tulane and Drs. Hamm and Machado remains largely unchanged from the Complaint and remains unclear. Plaintiff adds some additional detail about the "overlapping duties"[47] of Tulane and Drs. Hamm and Machado, attempting to overcome the position articulated in the original Motions to Dismiss that there was no underlying tortious conduct.[48] However, the newly alleged "duties" are duplicative of those articulated in the breach of contract claim and do not remedy that the alleged conduct fails to meet the bar for proving an underlying tort claim. In any case, as outlined in the original Motions to Dismiss, Defendants are shielded by the doctrine of academic discretion.[49] Plaintiff still fails to state a claim for (1) negligent supervision of a student; (2) negligent supervision and training; or (3) gross negligence against the Individual Defendants or Tulane.

Count VII (Defamation) against Dr. Crosslin also remains largely unchanged. Plaintiff alleges that Dr. Crosslin wrote an email to Dr. Machado, "a senior administrator" in the Ph.D. program that contained "false statements" about Plaintiff's "purported misconduct,"[50] constituting a publication of a false statement to a third party. Plaintiff still does not specify exactly what those statements were. He now alleges that Dr. Crosslin and Dr. Machado's private communications

---

[44] R. Doc. 13 at ¶ 179.
[45] R. Doc. 13 at ¶¶ 180-81, 185-86.
[46] R. Doc. 13 at ¶ 188.
[47] R. Doc. 13 at ¶ 192.
[48] R. Doc. 6, p. 24.
[49] R. Doc. 6, p. 24. R. Doc. 7, p. 15-16.
[50] R. Doc. 13 at ¶¶ 210-213.

regarding academic matters and performance are not privileged due to "malice," but he but fails to allege anything beyond conclusory statements to prove such malice.

Count VIII (Abuse of Rights) against Dr. Crosslin adds some additional detail about the alleged "rights" abused by Dr. Crosslin, such as his supervisory authority. These new facts fail to meet the high bar for a plaintiff to prove an abuse of rights claim, which is applied sparingly in Louisiana. Nor do the amendments rebut or change that Dr. Crosslin's actions are protected by the doctrine of academic freedom, as articulated in the Individual Defendants' Motion to Dismiss.[51]

Count IX (Title VI National Origin Discrimination) against Tulane is amended to include additional details purporting to establish a disparate treatment claim, alleging that none "of the U.S.-born Ph.D. students in Dr. Crosslin's group were subjected to adverse action as a result of travel."[52] He still fails to plead any facts showing intent to discriminate, does not plead any specific discriminatory policy, and does not allege that Tulane had actual knowledge of this discrimination, as briefed in Tulane's original Motion to Dismiss.[53] To the extent that his new theory is disparate treatment, Plaintiff seeks compensatory damages, injunctive, and declaratory relief.[54]

## II.    LEGAL STANDARD

A motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure challenges the legal sufficiency of the complaint.[55] "To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead 'enough facts to state a claim to relief that is plausible on its face.'"[56] A court is not required to "accept labels, conclusions, or formulaic recitation of the elements of a cause of

---

[51] R. Doc. 7, p. 22-23.
[52] R. Doc. 13 at ¶ 242.
[53] R. Doc. 6, p. 25.
[54] R. Doc. 13 at ¶ 246.
[55] Fed. R. Civ. P. 12(b)(6). *Ramming v. United States,* 281 F.3d 158, 161 (5th Cir. 2001).
[56] *In re Katrina Canal Breaches Litig.,* 495 F.3d 191, 205 (5th Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544 (2007)).

action," and is not bound to accept legal conclusions couched as factual allegations.[57] "Indeed, the Court must first identify allegations that are conclusory and, thus, are not entitled to the assumption of truth." Factual allegations "must be enough to raise a right to relief above the speculative level."[58] "Conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to [defeat] a motion to dismiss."[59] "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."[60] Moreover, "[d]ismissal is proper if the complaint lacks an allegation regarding a required element necessary to obtain relief."[61] A court may examine "any documents attached to the complaint, and any documents attached to the motion to dismiss that are central to the claim and referenced by the complaint."[62] Under this standard, Plaintiff has failed to state any claim for relief, and so his claims must be dismissed.

## III.    ANALYSIS

### A.    Defendants Adopt All Arguments Made in their Original Motions to Dismiss Filed in Response to Plaintiff's Amended Complaint

In the Fifth Circuit, defendants are not required to file new motions to dismiss when a plaintiff amends their Complaint while the defendant's original motion to dismiss is pending. "If some of the defects raised in the original motion remain in the new pleading, the court simply may consider the motion as being addressed to the amended pleading." [63] Therefore, where the Amended Complaint does not remedy the deficiencies of the original Complaint, Defendants reaffirm the arguments made in their original Motion to Dismiss. Because the allegations remain defective in Plaintiff's Amended Complaint for the same reasons, no further response from

---

[57] *Twombly*, 550 U.S. at 555; *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).
[58] *Currier v. Entergy Servs., Inc.*, 2014 WL 1093687, at *5 (E.D. La. Mar. 14, 2014).
[59] *Jones v. Alcoa, Inc.*, 339 F.3d 359, 362 (5th Cir. 2003).
[60] *Ashcroft*, 556 U.S. at 678.
[61] *Campbell v. City of San Antonio*, 43 F.3d 973, 975 (5th Cir. 1995).
[62] *Emden v. Museum of Fine Arts, Houston*, 103 F.4th 308, 313 n. 8 (5th Cir. 2024), *cert. denied sub nom. Emden v. The Museum of Fine Arts, Houston*, 145 S. Ct. 444, 220 L. Ed. 2d 191 (2024)
[63] *See Rountree v. Dyson*, 892 F.3d 681, 683-84 (5th Cir. 2018).

Defendants is necessary. This applies to Plaintiff's claims for Intentional Infliction of Emotional Distress (Count IV), Negligent Supervision, Training, Retention, and Gross Negligence (Count VI), Defamation (Count VII), and Abuse of Rights (Count XIII), for which the new and additional conclusory allegations in Plaintiff's Amended Complaint do not remedy the deficiencies outlined in the original Motions to Dismiss filed by Tulane and the Individual Defendants.[64]

In this Motion, Defendants address Plaintiff's amended claims for Discrimination and Failure to Accommodate (Count I), Retaliation (Count II), Breach of Contract (Count III), Fraudulent Inducement (Count V), and Title VI National Origin Discrimination (Count IX), all of which should be dismissed with prejudice for failure to state a claim for relief.

### B.    Plaintiff's ADA and Section 504 Claims, Alleged Concurrently, Cannot Succeed as a Matter of Law and Should Be Dismissed.

As briefed in Tulane's Motion to Dismiss, Plaintiff's claims under the Americans with Disabilities Act and Section 504 of the Rehabilitation Act are alleged concurrently and so should be analyzed concurrently.  The ADA and the Rehabilitation Act are interpreted *in pari materia*."[65] The one difference is the entities governed by each statute: Title III of the ADA applies to places of public accommodation, such as educational institutions, and Section 504 applies to federally-funded programs and activities."[66] "The RA and the ADA are judged under the same legal

---

[64] R. Doc. 6, R. Doc. 7. The Individual Defendants specifically maintain the position that Plaintiff's claims under the ADA, Section 504, and Title VI cannot proceed against them to the extent alleged because there is no individual liability under those statutes, as briefed in the Individual Defendants' Motion to Dismiss. *See* R. Doc. 7, p. 11-12.

[65] *Bailey v. Bd. of Commissioners of Louisiana Stadium & Exposition Dist.*, 484 F. Supp. 3d 346, 363-64 (E.D. La. 2020), *aff'd sub nom. Bailey v. France*, 852 F. App'x 852 (5th Cir. 2021).

[66] *Ward v. Franciscan Missionaries of Our Lady Univ.*, No. CV 22-220-JWD-SDJ, 2024 WL 4256334 at *13 (M.D. La. Sept. 20, 2024).

standards, and the same remedies are available under both Acts."[67] "Likewise, the relevant definition of disability set forth in the ADA is applicable to claims made under the RA."[68]

>    ### i.    Plaintiff's Liver Disease Does Not Make Him a Qualifying Individual With a Disability Based on the Accommodations Sought (Counts I and II).

The ADA defines "disability" as "a mental or physical impairment [which] must substantially limit an individual's ability to perform at least one major life activity."[69] "Merely having an impairment" is not enough to qualify as disabled—a plaintiff "also need[s] to demonstrate that the impairment substantially limits a major life activity."[70] Whether an impairment is substantially limiting depends on "its nature and severity, its duration or expected duration, and its permanent or expected permanent or long-term impact."[71] "[A] plaintiff must prove a substantial limit with specific evidence that *his particular* impairment substantially limits *his particular* major life activity."[72] For example, a security officer whose hearing impairment was remedied by wearing hearing aids was determined to not have a disability under the ADA or Rehabilitation Act because there was no substantial limit to any major life activity.[73]

Plaintiff now describes two disabilities which he claims to suffer from. With respect to his liver condition, Plaintiff concludes that his condition "substantially limits the major life activity of digestive function."[74] Plaintiff makes no connection between his alleged impaired digestive function and the ability to perform his laboratory research in the dry lab where he worked. He does

---

[67] *Kemp v. Holder*, 610 F.3d 231, 234 (5th Cir. 2010). *See also Delano–Pyle v. Victoria County, Tex.*, 302 F.3d 567, 574 (5th Cir. 2002) ("The language in the ADA generally tracks the language set forth in the RA," and "[j]urisprudence interpreting either section is applicable to both.").
[68] *Id.* at 234-35.
[69] *Waldrip v. Gen. Elec. Co.*, 325 F.3d 652, 655 (5th Cir. 2003).
[70] *Mueck v. La Grange Acquisitions, L.P.*, 75 F.4th 469 (5th Cir. 2023), *as revised* (Aug. 4, 2023)
[71] *Dupre v. Charter Behavioral Health Sys. of Lafayette Inc.*, 242 F.3d 610, 614 (5th Cir. 2001).
[72] *Waldrip*, 325 F.3d at 656.
[73] *Kemp*, 610 F.3d at 236.
[74] R. Doc. 13 at ¶ 9.

not allege that his impaired digestive function would be accommodated by a remote working arrangement, nor that travel to China was required to treat his alleged limited digestive function. Instead, Plaintiff alleges he had to go to China to obtain "further diagnostic testing" over the course of "two to three months," after which he could return to the U.S.[75] In fact, he alleges that he *did* go to China to obtain this diagnostic treatment and that he received his alleged diagnosis of severe hepatic steatosis while there.[76] Simply having a medical condition does not constitute a disability under the ADA.[77] That is especially the case here as Plaintiff's allegations are limited to needing a diagnostic test because of an alleged medical condition. His conclusory statements thus fail as a matter of law to allege that he is a qualifying individual with a disability.

Based on this significant deficiency of pleading, Plaintiff's Complaint, and in particular, Counts I and II, must be dismissed with respect to his allegations connected with his fatty liver disease because that condition does not qualify him as disabled under the ADA or Section 504.

### ii. Count I Fails Because Tulane Provided Plaintiff with His Requested Accommodations and Engaged in the Interactive Process.

For either of his alleged disabilities, Plaintiff fails to allege that Tulane discriminated against or failed to accommodate him. To prove discrimination, a plaintiff must show "(1) that he has a qualifying disability; (2) that he is being denied the benefits of services, programs, or activities for which the public entity is responsible . . .; and (3) that such discrimination is by reason of his disability."[78] Discrimination may include failure to make reasonable modifications or accommodations, unless such modifications would "fundamentally alter the nature of" the accommodations.[79] Title III "does not require a place of public accommodation to provide a

---

[75] R. Doc. 13 at ¶¶ 14, 23.
[76] R. Doc. 13 at ¶ 24.
[77] *See Nottingham v. Richardson*, 499 Fed.Appx. 368, 376-77 (5th Cir. 2012) (Plaintiff's conditions of flu and thrush were not "disabilities," but temporary medical conditions).
[78] *Bailey*, 484 F.Supp.3d at 364.
[79] *Ward*, 2024 WL 4256334 at *18.

plaintiff with the ideal or preferred accommodation; rather, the ADA requires that a defendant provide a plaintiff with an accommodation that is reasonable and permits the plaintiff to participate equally in the good, service, or benefit offered."[80]

The law requires more than "mere knowledge of" a disability; "the service provider must also have understood the limitations the plaintiff experienced as a result of that disability."[81] "Otherwise, it would be impossible for the provider to ascertain whether an accommodation is needed at all, much less identify an accommodation that would be reasonable under the circumstances."[82] Because the ADA "does not require clairvoyance," the plaintiff bears the burden of specifically identifying the disability and resulting limitations, and "to request an accommodation in direct and specific terms."[83] To satisfy the knowledge requirement of a failure to accommodate claim under the ADA, "the entity must understand the limitations a plaintiff experienced *as a result* of his disability."[84]

Plaintiff alleges that he obtained approval from Dr. Crosslin on March 12, 2025 to obtain a "medically necessary diagnostic procedure" related to his condition.[85] He then obtained further approval from Dr. Machado on March 21, 2025, following up with a "detailed trip plan" on March 26, 2025.[86] He obtained final approval from the Office of International Student Services on April 4, 2025.[87] "Plaintiff expressly communicated that his request for remote work was **temporary and time-limited**, specifically **for a period of approximately two to three months**"[88] (emphasis

---

[80] *Bailey*, 484 F.Supp.3d at 365.
[81] *Windham v. Harris Cnty., Texas*, 875 F.3d 229, 236 (5th Cir. 2017) (cleaned up) (quoting *Taylor v. Principal Fin. Grp., Inc.*, 93 F.3d 155, 164 (5th Cir. 1996)).
[82] *Id.*
[83] *Id.* at 165.
[84] *Valentine v. Collier*, 993 F.3d 270, 290 (5th Cir. 2021).
[85] R. Doc. 13 at ¶¶ 12, 15.
[86] R. Doc. 13 at ¶¶ 18, 20.
[87] R. Doc. 13 at ¶ 21.
[88] R. Doc. 13 at ¶ 23.

PD.61071327.1

original). He did not return to the United States until August 13, 2025.[89] At no point does Plaintiff allege that his request was denied or that he was not provided his requested accommodation.[90] He only alleges that, nearly four months later on July 31, 2025, when he still had not returned from China, Tulane notified him that he would be removed from Dr. Crosslin's laboratory.[91]

Plaintiff was not entitled to his "preferred accommodation" under the law. To the extent the ADA applied (which is denied), Tulane's obligation was to make "reasonable modifications or accommodations" for Plaintiff, which it did by allowing him to work remotely while undergoing diagnostic evaluation. Plaintiff was only approved to stay in China for "two to three months," and he does not allege that he provided any update on his return timeline, requested any modifications to the originally approved timeline, or offer any explanation for his excessively long stay. Based upon Plaintiff's own allegation that Tulane did permit him to work remotely in China while he allegedly obtained a diagnostic scan, he cannot prove that it discriminated against him. Further, Plaintiff did not provide sufficient information to Tulane for it to have knowledge of his disability to understand the accommodation needed beyond that requested, and he did not follow the procedures outlined in the BMS Handbook for either medical leave requests, submitted through Student Resources and Support Services, or for disability accommodations, submitted through the Goldman Center for Student Accessibility.[92] Regardless, Tulane was not required to predict Plaintiff's additional needs beyond his diagnostic request, nor was it obligated to provide indefinite accommodation without additional requests. Accordingly, Plaintiff's claim for discrimination based on his alleged fatty liver disease must be dismissed.

---

[89] R. Doc. 13 at ¶ 42.
[90] In fact, on the facts alleged, Plaintiff appears to have made a misrepresentation as to the nature of his proposed accommodation. He states that he told Dr. Crosslin that the accommodation was for "treatment" of his condition, yet he only alleges that he went to China for "diagnostic evaluation." R. Doc. 13 at ¶¶ 11-13.
[91] R. Doc. 1 at ¶¶ 2, 6-7.
[92] Exhibit A – BMS Program Handbook, at 36-37.

As to Plaintiff's newly-alleged major depressive disorder, Plaintiff alleges that Tulane was first notified of this disability when he emailed Dr. Hamm on August 29, 2025 that he was "suffering from severe depression and was under the care of a psychiatrist."[93] This was in response to an email from Dr. Machado on August 6, 2025, notifying him that he would need to find a new advisor by September 5, 2025, in order to remain in good standing.[94] As a show of good faith, Tulane granted Plaintiff an extension of 21 days to find a new advisor.[95] Plaintiff "responded that the proposed accommodation was not reasonable."[96] He alleges that the "BMS Handbook does not impose" a requirement that Plaintiff secure a new mentor on his own, and he instead "proposed a settlement plan" that is not specified in the Amended Complaint.[97] He was then directed by Tulane to the OIE for further investigation, which remains pending.[98] Plaintiff was not and has never been dismissed from the program, despite his failure to secure a new advisor.[99]

This claim fails on multiple fronts. First, as with his alleged fatty liver condition, Plaintiff's alleged statement to Dr. Hamm that he has depression does not automatically transform him into an individual with a disability under the ADA.[100] Also, Plaintiff does not allege sufficient facts to demonstrate that his August 29, 2025 email constituted a request for accommodation. All he alleges is that he emailed Dr. Hamm, the Dean of the Medical School, stating that he was suffering from severe depression. He does not state what accommodation for this depression was sought, or

---

[93] R. Doc. 13 at ¶ 44.
[94] R. Doc. 13 at ¶ 41.
[95] R. Doc. 13 at ¶ 47.
[96] R. Doc. 13 at ¶ 48.
[97] R. Doc. 13 at ¶ 49-50. In fact, the American Association of Medical Colleges' Compact Between Biomedical Graduate Students and Their Research Advisors, effective 2017 and incorporated as an appendix to the BMS Handbook, states that students maintain "the primary responsibility for the development of [their] own career," including securing mentorship and seeking out advisors. Exhibit A – BMS Handbook, p. 53-54.
[98] R. Doc. 13 at ¶ 53-54.
[99] R. Doc. 13 at ¶ 63.
[100] *See Lumar v. Monsanto Co.*, 395 F.Supp.3d 762, 778-79 (5th Cir. 2019) ("[S]tanding alone, the diagnosis of a condition . . . is insufficient to trigger the protections of the ADA[.]")

the specific limitations of his depression. And, again, he did not follow the provisions of the BMS Handbook in requesting an accommodation from the Goldman Center. Regardless, even if this email was an accommodation request (which is denied), Tulane engaged in the interactive process by offering a 21-day extension of time to find a new advisor, allowing him a total of 51 days to secure a new advisor from the original notice by Dr. Machado on August 6, 2025. Again, to the extent ADA applied (which is denied), Plaintiff was not entitled under the ADA to his "preferred" accommodation, only one that met Tulane's obligation to permit him to "participate equally" in the program.[101] He was provided that opportunity and did not accept it. Even still, Plaintiff was not and has never been dismissed from the program despite this failure. For these reasons, Plaintiff's claim for discrimination based on his major depressive disorder must be dismissed.[102]

### iii.    Count II Fails Because Tulane Did Not Retaliate Against Plaintiff.

Plaintiff also fails to allege that Tulane retaliated against him. Title V of the ADA prohibits discrimination against any individual who has "opposed any act or practice made unlawful by this chapter" or "made a charge, testified, assisted, or participated" in any investigation.[103] "To establish a prima facie case of unlawful retaliation under the ADA, the plaintiff must show that: (1) []he engaged in an activity protected by the ADA, (2) []he suffered an adverse [consequence], and (3) there is a causal connection between the protected activity and the adverse action."[104]

As set forth in Tulane's original Motion to Dismiss, Plaintiff fails to allege that he experienced an adverse action or that there was a causal connection to his alleged protected

---

[101] *Bailey*, 484 F.Supp.3d at 365.

[102] As to Plaintiff's allegations about grievance procedures, Defendants maintain that the regulations promulgated alongside Section 504 requiring that qualifying programs adopt grievance procedures do not create a private cause of action. *See also Power ex rel. Power v. Sch. Bd. of City of Virginia Beach*, 276 F. Supp. 2d 515 (E.D. Va. 2003); *A.W. by Ms. C. v. Marlborough Co.*, 25 F. Supp. 2d 27 (D. Conn. 1998); *Guckenberger v. Boston Univ.*, 974 F.Supp. 106, 142 (D.Mass. 1997). Plaintiff was ultimately able to file a complaint with the OIE, so this allegation has no merit.

[103] 42 U.S.C. § 12203. The Rehabilitation Act incorporates the retaliation provision of the ADA. *Duncan v. Washington Metropolitan Area Transit Authority*, 214 F.R.D. 43 (D. D.C. 2003).

[104] *Lyons v. Katy Indep. Sch. Dist.*, 964 F.3d 298, 304 (5th Cir. 2020).

activity, and his own allegations confirm that Tulane had legitimate, non-discriminatory reasons for its actions.[105] As to his alleged fatty liver condition, Plaintiff alleges that Tulane retaliated against him by dismissing him from Dr. Crosslin's laboratory on July 31, 2025. He was not and has never been dismissed from the Ph.D. program or Tulane. As discussed above, Plaintiff instead alleges that he was advised that he needed to obtain a new dissertation advisor by September 25, 2025. According to Plaintiff, he had been without an advisor or laboratory, required by the program, since at least July 31, 2025.[106] Based upon Plaintiff's own allegations, Tulane had a legitimate, non-discriminatory reason for advising him that he needed to find an advisor and laboratory.[107] It is unreasonable for Plaintiff to expect that he would be able to indefinitely remain without an advisor or laboratory assignment. The same logic applies to Plaintiff's major depressive disorder. Tulane's request that he find a new dissertation advisor was made *prior* to his notification on August 29, 2025, that he was suffering from such a disorder. And even once Plaintiff failed to secure a new dissertation advisor by September 25, he *still* was not removed from the program. Because Plaintiff has not alleged an adverse action or a causal relationship between any such alleged action and protected activity, his retaliation claim fails and must be dismissed.

### iv.    Plaintiff's Intended Relief Remains Improper.

Finally, under the ADA and Section 504, Plaintiff seeks compensatory, declaratory, and injunctive relief.[108] Even if he could succeed on any of those claims (which is denied), his recovery is limited. Title III of the ADA allows only for injunctive relief against the private entity required to provide a public accommodation.[109] Because Title V of the ADA bases recovery on the

---

[105] *Id.* at 306.
[106] R. Doc. 13 at ¶ 63.
[107] Further, the BMS Handbook places the onus on Ph.D. candidates to secure a dissertation advisor. Exhibit A, p. 8.
[108] R. Doc. 13 at ¶¶ 132, 145.
[109] *George v. Hobby Lobby Stores, Inc.*, 769 F. Supp. 3d 537 (E.D. La. 2025).

"remedies and procedures available" under the title allegedly violated, the same applies for his retaliation claim.[110] Similarly, emotional distress damages are not available under Section 504.[111] Plaintiffs can only recover compensatory damages under Section 504 "upon a showing of intentional discrimination, which requires "something more than deliberate indifference."[112] For the reasons set forth herein and in the original Motions to Dismiss, Plaintiff has not alleged any intentional discrimination which would entitle him to compensatory damages. Thus, Plaintiff would (at best) be entitled to recover in the form of injunctive relief, and so, if this Court does not grant this Motion to Dismiss in its entirety, Plaintiff's claims for compensatory, emotional distress, and other damages to the extent sought under the ADA and Section 504 must be dismissed.

### C.    Plaintiff's Breach of Contract Claim (Count IV) Should Be Dismissed.

To state a breach of contract claim,  Plaintiff must allege the essential elements: (1) the obligor's undertaking on obligation to perform; (2) the obligor failed to perform the obligation, and (3) the failure to perform resulted in damages.[113]  The relationship between a student and a private educational institution *may* be considered contractual in nature based on school publications presented to the student.[114]  However, to survive a motion to dismiss, a plaintiff "must allege a breach of a specific provision of the contract."[115] Merely pleading that a plaintiff "entered into an agreement" and then undertook obligations set forth therein is insufficient.[116] Plaintiff' alleges four purported "contracts" were breached: (1) the BMS Program Handbook, creating "binding expectations for laboratory placement, stipend eligibility, academic progress, and grievance

---

[110] 42 U.S.C. § 12203(c).
[111] *See Cummings v. Premier Rehab Keller, P.L.L.C.*, 948 F.3d 673, 678 (5th Cir. 2020), aff'd, 596 U.S. 212, 142 S. Ct. 1562, 212 L. Ed. 2d 552 (2022) (holding emotional distress damages not available under the RA);
[112] *J.W. v. Paley*, 81 F.4th 440, 449-50 (5th Cir. 2023).
[113] *See 1436 Jackson Joint Venture v. World Const. Co., Inc.*, 499 So. 2d 426, 427 (La. App. 4 Cir. 1986).
[114] *See I.F. v. Administrators of the Tulane Educational Fund*, 131 So.3d 491, 498 (La. App. 4 Cir. 12/23/13) (*citing Babcock v. New Orleans Baptist Theological Seminary*, 554 So. 2d 90, 96-97 (La. App. 4th Cir. 1989)).
[115] *Barbe v. Ocwen Loan Servicing, LLC*, 383 F. Supp. 3d 634, 643 (E.D. La. 2019).
[116] *Sharigan v. Sharigan*, 591 F.Supp.3d 100, 110 (E.D. La. 2022).

PD.61071327.1

procedures;" (2) Tulane's written disability accommodation policies, "which promise a defined process for granting and maintaining medical accommodations;" (3) "approval" of his disability accommodation; and (4) Tulane's Equal Opportunity Policy.[117]

As to the BMS Handbook, Plaintiff asserts a variety of alleged breaches to which he cites particular sections. Plaintiff's extensive discussion of the BMS Handbook in the Amended Complaint incorporate it by reference, and it is central to Plaintiff's breach of contract claim, so it is attached to this Motion as Exhibit A.[118] Plaintiff utterly fails to allege that Tulane breached any purported obligations in the BMS Handbook.[119] First, he claims §§ II(B)(7)-(8) of the Handbook created an obligation for Dr. Crosslin to "maintain regular supervisory conduct, and effectively abandon[ing] his role" as a dissertation advisor, which Plaintiff alleges Dr. Crosslin breached.[120] He fails to acknowledge that the same sections put the onus on choosing and matching with a dissertation advisor through completion of the program, and that "[f]ailure to match with a Dissertation Advisor can lead to dismissal."[121] Neither Tulane nor Dr. Crosslin (who has no privity of contract with Plaintiff) through the BMS Handbook or otherwise promised him a right to an advisor; instead, it was Plaintiff's own burden to comply with the expectations of the BMS Handbook including to secure a Dissertation Advisor. Next, Plaintiff alleges that § II(B)(7) required Dr. Crosslin to participate in and review his Individual Development Plan.[122] That section

---

[117] R. Doc. 13 at ¶ 150.
[118] *See Brandt Dealer Servs. LLC v. Hancock Whitney Bank*, 762 F. Supp. 3d 469, 474 (E.D. La. 2025) (considering a contract attached as an exhibit when ruling on a defendant's Rule 12(b)(6) Motion to Dismiss because it was referenced in the Complaint and central to the plaintiff's breach of contract claim).
[119] Plaintiff's claims also fail because of the wide latitude recognized by Louisiana courts for private schools to implement and enforce internal policies. *See Flint v. St. Augustine High School*, 323 So.2d 229, 233 (La. App. 4th Cir. 1975); *Ahlum v. Admin. Of Tulane Educational Fund*, 617 So.2d 96, 98-99 (La. App. 4th Cir. 1993). This issue is fully briefed in Tulane's original Motion to Dismiss, and Plaintiff fails to reference any provision of the BMS Handbook in the Amended Complaint falling outside of the university's discretion in enforcing its own internal policies.
[120] R. Doc. 13 at ¶ 132(a).
[121] Exhibit A, p. 8-9.
[122] R. Doc. 13 at ¶ 132(b).

specifically states that "students should complete an IDP annually" with advisors only required to review that plan. Again, the onus to submit a completed IDP by the June 30 deadline falls on the student.[123] Plaintiff's vague allegations that Dr. Crosslin did not review his IDP thus do not constitute a breach of contract, and in any case, his failure to submit the IDP by June 30 was no fault of Tulane or Dr. Crosslin. Third, Plaintiff claims that § II(B)(8) required Dr. Crosslin to discuss his progress with a committee before making a determination as to his academic status.[124] There is no such requirement in the BMS Handbook, and the role of the Dissertation Committee is to meet annually with the Ph.D. candidate, discuss research progress, and agree on the acceptability of the candidate's final dissertation.[125] This allegedly breached obligation simply does not exist. Fourth, Plaintiff claims that Dr. Crosslin imposed "academic probation, dismissal, or other serious adverse action" without following "established institutional procedures[.]"[126] Again, Plaintiff was not and does not allege to have been dismissed from the program or placed on academic probation.[127] Even if probation or dismissal was imposed (which is denied), the BMS Handbook provides that a student may be placed on probation for "violation of the expectations of professional behavior," which was the reason cited for Plaintiff's removal from Dr. Crosslin's laboratory (i.e. "misconduct").[128] Finally, Plaintiff claims that the doctoral stipend is a "programmatic financial support administered by the institution" that cannot be withdrawn by an individual advisor.[129] The cited section of the BMS Handbook clearly states that stipends for students beyond the second year are provided by dissertation advisors as research assistantships.[130]

---

[123] Exhibit A, p. 7.
[124] R. Doc. 13 at ¶ 132(c).
[125] Exhibit A, p. 9, 12,
[126] R. Doc. 13 at ¶ 132(d).
[127] R. Doc. 13 at ¶ 63.
[128] R. Doc. 13 at ¶ 217. Exhibit A, p. 33.
[129] R. Doc. 13 at ¶ 132(d).
[130] Exhibit A, p. 28.

PD.61071327.1

Plaintiff also references two breaches of Tulane's Equal Opportunity Policy, also attached as Exhibit B hereto, based on incorporation by reference. Plaintiff alleges that Drs. Hamm and Machado violated a mandatory reporting obligation under §3.1 of that policy by failing to report "discrimination, harassment, retaliation, or other conduct implicating EO protections involving students."[131] Plaintiff alleges no facts to support a breach of this provision. As set forth extensively, Dr. Crosslin's July 31, 2025 email did not constitute an act of discrimination or retaliation, and so there was no obligation to report as much. Moreover, Plaintiff alleges that he was able to report his complaints to the appropriate university department.[132] Plaintiff's August 29, 2025 email was the first notice to Dr. Hamm of any alleged act of discrimination, and Dr. Hamm "acknowledged receipt" the same day.[133] Dr. Hamm then reported the issue internally, and Tulane contacted Plaintiff about the claim within a week.[134] There was thus no breach of the mandatory reporting obligations by any Tulane representative. Finally, Plaintiff alleges that the OIE "is required to conduct and complete EO investigations within 60 days."[135] The policy does not include such a requirement, stating that investigations "will be conducted as expeditiously as possible and are usually competed within a reasonable period, typically 60 days, though this may vary[.]"[136] This is not language sufficient to bind Tulane to any obligation or form a contract.

Regarding the final alleged contract, Dr. Crosslin's approval of his remote work arrangement, Plaintiff's Amended Complaint fails to allege with specificity any provision breached. This breach of contract claim regarding his alleged accommodation is merely a rehashing of his deficient ADA and RA claims. And as discussed above, Tulane provided Plaintiff

---

[131] R. Doc. 13 at ¶ 153-154.
[132] R. Doc. 13 at ¶¶ 53-54.
[133] R. Doc 13 at ¶ 45.
[134] R. Doc. 13 at ¶ 45, 47.
[135] R. Doc. 13 at ¶ 155-56.
[136] Exhibit B, p. 17.

his request, remote work for "two to three months." With no specific provision, Plaintiff has failed

to show a breach of this alleged contract. Thus, because Plaintiff's claims for breach of contract

consist of vague, contradictory, and conclusory allegations that are not supported by the law or

fact, Plaintiff fails to state a claim upon which relief may be granted and must be dismissed.

### D.    Plaintiff Has Not Plead Fraudulent Inducement Such that His Allegations can Survive a Motion to Dismiss (Count V).

Like his former claim for fraud, Plaintiff's allegations of fraudulent inducement fail to meet

the high burden of specificity required for such a claim to succeed. "[T]here are three

basic elements to an action for fraud against a party to a contract: (1) a misrepresentation,

suppression, or omission of true information; (2) the intent to obtain an unjust advantage or to

cause damage or inconvenience to another; and (3) the error induced by a fraudulent act must

relate to a circumstance substantially influencing the victim's consent to (a cause of) the

contract."[137] A fraud plaintiff thus "must demonstrate the existence of a contract."[138] In the absence

of a direct contract, there is no valid cause of action.[139] Fraud requires "a legal duty to supply the

correct information and a breach of that duty resulting in damages to the plaintiff."[140] "Specific

intent to deceive is a necessary element of fraud."[141]

With no valid contractual relationship between Dr. Crosslin and Plaintiff, a claim for fraud

fails. Further, none of Plaintiff's allegations demonstrate that Dr. Crosslin had the specific intent

to deceive him. Ultimately, this claim is premised upon an academic decision made by Dr.

Crosslin, and as discussed, academic decision-making is largely protected by the doctrine of

---

[137] *Shelton v. Standard/700 Assocs.*, 2001-0587 (La. 10/16/01), 798 So. 2d 60, 64.
[138] *Free v. Abbott Lab'ys, Inc.*, 164 F.3d 270, 274 (5th Cir. 1999) (quoting *Newport Ltd. v. Sears, Roebuck & Co.*, 6 F.3d 1058, 1067 (5th Cir.1993)).
[139] *Id.*
[140] *Casbon v. K.W.E.J., LLC*, 23-321 (La. App. 5 Cir. 10/4/23), 375 So. 3d 524, 530.
[141] *Robins v. Coles*, 2023-1343 (La. App. 1 Cir. 8/26/24), 395 So. 3d 345, 352, *writ denied,* 2024-01179 (La. 12/11/24), 396 So. 3d 965.

academic freedom.[142] In any case, there is no non-conclusory fact in the Complaint that would support that Dr. Crosslin intended to harm or deceive Plaintiff, and so a claim for fraud fails. Plaintiff has not alleged that Dr. Crosslin owed him any legal duty to supply the correct information, and Dr. Crosslin's statements about Plaintiff's performance were not in violation of any such duty. Fraud also requires that the damages suffered by the plaintiff be based on a justifiable reliance on a misrepresentation or omission. Plaintiff only alleges that he relied on the representation that he would be entitled to return to China to seek treatment, which he was afforded. In fact, if the alleged misrepresentation by Dr. Crosslin about his performance issues and attendance was made *after* Plaintiff's trip was authorized, there is no basis to support that such statement induced him into the alleged "contract". Because of the failure to meet any pleading element, there can be no claim for fraudulent inducement under Louisiana law.[143]

### E.    Plaintiff Cannot Succeed on His Title VI Claim (Count IX).

Finally, Plaintiff's Title VI claim fails because he has not alleged any facts demonstrating discrimination based on his national origin. Title VI prohibits exclusion from participation in federally assisted programs "on the ground of race, color, or national origin."[144] "[A] private right of action under Title VI for damages requires intentional discrimination by the defendants."[145] In the absence of a specific discriminatory policy, a plaintiff must allege that (1) a person with authority had (2) actual knowledge of discrimination and (3) responded with deliberate indifference.[146] Plaintiff's claims here fail on every element. First, Plaintiff pleads no facts to support the position that Tulane intentionally discriminated against him based on his national

---

[142] *See Mills*, 340 So.3d at 971.
[143] While not specifically pled, Plaintiff's fraud claim also fails to meet the Fed. R. Civ. P. 9(b) standard for alleging fraud, discussed in detail in the Individual Defendants' Motion to Dismiss. R. Doc. 7.
[144] 42 U.S.C. § 2000d.
[145] *Scokin v. State of Tex.*, 723 F.2d 432, 441 (5th Cir. 1984).
[146] *Washington v. Smith*, 639 F. Supp. 3d 625, 656 (E.D. La. 2022).

origin. He offers no statements by Dr. Crosslin supporting any discriminatory intent. He does not plead any specific discriminatory policy, does not allege that any person with authority had actual knowledge of discrimination and responded with deliberate indifference, and does not allege that he made any complaint about national origin discrimination. Plaintiff's only conclusory allegation is that "[n]one of the U.S.-born Ph.D. students in Dr. Crosslin's group were subjected to adverse action as a result of travel."[147] He does not identify any specific student outside of his protected class who was allowed to travel under the same circumstances as him without experiencing any adverse action. To the extent that Plaintiff cites other alleged lawsuits against Tulane, those allegations are irrelevant and conclusory. Count IX must be dismissed.

## IV.    CONCLUSION

Based upon the foregoing and the incorporated arguments from the previously-filed Motions to Dismiss, Defendants' Motion to Dismiss the Amended Complaint should be granted. Defendants respectfully move this Court for an order dismissing with prejudice all of Plaintiff's claims, at Plaintiff's costs, including any other relief to which Defendants may also be warranted.

Respectfully submitted,

**PHELPS DUNBAR LLP**

BY:    _/s/ Rebecca Sha_
Kim M. Boyle (La. Bar No. 18133)
Rebecca S. Sha (La. Bar No. 35317)
Andrew M. Albritton (La. Bar No. 39780)
Caroline E. Perlis (La. Bar No. 40905)
Canal Place | 365 Canal Street, Suite 2000
New Orleans, Louisiana 70130
Telephone: 504 566 1311
Facsimile: 504 568 9130
Email:  boylek@phelps.com
            rebecca.sha@phelps.com

---

[147] R. Doc. 13 at ¶ 242.

PD.61071327.1

Case 2:25-cv-02474-SSV-EJD     Document 18-1     Filed 03/13/26     Page 26 of 26

andrew.albritton@phelps.com
caroline.perlis@phelps.com

**ATTORNEYS FOR DEFENDANTS
TULANE, DAVID CROSSLIN, HEATHER
MACHADO, AND LEE HAMM**

## CERTIFICATE OF SERVICE

I hereby certify that on this 13th day of March, 2026, I filed the foregoing by using the CM/ECF system and have served notice of the filing pursuant to Fed. R. Civ. P. 5(b)(2) and Local Rule 5.4 to Pro-Se Plaintiff, Yue Zhao by certified mail and electronic mail to 500 Aries Dr. Apt 5A, Mandeville, LA 70471 and omniscientyue@gmail.com.

/s/ *Rebecca Sha*
REBECCA SHA

PD.61071327.1