U.S. DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

FILED    Mar 15 2026

CAROL L. MICHEL
CLERK

SP                                   EDSS

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| YUE ZHAO | CIVIL ACTION NO. 2:25-cv-2474 |
| VERSUS | JUDGE SARAH S. VANCE |
| THE ADMINISTRATORS OF THE TULANE EDUCATIONAL FUND; DAVID CROSSLIN; HEATHER MACHADO; LEE HAMM | MAGISTRATE JUDGE EVA J. DOSSIER |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' RENEWED MOTIONS TO DISMISS (RULE 12(b)(6))**

Plaintiff, Yue Zhao, respectfully submits this Memorandum in Opposition to Defendants' Motions to Dismiss pursuant to Rule 12(b)(6). Defendants have filed three motions to dismiss (R. Docs. 6, 7, and 18). The March 13 motion expressly incorporates the arguments raised in the earlier motions. Plaintiff therefore addresses the arguments raised in Doc. 6, Doc. 7, and Doc. 18 collectively. For the reasons set forth below, the Motions should be denied in their entirety.

This case turns on disputed facts and intent. Defendants' motions repeatedly ask the Court to credit Defendants' version of events and resolve factual inferences against Plaintiff–tasks reserved for summary judgment or trial. At this stage, Rule 12(b)(6) requires the Court to accept the Amended Complaint's well-pleaded allegations as true and draw reasonable inferences in Plaintiff's favor.

## I. GOVERNING STANDARD

At the motion to dismiss stage, the Court must accept all well-pleaded factual allegations as

true and draw all reasonable inferences in favor of Plaintiff. The Court may not weigh evidence, resolve credibility disputes, or determine whose version of events is more persuasive. The Rule 12(b)(6) inquiry tests only the sufficiency of the pleadings–not the ultimate merits of the claims.

To survive dismissal, a complaint need only contain sufficient factual matter to "state a claim to relief that is plausible on its face."[1] Plausibility does not require probability, nor does it permit the Court to credit a defendant's competing narrative over well-pleaded allegations. Where a defendant's arguments depend on rejecting Plaintiff's factual allegations and substituting its own version of events, dismissal is improper.

## II. FACTUAL BACKGROUND

This case arises from a coordinated sequence of conduct in which Tulane University, acting through its agent Dr. David Crosslin, approved Plaintiff's disability accommodation, induced reliance upon that approval, and then revoked it at a moment of heightened vulnerability–while Plaintiff was abroad for medical treatment and visa renewal–followed by retroactive termination of stipend funding and removal from the laboratory without institutional process. Plaintiff alleges that Dr. Crosslin offered post hoc academic justifications following the revocation.[2]

Plaintiff alleges two sets of disabilities: (1) his preexisting documented medical condition for which accommodation was approved; and (2) a subsequently developed, clinically diagnosed Major Depressive Disorder precipitated by Defendants' actions.[3]

The Complaint further alleges two distinct rounds of protected activity and corresponding adverse action. First, Plaintiff requested and obtained a disability accommodation; shortly thereafter, that accommodation was revoked and stipend funding terminated. Second, Plaintiff invoked institutional grievance mechanisms through counsel; thereafter, he faced threatened dismissal, continued exclusion from the laboratory, and denial of meaningful program access.[4]

These actions were compounded by institutional failures, including noncompliance with manda-

---

[1]Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).
[2]Amended Complaint paras. 11-15, 24-32, 57-59, 81-82.
[3]Amended Complaint paras. 9, 57-58.
[4]Amended Complaint paras. 11-15, 26-32, 43, 51-52.

tory Equal Opportunity reporting duties, failure to complete Tulane's EO investigation within required timelines, lack of interim academic safeguards, and imposition of an unwritten 21-day advisor ultimatum not found in published BMS policy.[5]

The claims are therefore not isolated disputes but reflect a consistent pattern: protected activity followed by adverse action, layered upon structural policy breakdown.

### III. LEGAL ARGUMENT

#### A. Disability Discrimination and Failure to Accommodate (Count I)

The Supreme Court's June 12, 2025 decision in A.J.T. v. Osseo Area Schools forecloses any argument that Plaintiff must satisfy a school-specific "bad faith or gross misjudgment" standard to proceed under the ADA or Section 504 in the educational setting. The Court held that ADA and Rehabilitation Act claims based on educational services are governed by the same standards that apply in other disability discrimination contexts, rejecting the heightened school-specific rule on which Defendants may rely. To the extent compensatory damages require intentional discrimination, the ordinary deliberate-indifference framework applies rather than a more demanding education-only standard.[6]

#### 1. Plaintiff Plausibly Alleges Two Disabilities under The ADA And Section 504

Defendants first argue that Plaintiff has not plausibly alleged a qualifying disability.[7] That argument ignores both the factual allegations and the governing pleading standard. The Amended Complaint alleges that Plaintiff suffers from Severe Fatty Liver Disease[8], confirmed by medical imaging and laboratory testing showing persistent abnormal liver function. This condition substantially limits a major life activity–digestive function–which is expressly recognized under the ADA. The complaint further alleges that Plaintiff later developed Major Depressive Disorder[9],

---

[5]Amended Complaint paras. 47, 49, 54-56, 69-75, 96-99.

[6]A.J.T. v. Osseo Area Schs., 2025 WL 1657415 (U.S. June 12, 2025).

[7]Doc. 18-1 Section III.B.i; Doc. 6-1 Section IV.A.i

[8]Amended Complaint paras. 8-9.

[9]Amended Complaint paras. 58.

a clinically diagnosed mental impairment that substantially limits major life activities, including concentrating, sleeping, and working.[10] At the pleading stage, these allegations plausibly allege a disability; Defendants' contrary characterization raises factual questions not resolvable on a Rule 12(b)(6) motion.

### 2.   The Amended Complaint Plausibly Alleges A Reasonable Accommodation Request And Approval

Defendants next contend that Plaintiff either failed to request an accommodation or already received the accommodation he requested.[11]

The Amended Complaint alleges the opposite.  Plaintiff informed his advisor, Dr. Crosslin, of his medical condition and requested a temporary accommodation allowing him to continue his research remotely while undergoing medical testing and treatment.  The request was explicitly approved by Dr. Crosslin and acknowledged by BMS administrators.[12]

The Amended Complaint further alleges that the accommodation involved three coordinated institutional actions: 1) written approval by Dr. Crosslin, 2) acknowledgement by Dr. Machado and BMS administrators, and 3) an international travel authorization issued through Tulane's Office of International Students and Scholars.[13]

Defendants' own briefing concedes that Tulane approved a temporary remote-work arrangement.[14]  Having conceded approval, Defendants cannot plausibly argue–as a matter of law at the pleading stage–that Plaintiff never requested an accommodation.

### 3.  Tulane's Agent Dr. Crosslin's Adverse Actions towards Plaintiff When The Accommodation Was Still Ongoing

Tulane's own argument acknowledges that "Tulane allowed remote work for 2.5 months"[15]

---

[10] 42 U.S.C. Sec. 12102(1)-(4).

[11] Doc. 18-1 at 3, 15, 17 (arguing that Plaintiff did not seek accommodations through Student Resources or the Goldman Center, and that he did not allege his request was denied or that he was not provided his requested accommodation).

[12] Amended Complaint paras. 11-12, 15, 23.

[13] Amended Complaint paras. 15, 17, 20-21.

[14] Doc. 18-1 Sec. III.B.ii; Doc. 6-1 Sec. IV.A.ii.

[15] Doc. 18-1 Sec. III.B.iii (acknowledging Plaintiff's remote-work approval was temporary and time-limited for approximately two to three months).

and that "Plaintiff was removed from Dr. Crosslin's lab on July 31."[16] These admissions confirm the sequence alleged in the Amended Complaint: Tulane approved Plaintiff's disability-related accommodation and allowed Plaintiff to rely on that approval for a period of time. Yet while that accommodation remained in effect, Dr. Crosslin–acting as Tulane's agent–took adverse actions against Plaintiff, including removing him from the laboratory and disrupting his academic status.[17]

### 4. Preferred Accommodation Argument Is Moot

Plaintiff does not allege that Tulane failed to provide a preferred accommodation. Rather, Plaintiff alleges that Tulane approved a medically related accommodation, allowed Plaintiff to rely on that approval, and later penalized him for exercising the accommodation Tulane itself authorized. The accommodations at issue were limited to (1) permission to work remotely, (2) the right to pursue a grievance regarding Dr. Crosslin's conduct, and (3) protection from dismissal while the grievance and accommodation issues were pending. None of these requests constitutes a "preferred accommodation."[18]

### 5. Nominal Approval of An Accommodation Does Not Satisfy The ADA

Defendants argue that Plaintiff cannot state a failure-to-accommodate claim because Tulane purportedly "approved" his requests. This argument fundamentally misstates ADA and Section 504 jurisprudence. Under established federal precedent, an entity's mere nominal approval of an accommodation is legally insufficient if the entity subsequently fails to implement it, unreasonably delays it, or acts in bad faith to frustrate its completion.[19]

Here, Plaintiff alleges that while Tulane initially approved his medical travel and later agreed to a transition period, Tulane's agents actively sabotaged the completion of both accommodations.[20][21]

---

[16] Doc. 18-1 Sec. III.B.iii (stating that on July 31, 2025, Tulane notified Plaintiff he would be removed from Dr. Crosslin's laboratory).

[17] Amended Complaint paras. 26, 28-29, 32; Doc. 18-1 Sec. III.B.ii.

[18] Amended Complaint paras. 11-21, 43, 47-52.

[19] Strife v. Aldine Indep. Sch. Dist., No. 24-20269, slip op. at 22-23 (5th Cir. July 28, 2025) (holding that an unreasonable delay in implementing or granting an accommodation may amount to a failure to accommodate); McCray v. Wilkie, 966 F.3d 616, 621 (7th Cir. 2020) (same).

[20] Amended Complaint paras. 15, 17, 20-21.

[21] Amended Complaint paras. 11-21, 43, 47-52.

Dr. Crosslin unilaterally revoked the first accommodation mid-course by terminating Plaintiff's stipend while he was abroad, and Tulane frustrated the second by imposing a hostile, unwritten 21-day ultimatum under threat of expulsion.[22][23]  Furthermore, Plaintiff specifically requested the accommodation of pursuing a formal grievance regarding this conduct.[24]  While Tulane nominally accepted this by initiating an Equal Opportunity (OIE/EO) investigation, the institution completely failed to complete the investigation within its own mandated 60-day timeline.[25]  Section 504 regulations strictly require institutions to adopt and implement procedures for the "prompt and equitable resolution of complaints."[26] An indefinite, unresolved EO investigation constitutes an unreasonable delay and a failure to deliver the agreed-upon grievance process.

A nominal "approval" that is maliciously revoked, stalled, or never practically completed constitutes a constructive denial of the accommodation. Because the breakdown of the interactive process, the failure to complete the EO investigation, and the ultimate failure to deliver the accommodations are directly traceable to Defendants' bad-faith conduct, Plaintiff has plausibly alleged a failure to accommodate.[27]

### B. Retaliation (Count II)

#### 1. Tulane Argues "No Adverse Action"

Tulane argues that "Plaintiff remained enrolled in the program and was told to secure a new advisor, not expelled," a fact Plaintiff does not dispute. However, this characterization omits and attempts to disclaim the adverse actions imposed by Tulane's agent, Dr. Crosslin, including Plaintiff's removal from the laboratory, termination of stipend support, and loss of research access. Defendants acknowledge that Dr. Crosslin served as Plaintiff's advisor and laboratory supervisor, and therefore acted as Tulane's agent within the Ph.D. program.[28] Tulane University may not disclaim,

---

[22]Amended Complaint paras. 11-15, 24-32, 57-59, 81-82.

[23]Amended Complaint paras. 47, 49, 54-56, 69-75, 96-99.

[24]Amended Complaint paras. 11-21, 43, 47-52.

[25]Amended Complaint para. 96-99.

[26]34 C.F.R. Sec. 104.7(b).

[27]Loulseged v. Akzo Nobel Inc., 178 F.3d 731, 736 (5th Cir. 1999).

[28]Doc. 18-1 at 3 (acknowledging that Dr. Crosslin was Plaintiff's "supervisor in the dry laboratory" and dissertation advisor).

disavow, or exclude responsibility for Dr. Crosslin's adverse actions toward Plaintiff.[29]

Furthermore, the threat of dismissal communicated through Tulane's counsel, Mr. Greene, constitutes an institutional adverse action that Tulane cannot plausibly deny.[30]

The Fifth Circuit applies the Burlington "materially adverse" framework in ADA retaliation cases.[31] Under that objective standard, the threats of program dismissal, revocation of an approved arrangement, and loss of stipend support plausibly qualify as materially adverse.[32]

### 2. Causation Argument: A Manipulation of Timeline

Defendants' causation argument rests on an artificially narrow framing of Plaintiff's protected activity. The motion focuses exclusively on Plaintiff's August 29, 2025 disclosure of depression and argues that the alleged adverse actions on July 31 and August 6 necessarily predate that disclosure.[33] But the Amended Complaint alleges protected activity that occurred months earlier: Plaintiff's request for, and Tulane's approval of, a disability-related accommodation permitting temporary remote work abroad.

Defendants themselves acknowledge that Tulane approved Plaintiff's request to work remotely for a limited period of time.[34]. Plaintiff's reliance on that approved accommodation constitutes protected activity under the ADA and Section 504. When the complaint's allegations are accepted as true and viewed in the light most favorable to Plaintiff, the challenged actions–removing Plaintiff from his laboratory assignment and disrupting his advisor relationship–occurred after that protected activity and therefore plausibly support a causal connection.

Defendants' causation argument relies on an artificially truncated timeline. The Amended Complaint alleges that protected activity began with Plaintiff's accommodation request and continued through subsequent complaints. The adverse actions alleged followed that protected activity, and temporal proximity plausibly supports causation at this stage.

---

[29]Doc. 18-1 Sec. III.B.iii; Amended Complaint paras. 26-32, 63.

[30]Amended Complaint para. 51.

[31]Vincent v. Coll. of the Mainland, No. 16-41465, slip op. at 10 (5th Cir. July 7, 2017) (applying Burlington's materially adverse standard in ADA retaliation analysis).

[32]Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006).

[33]Doc. 18-1 Sec. III.B.iii.

[34]Doc. 18-1 Sec. III.B.ii

### 3. "Legitimate Reason" Was Not Legitimate Because It Was Conditioned upon The Disputed Adverse Action

Tulane argues that "Tulane had a legitimate non-discriminatory reason to dismiss the Plaintiff: a doctoral student needed an advisor and lab placement." Dismissal or threat of dismissal from the program is obviously an adverse action. [35]

Plaintiff does not dispute that doctoral students typically require an advisor and laboratory placement. However, Defendants' argument improperly isolates this fact from the surrounding circumstances alleged in the Amended Complaint.

The Amended Complaint alleges that Plaintiff's lack of laboratory placement was not an independent academic issue but the direct consequence of adverse actions taken by Tulane's agents, including Dr. Crosslin. These actions placed Plaintiff in an institutional limbo where he was deprived of his laboratory affiliation and research support. Defendants cannot create the very condition that deprived Plaintiff of a lab placement and then rely on that condition as a purported legitimate justification for the adverse action.[36]

Viewed as a whole, the Amended Complaint plausibly alleges that the absence of a lab placement was the result of Defendants' own conduct rather than a neutral academic requirement. At the pleading stage, Defendants' attempt to recast this consequence as a legitimate non-discriminatory reason is improper and raises factual issues that cannot be resolved on a motion to dismiss.

### 4. Tulane's Failure to Dismiss Plaintiff Was Driven by Legal Pressure, Not Kindness

Tulane argues "And even once Plaintiff failed to secure a new dissertation advisor by September 25, he still was not removed from the program"[37], characterizing its kindness towards Plaintiff. Plaintiff alleges that Tulane, through counsel, threatened dismissal and refrained only after Plaintiff objected that such action would constitute unlawful retaliation.[38] Whether Tulane refrained from dismissing Plaintiff voluntarily or under legal constraint is a factual question.

---

[35] Doc. 18-1 Sec. III.B.iii; Doc. 6-1 Sec. IV.A.iii.

[36] Amended Complaint paras. 26-32, 41, 63.

[37] Doc. 18-1 Section III.B.iii

[38] Amended Complaint para. 51-52.

### 5. Tulane Proceeded with Dismissal Threats despite Anti-Retaliation Notice

The Amended Complaint alleges that Tulane received explicit notice of Plaintiff's protected activity and the risk of retaliation through a formal demand letter submitted by Plaintiff's counsel, David Lambert, which specifically requested anti-retaliation safeguards. [39] Despite this notice, Tulane–through its counsel and program leadership–subsequently threatened to dismiss Plaintiff from the Ph.D. program unless he secured a new dissertation advisor by September 25. This ultimatum was issued after Tulane had actual knowledge of Plaintiff's disability, his grievance, and counsel's warning regarding retaliation. The issuance of such a dismissal threat after receiving an explicit anti-retaliation notice plausibly supports an inference of retaliatory intent rather than a neutral academic decision.

### C. Breach of Contract (Count III)

Plaintiff has alleged in detail how Tulane's agent Dr. Crosslin and other Tulane administrators violated the contractual obligations governing Plaintiff's doctoral program. At the Rule 12 stage, Defendants' arguments improperly attempt to weigh factual disputes. These factual issues must be resolved through discovery and, if necessary, at trial rather than on a motion to dismiss.

### 1. Policy Versions Dispute and Rule 12(d)

Defendants' argument depends on policy documents outside the pleadings, including versions revised after the events at issue. The BMS Handbook they submitted reflects revisions dated **August 12, 2025**[40], and the EO Policy they submitted was revised on **December 17, 2025**.[41] Under Federal Rule of Civil Procedure 12(d), if matters outside the pleadings are presented and not excluded, the motion must be treated as one for summary judgment, and the nonmovant must be given a reasonable opportunity to present pertinent material.[42] The Court should decline conversion at this early stage and decide the Rule 12(b)(6) motions on the pleadings alone.

---

[39] Amended Complaint para. 43.
[40] Doc. 18- Exhibit A
[41] Doc. 18- Exhibit B
[42] Fed. R. Civ. P. 12(d).

## 2. Defendants' Argument Is Internally Inconsistent

Defendants' position is internally inconsistent. On the one hand, Defendants argue that Dean Hamm "reported the issue internally," suggesting that the matter was sufficiently serious to warrant institutional reporting and response.[43] On the other hand, Defendants contend that Dr. Machado had no reporting obligation because Dr. Crosslin's July 31 email "did not constitute discrimination or retaliation."[44] These positions cannot both be true. If the incident did not implicate discrimination or retaliation concerns, there would have been no reason for Dean Hamm to report the matter internally at all. Conversely, if the issue was sufficiently serious to warrant internal reporting, the question of whether mandatory reporting obligations were triggered becomes a factual dispute that cannot be resolved on a motion to dismiss. At minimum, the pleadings raise a plausible inference that Tulane officials recognized the seriousness of the allegations and engaged institutional reporting channels, which precludes dismissal at this stage.

## 3. Dr. Machado Failed to Report Allegations to OIE

Defendants argue that no reporting obligation existed because Dr. Crosslin's July 31 email "did not constitute discrimination." But the Equal Opportunity Policy requires reporting of **allegations** of discrimination or retaliation involving students.[45] Plaintiff alleges that such allegations were communicated to program leadership. Whether those allegations ultimately prove true is irrelevant to the reporting obligation and cannot be resolved on a motion to dismiss.

## D. Intentional Infliction of Emotional Distress (Count IV)

### 1. Outrageousness Is in Question

Defendant Crosslin relies on the high bar articulated in White v. Monsanto, 585 So.2d 1205 (La. 1991). But the allegations here are materially different. In White, the conduct involved a discrete episode of workplace abuse in an ordinary employment context. Here, Plaintiff alleges a

---

[43] Doc. 18-1 at 22 (arguing that Dr. Hamm "reported the issue internally" after receiving Plaintiff's August 29, 2025 email).

[44] Doc. 18-1 at 22 (arguing, as to Dr. Machado, that Dr. Crosslin's July 31, 2025 email did not constitute discrimination or retaliation and therefore triggered no reporting obligation).

[45] Doc. 18-1 Ex. B, Equal Opportunity Policy, Section 3.1.

coordinated course of conduct: approval of a disability accommodation, inducement of reliance, revocation while Plaintiff was abroad for medical treatment, retroactive stipend termination, and removal from the laboratory.[46]

Louisiana authority addressing the professor-student context confirms why White is not the closest analogue. In Smith v. Atkins, the court recognized intentional infliction of emotional distress where a law professor used his authority to subject a student to sustained humiliation. That professor-student power imbalance is far closer to the allegations here than White's ordinary workplace setting. Plaintiff alleges that Dr. Crosslin exercised extraordinary control over an international student's funding, laboratory access, advisor status, and academic continuation, then used that power while Plaintiff was medically vulnerable and overseas. Those allegations plausibly describe the same kind of authority-based abuse that Louisiana courts have already found actionable.[47]

Moreover, unlike White, Plaintiff alleges that Dr. Crosslin acted with knowledge of Plaintiff's documented medical condition and exercised near-total supervisory control over Plaintiff's funding, research access, and academic progress. Rather than an isolated incident, the alleged conduct occurred at a moment of heightened vulnerability and resulted in severe consequences, including the development of an additional clinically diagnosed disability. These allegations plausibly describe conduct substantially more outrageous than the conduct at issue in White.[48]

### 2. The "Academic Discretion" Defense Raises Core Factual Disputes

Defendants repeatedly characterize Dr. Crosslin's conduct as "academic discretion."[49] This assertion itself creates a factual dispute.

Not every action occurring in an academic setting constitutes protected academic discretion. Plaintiff alleges a specific timeline:

- Approval of a disability accommodation;[50]

---

[46] Amended Complaint paras. 11-15, 26-32, 57-59, 81-82.
[47] Smith v. Atkins, 622 So. 2d 795, 800 (La. Ct. App. 4 Cir. 1993).
[48] Amended Complaint paras. 11-15, 26-32, 57-59, 64-69.
[49] Doc. 18-1 Section III.D; Doc. 7-1 Section IV.B
[50] Amended Complaint para. 15.

- Continued communication acknowledging that approval;[51]

- Plaintiff's reliance and travel for medically necessary treatment;[52]

- Revocation of the accommodation;[53]

- Fabrication of academic justifications;[54]

- Retroactive termination of stipend funding.[55]

Retroactive stipend cancellation is financial in nature. It is not an academic evaluation. Plaintiff plausibly alleges that Defendants recharacterized a non-academic dispute as "academic discretion" to justify discriminatory and retaliatory conduct.

### 3. Tulane's Own Conduct Undermines The "Academic Discretion" Theory

Plaintiff alleges that Tulane initiated an Equal Opportunity investigation[56] into Dr. Crosslin's conduct. Academic discretion, standing alone, does not meet the threshold for institutional discrimination investigation under Tulane's own policy.

Tulane cannot simultaneously:

- Treat the conduct as serious enough to trigger EO investigation;

- Decline to complete that investigation within required timeframes; and

- Invoke academic discretion as a complete shield.

These contradictions create factual disputes concerning institutional endorsement and ratification.

### 4. Dr. Crosslin's "Academic Discretion" Violated Multiple Tulane Internal Policies

Plaintiff alleges in the Breach of Contract Count that Dr. Crosslin's conduct violated multiple Tulane internal policies. Given this is true, Dr. Crosslin's conduct cannot be academic discretion. Academic discretion does not extend to conduct that contravenes Tulane University's own written

---

[51] Amended Complaint para. 20.
[52] Amended Complaint para. 24.
[53] Amended Complaint para. 26.
[54] Amended Complaint para. 27-32.
[55] Amended Complaint para. 28.
[56] Amended Complaint para. 96-99.

policies.[57]

### E. Fraudulent Inducement (Count V)

#### 1. Rule 9(b) Particularity

Count V satisfies Rule 9(b).  The Amended Complaint alleges that the approved disability-based remote research and medical travel accommodation constituted part of the contractual relationship between Plaintiff and Tulane.  It identifies the who (Dr.  Crosslin acting as Tulane's authorized agent), the what (written approval of remote research and medical travel), the when (March 2025), the where (email communications copied to program administration), and the how (approval used to induce Plaintiff's continued enrollment and reliance, followed by reversal and retroactive stipend termination once Plaintiff was abroad). [58]

Plaintiff alleges that, at the time the representations were made, Tulane–through its agent Dr. Crosslin–had no present intent to honor the accommodation once Plaintiff became dependent on it. Plaintiff alleges that the sequence of events–including Dr.  Crosslin's sudden failure to respond to Plaintiff's emails after Plaintiff returned to China, while simultaneously praising Plaintiff's hard work in a group meeting–gives rise to a reasonable inference that the prior representations were made with scienter.[59]

Plaintiff reasonably relied on those representations by traveling for medical testing and continuing research under the approved arrangement.  These particularized allegations describe fraudulent inducement arising from an intentional misrepresentation of present intent, not merely a subsequent breach of contract.[60]

#### 2. "No Contract Argument" Is Moot

Fraud in the inducement requires a contract; the defense says none is pled between Plaintiff and Dr.  Crosslin.[61]  However, this count in the Amended Complaint is against Tulane, not Dr.

---

[57] Amended Complaint paras. 152-156, 198.
[58] Amended Complaint paras. 176-179.
[59] Amended Complaint paras. 179, 182-186.
[60] Amended Complaint paras. 180-181, 187.
[61] Doc. 18-1 Sec. III.D; Doc. 7-1 Sec. IV.F

Crosslin. Plaintiff alleges Dr. Crosslin, as Tulane's agent, induced Plaintiff into a travel contract with Tulane.

### 3. Academic Discretion Argument Is in Factual Dispute

The theory remains bound up with academic decision-making, which the defense frames as protected by academic freedom.[62] Plaintiff has already argued against this point[63] in Section III.D.2 and claims that Dr. Crosslin's conduct was not academic discretion.

### 4. The Argument That Dr. Crosslin's Adverse Action Cannot Induce This Contract: A Manipulation of Timeline

Defendants argue that Dr. Crosslin's later adverse actions could not have induced the alleged agreement.[64] This argument ignores the sequence alleged in the Amended Complaint. Plaintiff alleges that Dr. Crosslin issued written approval authorizing Plaintiff's disability-related accommodation and continuation in the laboratory. That written approval induced Plaintiff's reliance: Plaintiff remained in the laboratory, continued working under Dr. Crosslin's supervision, and organized his travel and research activities based on that authorization. The later adverse actions–revoking the arrangement while Plaintiff was abroad for medical treatment, terminating stipend support, and removing Plaintiff from the laboratory–do not constitute the inducement themselves. Rather, they serve as circumstantial evidence that Dr. Crosslin never intended to honor the commitment reflected in his written approval. When the allegations are read as a whole and accepted as true, the Amended Complaint plausibly alleges that the written approval induced reliance and that Dr. Crosslin's subsequent conduct reveals the earlier misrepresentation.

### F. Negligent Supervision, Training, and Negligence (Count VI)

#### 1. Louisiana Negligence Law Does Not Require That The Injury Be Physical.

Louisiana recognizes recovery for serious emotional distress even absent physical injury in

---

[62] Doc. 18-1 Sec. III.D; Doc. 7-1 Sec. IV.F
[63] See Section III.D.2.
[64] Doc. 18-1 at 24 (arguing that if the alleged misrepresentation was made after Plaintiff's trip was authorized, it could not have induced the alleged "contract").

appropriate circumstances.[65]  Plaintiff alleges Tulane owed and breached duties through its supervisory and reporting structures, and that the breach proximately caused clinically diagnosed mental injury and related damages.  Whether the alleged distress meets the governing seriousness standard is a fact question not resolvable at the pleading stage.

### 2. The Incomplete OIE Investigation Creates Institutional Liability Questions

Plaintiff alleges that Tulane initiated an OIE investigation subject to a 60-day completion expectation under policy. The investigation was not completed[66].

This yields two possibilities:

- Institutional failure to comply with mandatory procedures; or
- Obstruction or avoidance by Dr. Crosslin.

Either scenario implicates a Defendant.  The reason for the investigation's failure is a factual matter requiring discovery.

Regardless of which explanation proves true, the incomplete investigation strengthens–not weakens–the plausibility of institutional liability.  Because this key factual dispute cannot be resolved at the motion-to-dismiss stage, the motion to dismiss this Count should be denied.

### 3. Dr. Machado And Dean Hamm's Failure to Report The Incident

Defendants did not deny the fact that Dr. Machado did not report the incident to OIE. Defendants claim Dean Hamm has reported this incident through internal channel.[67]  However, Dean Hamm reported this incident to the internal counsel, not OIE. Therefore, this key factual dispute needs to be confirmed in discovery. [68]

### G. Defamation (Count VII)

### 1. Defendant Argues That Plaintiff Fails to Identify The Exact Statement, When

---

[65] Spencer v. Valero Refining Meraux LLC (2022).
[66] Amended Complaint para. 96-99.
[67] Doc. 18-1 at 22 (stating that "Dr. Hamm then reported the issue internally" after receiving Plaintiff's August 29, 2025 email).
[68] Amended Complaint paras. 55, 153-154, 202.

**It Was Made, Or Why It Was False.**[69]

The Amended Complaint alleges the substance of the defamatory charge: that Dr. Crosslin reported to program leadership that Plaintiff engaged in "misconduct" and had "performance issues" warranting adverse academic action, and that these accusations were false and used to justify Plaintiff's lab removal and loss of support. Louisiana law does not require verbatim quotation at the pleading stage so long as the alleged statements are described with reasonable specificity.[70]

### 2. Academic Performance Dispute Is The Key Factual Dispute[71]

Defendants argue that Plaintiff's removal was based on poor academic performance and attendance.

Plaintiff alleges:

- Dr. Crosslin was rarely physically present on campus;[72]
- Laboratory research was performed remotely via computer;[73]
- Plaintiff maintained a 3.788 GPA;[74]
- Plaintiff has no history of academic misconduct.[75]

Plaintiff has no way to physically "attend" Dr. Crosslin's program when Dr. Crosslin is rarely on campus. Whether "attendance" was a genuine concern or a post hoc justification is a factual question. At this stage, the Court must accept Plaintiff's version as true.

Whether real performance issue exists is a key factual dispute in this lawsuit. Therefore, by this reason alone, the Defamation Count should not be dismissed. [76]

### 3. Defendant Attempts to Characterize The Statements As Merely Private Internal

---

[69]Doc. 18-1 at 8 (arguing that Plaintiff still does not specify exactly what the alleged defamatory statements were).

[70]Badeaux v. Southwest Computer Bureau, Inc., 929 So.2d 1211 (La. 2006).

[71]Doc. 18-1 at 8-9 (characterizing the alleged statements as accusations of "purported misconduct" and communications regarding academic matters and performance).

[72]Amended Complaint para. 64-65.

[73]Amended Complaint para. 22.

[74]Amended Complaint para. 60.

[75]Amended Complaint para. 60.

[76]Kennedy v. Sheriff of East Baton Rouge, 935 So. 2d 669 (La. 2006)

16

**Communications between A Faculty Advisor And Program Administrators.**[77]

However, the fact that a communication occurs within an institution does not shield it from defamation liability. Statements concerning a student's alleged misconduct or performance, when communicated to decision-makers with authority over the student's academic status, are capable of harming reputation and career prospects.

### 4. Defendants' Reliance on Qualified Privilege Is Premature.[78]

Whether an internal statement is protected by qualified privilege turns on good faith and the absence of malice–fact questions ill-suited for resolution on a Rule 12(b)(6) record. The Amended Complaint plausibly alleges retaliatory motive and bad faith, which is sufficient to proceed to discovery.[79]

### 5. Defendant's Attempt to Reframe The Allegations As A Mere Disagreement over Academic Judgment Ignores The Substance of The Claim.[80]

Plaintiff does not challenge Dr. Crosslin's academic evaluation in the abstract; rather, Plaintiff alleges that Dr. Crosslin made false statements about Plaintiff's conduct and performance to justify adverse actions already underway.

### 6. Defendants Contend That The Amended Complaint's Allegations of Malice Are Conclusory.[81]

But the Amended Complaint alleges specific surrounding circumstances–including the timing of the statements following protected activity and the sequence of adverse actions–that plausibly support an inference of bad faith and retaliatory motive. Such allegations are sufficient at the pleading stage to defeat dismissal based on qualified privilege.

### H. Abuse of Rights (Count VIII)

---

[77]Doc. 18-1 at 8-9 (describing the alleged statements as private communications between Dr. Crosslin and Dr. Machado about Plaintiff's purported misconduct and academic performance).

[78]Doc. 18-1 at 9 (arguing that Plaintiff alleges the communications are not privileged only because of purported "malice").

[79]Elmer v. Coplin, 485 So.2d 171 (La. App. 2 Cir. 1986).

[80]Doc. 18-1 at 8-9 (framing the alleged statements as communications regarding academic matters and performance).

[81]Doc. 18-1 at 9 (arguing that Plaintiff fails to allege anything beyond conclusory statements to prove malice).

### 1. Intent to Harm Is Alleged And Cannot Be Resolved at Rule 12 Stage

Defendants argue that Plaintiff fails to allege facts showing a predominant intent to harm. This argument ignores the sequence of events alleged in the Amended Complaint. Plaintiff alleges that after approving Plaintiff's medically related accommodation, Dr. Crosslin initiated a series of adverse actions, including revoking the arrangement while Plaintiff was abroad for medical treatment, terminating Plaintiff's stipend support, and removing Plaintiff from the laboratory. These surrounding circumstances plausibly support an inference that the actions were motivated by retaliation rather than by legitimate academic concerns.

### 2. Defendant Contends That The Complaint Does Not Negate Dr. Crosslin's Legitimate Interests in Laboratory Supervision, Performance Evaluation, And Advisor Decisions.[82]

The Amended Complaint does not challenge the existence of those interests in the abstract. Instead, Plaintiff alleges that Defendant Crosslin invoked academic supervision as a pretext to justify adverse actions that followed Plaintiff's protected activity and reliance on Tulane's approved accommodation. Whether Defendants' asserted interests were genuine or pretextual is a factual question that cannot be resolved at the motion-to-dismiss stage.

### 3. Defendants Argue That The Amended Complaint's Allegations Regarding Dr. Crosslin's Supervisory Authority Do Not Satisfy The Doctrine's High Bar.[83]

To the contrary, those allegations reinforce the plausibility of Plaintiff's claim. The Complaint alleges that Dr. Crosslin exercised substantial control over Plaintiff's funding, laboratory access, and academic progress, creating a highly dependent advisor-student relationship. When such authority is allegedly used to impose adverse consequences following protected activity and reliance on approved accommodations, the Complaint plausibly alleges conduct that exceeds the bounds of ordinary academic administration.[84]

---

[82] Doc. 18-1 at 9 (arguing, as to Count VIII, that the amended allegations do not overcome the academic-freedom defense and still fail to state an abuse-of-rights claim under Louisiana's sparingly applied doctrine).

[83] Doc. 18-1 at 8-9 (arguing, as to Count VIII, that the alleged rights abused included Dr. Crosslin's supervisory authority, but those facts still fail to satisfy the doctrine's high bar, which is applied sparingly in Louisiana).

[84] See Section III.D.2.

#### 4. Plaintiff Has Also Alleged Dr. Crosslin's Potential Intent That Are Not Legitimate

Additionally, Plaintiff alleges that Dr. Crosslin faced laboratory funding constraints[85] and maintained outside interests[86] unrelated to Plaintiff's academic performance. Whether the motivating force behind the adverse actions was legitimate academic judgment, non-academic financial pressure, retaliation, or additional discrimination is a question of intent.

Intent is a classic factual issue. The Court–not Defendants–must determine the timeline and motivation of the adverse actions. Dismissal at this stage is improper.

### I. National Origin Discrimination (Count IX)

#### 1. Comparator Exists But Needs to Be Discovered under Seal

Defendants argue that Plaintiff fails to identify a similarly situated non-Chinese student who was treated differently.[87] Plaintiff does possess such comparator information. However, the identities of other graduate students constitute sensitive educational records protected by privacy considerations. At the pleading stage, Plaintiff is not required to disclose the identities of those students publicly. Such information can be produced through discovery under an appropriate protective order or sealed filing. The Amended Complaint nevertheless plausibly alleges disparate treatment, including that U.S.-born Ph.D. students in Dr. Crosslin's group were permitted to travel without suffering comparable adverse actions. This argument acknowledges that Plaintiff has alleged a comparator, merely not the identity of the comparator. [88]

#### 2. Adverse Actions by Tulane's Agent Crosslin Has Been Pled Repeatedly

The Amended Complaint repeatedly alleges that Dr. Crosslin, acting as Plaintiff's advisor and Tulane's agent, took a series of adverse actions against Plaintiff. These include revoking the previously approved accommodation, terminating Plaintiff's stipend support, removing Plaintiff from laboratory access, and initiating steps that jeopardized Plaintiff's continuation in the Ph.D.

---

[85] Amended Complaint para. 88.
[86] Amended Complaint para. 100.
[87] Doc. 18-1 at 25 (arguing that Plaintiff's allegation about "U.S.-born Ph.D. students" is conclusory because he does not identify any specific comparator outside his protected class).
[88] Amended Complaint paras. 83-84, 241-242.

program. These allegations are described in multiple sections of the Amended Complaint and form a consistent factual narrative showing that Plaintiff's academic progress, funding, and research access were materially disrupted by Dr. Crosslin's decisions. At the pleading stage, such allegations are more than sufficient to establish the existence of adverse actions.[89]

### 3. Intent Is Plausibly Alleged by The Timing of Dr. Crosslin's Adverse Actions

The Amended Complaint also plausibly alleges intent through the timing of Dr. Crosslin's conduct. Plaintiff alleges that Dr. Crosslin approved the relevant arrangement and allowed Plaintiff to rely upon it while Plaintiff continued his research activities and academic obligations. Only after Plaintiff traveled abroad and became particularly dependent on the continuation of his academic status did Dr. Crosslin initiate the adverse actions described above. The close temporal relationship between Plaintiff's travel circumstances as an international student and the subsequent adverse decisions supports a plausible inference that these actions were not merely routine academic decisions but were taken with knowledge of the disproportionate consequences they would impose on Plaintiff.[90]

### J. Relief Cannot Be Determined at Rule 12(b) Stage

### 1. Defendants Rely on An Outdated Legal Standard Rejected by The Supreme Court

Defendants rely on the assertion that "Plaintiffs can only recover compensatory damages under Section 504 upon a showing of intentional discrimination, which requires 'something more than deliberate indifference.'"[91]

Defendants' argument relies on a heightened standard historically applied in some education cases. But the Supreme Court recently rejected such education-specific standards in A.J.T. v. Osseo Area Schools (2025),[92] holding that claims against schools under the ADA and Section 504 are

---

[89] Amended Complaint paras. 26-32, 63, 113, 236.

[90] Amended Complaint paras. 15, 24-32, 81-82, 235-239.

[91] Doc. 18-1 at 19 (arguing that Section 504 compensatory damages require intentional discrimination and "something more than deliberate indifference").

[92] A.J.T. v. Osseo Area Schs., 2025 WL 1657415 (U.S. June 12, 2025).

governed by the same liability framework applicable in other contexts.  The Court specifically rejected the requirement that plaintiffs demonstrate "bad faith or gross misjudgment." Accordingly, Plaintiff need only plausibly allege deliberate indifference, which the Amended Complaint does.

### 2. "Relief Is Improper" Is Conclusory

To the extent Defendants challenge particular categories of damages, that dispute goes to remedies–not to whether the Amended Complaint states plausible claims.  If certain damages are ultimately unavailable under controlling precedent, including emotional-distress damages under Spending Clause statutes, the appropriate course is to narrow the prayer for relief, not to dismiss otherwise viable claims at Rule 12(b)(6).[93]

### V. Conclusion

For the foregoing reasons, Plaintiff respectfully requests that the Court deny Tulane's Motion to Dismiss (Doc. 6), the Individual Defendants' Motion to Dismiss (Doc. 7), and the Renewed Motion to Dismiss (Doc. 18) in their entirety.  Accepting the well-pleaded allegations as true, each Count plausibly alleges claims for relief and presents factual disputes that are inappropriate for resolution at the motion-to-dismiss stage.  Moreover, Defendants' motions rely heavily on materials outside the pleadings and arguments resembling summary judgment.  Accordingly, Plaintiff respectfully requests that the Court allow the case to proceed to discovery so that the relevant evidence may be properly developed.

Respectfully Submitted,

Date of signing: 3/15/2026

Signature of Plaintiff:

Printed Name of Plaintiff: Yue Zhao

Address: 500 Aries Dr Apt 5A

---

[93]Cummings v. Premier Rehab Keller, P.L.L.C., 596 U.S. 212 (2022).

21

Mandeville, LA 70471

**<u>Certification of Service</u>**

I hereby certify that on this 15th day of March, 2026, a true and correct copy of the foregoing filing was submitted by the Pro Se Plaintiff through the Court's Electronic Document Submission System (EDSS) for filing with the Clerk of Court for the United States District Court for the Eastern District of Louisiana.  Upon filing by the Clerk on the Court's CM/ECF system, service was thereby effected upon all counsel of record for Defendants, each of whom is registered to receive electronic service through CM/ECF.