UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

YUE ZHAO

CIVIL ACTION

VERSUS

NO. 25-2474

THE ADMINISTRATORS OF THE
TULANE EDUCATIONAL FUND ET
AL.

SECTION "R" (3)

## ORDER AND REASONS

Before the Court is the motion of defendants David Crosslin, Heather Machado, Lee Hamm, and the Administrators of the Tulane Educational Fund to dismiss plaintiff Yue Zhao's amended complaint.[1] Plaintiff opposes the motion.[2] Also pending before the Court is plaintiff's motion for leave to file a sur-reply to defendants' motion to dismiss.[3] Defendants oppose plaintiff's motion.[4] At the outset, the Court GRANTS plaintiff's motion for leave to file a sur reply and has considered plaintiff's proposed pleading in its determination of defendants' motion to dismiss. For the following reasons, the Court GRANTS defendants' motion.

---

[1]    R. Docs. 18.
[2]    R. Doc. 19.
[3]    R. Doc. 22.
[4]    R. Doc. 23.

## I.    BACKGROUND

Yue Zhao, proceeding pro se, brought this case on December 8, 2025.[5] Plaintiff alleges that he was a Biomedical Sciences ("BMS") PhD student at Tulane University with a placement in defendant Crosslin's research lab—a dry lab requiring no physical experiments.[6]  He further alleges that Crosslin previously acted as his PhD supervisor.[7]  Plaintiff's complaint arises from his removal from Crosslin's lab, which plaintiff contends was for discriminatory reasons.[8]

In early 2025 plaintiff alleges that he was diagnosed with severe fatty liver disease.[9]  Plaintiff alleges that he required a medical accommodation— remote work to receive medical testing and treatment in China—due to the severe fatty liver diagnosis.[10]   In a March 2025 email, Crosslin allegedly approved plaintiff's requested accommodation.[11]   Plaintiff additionally alleges that he reached out to Machado, the Assistant Dean of Tulane's BMS Program, regarding his requested trip to China, and that they had a meeting regarding the same, during which Machado instructed plaintiff to obtain a

---

[5]    R. Doc. 1.
[6]    R. Doc. 13 at ¶¶ 1–2, 22.
[7]    *Id.* at ¶ 2.
[8]    *See generally* R. Doc. 13.
[9]    *Id.* at ¶¶ 8–15.
[10]    *Id.* at ¶¶ 11–12.
[11]    *Id.* at ¶ 15.

travel signature from the Office of International Students and Scholars ("OISS").[12]  Plaintiff alleges that he acquired the travel signature from OISS on April 4, 2025.[13]  Plaintiff's request was allegedly not for "indefinite" travel and remote work, but was "temporary and time-limited, specifically for a period of two to three months[.]"[14]

Thereafter plaintiff left for China where he remained until at least August 2025.[15]  On July 31, 2025, Crosslin allegedly emailed plaintiff informing him that plaintiff no longer had a place in Crosslin's lab, Crosslin did not view plaintiff as "working remotely," and that plaintiff's stipend was cancelled effective July 10, 2025.[16]  Plaintiff contends that Crosslin's reasons for removing plaintiff from the Crosslin lab were false.[17]  Crosslin also allegedly emailed Machado on July 31, 2025, to inform her of Crosslin's decision to remove plaintiff from the Crosslin lab.[18]

On August 1, 2025, plaintiff allegedly submitted evidence of his remote work.[19]  Machado emailed plaintiff on August 6, 2025, informing him that

---

[12]     *Id.* at ¶¶ 16–20.
[13]     *Id.* at ¶ 21.
[14]     *Id.* at ¶ 23.
[15]     *See id.* at ¶¶ 24, 42.
[16]     *Id.* at ¶¶ 26–30.
[17]     *Id.* at ¶ 31.
[18]     *Id.* at ¶ 35.
[19]     *Id.* at ¶ 40.

3

Crosslin would reimburse unpaid funds and that plaintiff needed to find a new advisor by September 5, 2025, to remain in good standing.[20]  Plaintiff allegedly renewed his visa on August 13, 2025, and subsequently returned to the United States.[21]

On August 29, 2025, plaintiff allegedly sent a formal demand letter to Hamm, the Dean of Tulane University Medical School, and Provost Robin Forman detailing what he viewed as "discriminatory and retaliatory conduct" and requested anti-retaliation measures and an administrative hearing.[22] That same day, plaintiff allegedly informed Hamm that he was suffering from severe depression.[23]  Hamm allegedly acknowledged receipt and informed plaintiff that he would review the case.[24]  Plaintiff alleges that no hearing was conducted and that no anti-retaliation measures were initiated.[25]

Plaintiff alleges that Tulane, through its Associate General Counsel, offered plaintiff an additional 21 days to find a new advisor, thereby extending the September 5 deadline.[26]  Plaintiff allegedly informed Tulane

---

[20]     *Id.* at ¶ 41.
[21]     *Id.* at ¶ 42.
[22]     *Id.* at ¶ 43.
[23]     *Id.* at ¶ 44.
[24]     *Id.* at ¶ 45.
[25]     *Id.* at ¶¶ 46, 68–70.
[26]     *Id.* at ¶ 47.

that this accommodation was unreasonable.[27]  He also allegedly proposed an unspecified settlement plan that Tulane refused.[28]   Tulane then allegedly threatened to dismiss plaintiff from the PhD program if he did not find a new dissertation advisor by September 25.[29]  Plaintiff acknowledges that he has not been dismissed or expelled from Tulane.[30]

Plaintiff additionally alleges that Tulane instructed him to reach out to the Office of Institutional Equity.[31]  Plaintiff allegedly did so, and an Equal Opportunity investigation was initiated.[32]  Plaintiff further alleges that BMS leadership, specifically Machado and Hamm, did not report his allegations against Crosslin to the Office of Institutional Equity.[33]  As of February 4, 2026, the Office of Institutional Equity's investigation is allegedly still ongoing.[34]

Plaintiff further alleges that because of his dealings with Crosslin he developed Major Depressive Disorder.[35]  He alleges that he is no longer able

---

[27]     *Id.* at ¶ 48.
[28]     *Id.* at ¶ 50.
[29]     *Id.* at ¶ 51.
[30]     *Id.* at ¶ 63.
[31]     *Id.* at ¶ 53.
[32]     *Id.* at ¶ 54.
[33]     *Id.* at ¶ 55.
[34]     *Id.* at ¶ 54.
[35]     *Id.* at ¶ 57.

to continue his PhD studies.[36]  He additionally alleges that, with no assigned lab or stipend funding, he has no viable pathway to continue his PhD studies.[37]  Plaintiff acknowledges that he has not been issued a formal dismissal or expulsion from Tulane.[38]

Plaintiff brings nine claims: (1) Disability Discrimination and Failure to Accommodate under the Americans with Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 ("Section 504"); (2) Retaliation under the ADA and Section 504; (3) Breach of Contract; (4) Intentional Infliction of Emotional Distress; (5) Fraudulent Inducement; (6) Negligent Supervision, Training, and Negligence; (7) Defamation; (8) Abuse of Rights; and (9) National Origin Discrimination in violation of Title VI.[39]

Plaintiff's original complaint included several additional claims: Hostile Educational Environment under Section 504; Detrimental Reliance; Failure to Provide Required Accommodation and Grievance Procedures under the ADA and Section 504; and Gross Negligence.[40]  These claims were either incorporated into other claims or dropped in plaintiff's amended complaint.  The Court considers only plaintiff's claims as they are presented

---

[36]     *Id.* at ¶ 59.
[37]     *Id.* at ¶ 63.
[38]     *Id.*
[39]     *See generally* R. Doc. 13.
[40]     *See generally* R. Doc. 1.

in the amended complaint.  *See Royal Canin U.S.A., Inc. v. Wullschleger*, 604 U.S. 22, 35.

Defendants filed motions to dismiss plaintiff's original complaint.[41]  In response, plaintiff filed an amended complaint.[42]  Defendants now move to dismiss plaintiff's amended complaint and have incorporated arguments from the earlier-filed motions to dismiss.[43]  Plaintiff filed a response in opposition.[44]

The Court considers the parties' arguments below.

## II.    LEGAL STANDARD

To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must plead enough facts to "state a claim to relief that is plausible on its face," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 547 (2007)), and "that, if true, 'raise a right to relief above the speculative level.'"  *Franklin v. Regions Bank*, 976 F.3d 443, 447 (5th Cir. 2020) (quoting *Twombly,* 550 U.S. at 555).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."

---

[41]     R. Docs. 6, 7.
[42]     R. Doc. 13.
[43]     R. Doc. 18.
[44]     R. Doc. 19.

*Iqbal*, 556 U.S. at 678.  The Court must accept all well-pleaded facts as true and must draw all reasonable inferences in favor of the plaintiff.  *Lormand v. U.S. Unwired, Inc.*, 565 F.3d 228, 239, 244 (5th Cir. 2009).  But the Court is not bound to accept as true legal conclusions couched as factual allegations.  *Iqbal*, 556 U.S. at 678.

## III.  DISCUSSION

### A.    Disability Discrimination and Failure to Accommodate

The ADA prohibits discrimination against a qualified person in regard to the "hiring, advancement, or discharge of employees."   42 U.S.C. § 12112(a).  Discrimination includes, as relevant here, (1) failure to make "reasonable accommodations to the known physical or mental limitations" of an employee with a disability and (2) denial of equal employment opportunities to a person with a disability.  42 U.S.C. § 12112(b)(5).  "The language in the ADA generally tracks the language set forth in the [Rehabilitation Act "RA"], and jurisprudence interpreting either section is applicable to both."  *Kemp v. Holder*, 610 F.3d 231, 234 (5th Cir. 2010) (citation modified).

To establish a discrimination claim under the ADA, a plaintiff must demonstrate: (1) that he has a disability; (2) that he is qualified for the position of employment; and (3) he was discriminated against because of his

disability.  *Griffin v. United Parcel Serv., Inc.*, 661 F.3d 216, 222 (5th Cir. 2011).

A necessary aspect of plaintiff's claims is a showing that he suffers from a disability protected under the ADA.  *See Cutrera v. Board of Supervisors of Louisiana State University*, 429 F.3d 108, 111 (5th Cir. 2005).  "[W]hether a person has a disability under the ADA is an individualized inquiry." *Hodges v. ISP Technologies, Inc.*, 427 F. App'x 337, 340 (5th Cir. 2011) (quoting *Sutton v. United Air Lines, Inc.*, 527 U.S. 471 (1999)) (citation modified).  The ADA defines "disability" as "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment."  42 U.S.C. § 12102(a).

Not every impairment is a disability within the meaning of the ADA. *See Hodges*, 427 F. App'x at 340 (quoting *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184 (2002)).  The impairment must substantially limit one or more major life activities of the individual.  *See Bridges v. City of Bossier*, 92 F.3d 329, 332 (5th Cir. 1996).  Simply put, the "concept of a per se disability under the ADA, no matter how serious the impairment" is not recognized in the Fifth Circuit.  *Waldrip v. General Elec. Co.*, 325 F.3d 652, 656 (5th Cir. 2003).  The plaintiff must plausibly allege not merely that "an

impairment like his own could substantially limit a major life activity of another person or in his own future"; rather, he must allege "an impairment that has actually and substantially limited the major life activity on which he relies." *See id.*

To establish a failure to accommodate claim under the ADA, a plaintiff must show: (1) he is a qualified individual with a disability; (2) the disability and its limitations were known by the employer; and (3) the employer failed to make reasonable accommodations for the limitations. *Weber v. BNSF Ry. Co.*, 989 F.3d 320, 323 (5th Cir. 2021). "[I]t is the employee's initial request for an accommodation which triggers the employer's obligation to participate in the interactive process of determining one." *Taylor v. Principal Fin. Grp.*, 93 F.3d 155, 165 (5th Cir. 1996) (citing 29 C.F.R. § 1630.9). Once the employer has been put on notice of its employee's need for an accommodation, the ADA obligates both parties to engage in a good faith interactive process to develop a reasonable accommodation. *See Jenkins v. Cleco Power, LLC*, 487 F.3d 309, 316 (5th Cir. 2007). The contours of the interactive process must be determined on a case-by-case basis. *Loulseged v. Akzo Nobel Inc.*, 178 F.3d 731, 736 (5th Cir. 1999).

Here, plaintiff alleges two disabilities—severe fatty liver disease and major depressive disorder—but only one—severe fatty liver disease—is

10

alleged to have been active at the time of the bulk of the conduct plaintiff relies on for his discrimination claim. The Court will address each in turn.

### 1. *Fatty Liver Disease*

Plaintiff's assertion that he suffers from severe fatty liver disease is insufficient to show that he suffers from a disability within the meaning of the ADA. Plaintiff does not allege facts sufficient to support a showing that the impairment substantially limits one or more of his major life activities. His general allegation that fatty liver disease substantially limits digestive function is insufficient. Plaintiff has not plausibly alleged facts suggesting that his fatty liver disease "actually and substantially limited" *his* digestive function or any other major life activity. *Id.*; *see also Griffin*, 661 F.3d at 223. Plaintiff's invocation of his severe fatty liver disease diagnosis fails to form the basis of the first prong of a disability discrimination claim.

Furthermore, even if plaintiff had properly alleged a disability based on his fatty liver disease, he has not properly alleged a failure to accommodate any such disability by defendants. In his amended complaint, plaintiff states that he expressly sought a remote-work accommodation that was "temporary and time-limited, specifically for a period of approximately two to three months."[45]    Plaintiff alleges that he was granted this

---

[45]    R. Doc. 13 at ¶ 23.

accommodation, with the final administrative step occurring on April 4, 2025.[46]  Dr. Crosslin allegedly removed plaintiff from his lab on July 31, 2025, nearly four months after plaintiff received approval for remote work.[47]  Plaintiff does not adequately allege that any approved accommodation was revoked.  Per the dates alleged in the pleadings, plaintiff was granted a two- to three-month accommodation and was removed from his lab nearly four months later—*after* the expiration of the accommodation.

### 2. *Major Depressive Disorder*

The Court now turns to plaintiff's alleged major depressive disorder ("MDD").  This condition cannot support plaintiff's disability discrimination claim.  Plaintiff alleges that he suffered from this condition "as a direct result of Dr. Crosslin's conduct."[48]  Additionally, he alleges that Tulane was first notified of this condition on August 29, 2025.[49]  Plaintiff cannot look to this diagnosis to support a claim of disability discrimination based on actions taken by Tulane *before* his diagnosis.  The only alleged action after plaintiff received his MDD diagnosis and notified Tulane of it was Tulane's threatening plaintiff's dismissal but offering him 21 additional days to secure

---

[46]     *Id.* at ¶ 21.
[47]     *Id.* at ¶ 26.
[48]     R. Doc. 13 at ¶ 57.
[49]     *Id.* at ¶ 44.

a new advisor. This action forms the basis of plaintiff's failure to accommodate claim.

Plaintiff's allegation that he notified Tulane that he was suffering from severe depression, without more, is insufficient to state a claim under the ADA. As the Fifth Circuit has explained, "[m]ere knowledge of the disability is not enough." *Windham v. Harris Cnty.*, 875 F.3d 229, 236 (5th Cir. 2017). Plaintiff has the burden "to specifically identify the disability and resulting limitations and to request an accommodation in direct and specific terms." *Id.* at 236–37 (internal quotations and citations omitted). Here, plaintiff has not alleged that he identified the resulting limitations of his severe depression/MDD and provided Tulane with a direct and specific request for accommodation. Absent a specific and direct request, a plaintiff "can prevail only by showing that the disability, resulting limitation, and necessary reasonable accommodation were open, obvious, and apparent . . . ." *Id.* at 237 (citation modified). Plaintiff does not allege that the necessary reasonable accommodation, which he does not specify in his complaint, was "open, obvious, and apparent." *Id.*

Plaintiff has failed to state a claim for disability discrimination or failure to accommodate under the ADA and Section 504. Accordingly, the Court grants defendants' motion as to these claims and dismisses count I of

plaintiff's amended complaint.

## B.    Retaliation

The ADA prohibits discrimination "against any individual because such individual has opposed any act or practice made unlawful by" Chapter 126 of Title 42 of the U.S. Code.  42 U.S.C. § 12203(a).  To establish a retaliation claim under the ADA, a plaintiff must show: (1) that he was engaged in activity protected by the statute; (2) an adverse employment action; and (3) a causal connection between the two.  *January v. City of Huntsville*, 74 F.4th 646, 653 (5th Cir. 2023).  A plaintiff need not be a "qualified individual" under the ADA to prevail on a retaliation claim as long as he has a "good faith belief that the [ADA] has been violated." *Tabatchnik v. Continental Airlines*, 262 F. App'x 674, 676 (5th Cir. 2008) (citation modified).

Here, plaintiff alleges that he engaged in protected activity by (1) requesting disability accommodations and (2) reporting discrimination and retaliation to Tulane.[50]  Plaintiff alleges that he was retaliated against when he was (1) removed from Crosslin's lab and lost research, facility access, and stipend support that came from the lab position; and (2) threatened with

---

[50]    R. Doc. 13 at ¶ 135.

dismissal from Tulane's PhD program.[51]  Plaintiff does not allege that he was ever dismissed from Tulane's PhD program; indeed, he acknowledges that he has never been formally expelled or dismissed.[52]  The Court analyzes each alleged protected activity and instance of alleged retaliation in turn.

### 1. *Requesting a Disability Accommodation*

Plaintiff has failed to establish a causal connection between his request for a disability accommodation and his dismissal from Crosslin's lab. Plaintiff requested his accommodation in mid-March 2025.[53]  He was not removed from Crosslin's laboratory and told he needed to find a new laboratory and PhD supervisor until late July 2025.[54]  Plaintiff cannot establish causation based on temporal proximity alone because the events are not sufficiently close in time.  *See Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) ("The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case [of retaliation] uniformly hold that the temporal proximity must be very close."); *see also Lyons*, 964 F.3d at 306 (noting that the Fifth Circuit

---

[51]    *Id.* at ¶ 137.

[52]    *Id.* at ¶ 63.

[53]    *Id.* at ¶¶ 11–21.

[54]    *Id.* at ¶¶ 26–29.

has previously ruled "that a six-and-a-half week timeframe is sufficiently close, but that a five month lapse is not close enough, without other evidence of retaliation, to establish" a causal connection).  Plaintiff has pled no other facts that support causation.

### 2. *Grievance Report*

Plaintiff's claim that he suffered retaliation as a result of his grievance report fails because he has again not alleged facts sufficient to make a *prima facie* showing of causation.  Plaintiff alleges that he was informed of the need to find a new dissertation advisor on August 6, 2025—23 days *before* plaintiff submitted to defendants a formal demand letter alleging discrimination.[55] Defendants could not have retaliated against plaintiff for submitting a formal grievance that he had not yet submitted.

Plaintiff further alleges that defendants threatened him with dismissal sometime in early September.  The temporal proximity between this act and the submission of plaintiff's formal grievance is close enough to justify a *possible* causal inference.  But, even assuming that a threat of dismissal (rather than dismissal itself) constitutes an adverse employment action, "the mere fact that some adverse action is taken after an employee engages in some protected activity will not always be enough for a *prima facie* case."

---

[55]    *Id.* at ¶¶ 41, 43.

*Swanson v. General Servs. Admin.*, 110 F.3d 1180, 1188 n.3 (5th Cir. 1997). Retaliation protections do not permit employees "to disregard work rules or job requirements." *Id.* The BMS Handbook requires students to match with a dissertation advisor or face dismissal.[56] Plaintiff had not done so and had rejected defendants' offer of an extension to do so.[57] Moreover, the September threat of dismissal is not an isolated action; rather, it is a logical follow-up to Machado's email in August—*before* plaintiff submitted his grievance report—informing him that he would need to find a new advisor. Under these circumstances, plaintiff's allegation of threatened dismissal, without more than temporal proximity to his formal grievance, does not sufficiently plead a causal link between protected activity and an adverse employment action.

Further, the Court is dubious that a threat of dismissal that has still not been carried out after nine months even amounts to an adverse employment action.

Plaintiff has failed to adequately plead a claim for retaliation. The Court therefore must grant defendants' motion as to this claim. The Court dismisses count II of plaintiff's amended complaint.

---

[56]    R. Doc. 21-1 at 12.
[57]    R. Doc. 13 at ¶ 47.

## C.    Breach of Contract

Under Louisiana law, the essential elements of a breach of contract claim are: (1) a contract; (2) breach; and (3) resulting damages. *Padian v. Algiers Charter Sch. Ass'n, Inc.*, 274 So. 3d 1266, 1268 (La. App. 4 Cir. 2019) (cleaned up). Plaintiff's breach of contract claim is based on four alleged contracts: (1) the BMS Program Handbook; (2) Tulane's Equal Opportunity Policy; (3) Tulane's written disability accommodation policies; and (4) Crosslin's written accommodation approval.[58]

The Court first addresses its reliance upon the BMS Program Handbook and Tulane's Equal Opportunity Policy, which defendants have attached to their briefing.[59] On a 12(b)(6) motion the Court may consider "documents attached to either [the] motion . . . or an opposition to that motion when the documents are referred to in the pleadings and are central to plaintiff's claims." *Brand Coupon Network, L.L.C. v. Catalina Mktg.*

---

[58]    R. Doc. 13 at ¶¶ 146–158.

[59]    The Court notes that defendants originally attached newer versions of these policies. *See* R. Docs. 18-2, 18-3. Defendants attached the older versions, which plaintiff refers to in his complaint, to their reply brief. *See* R. Docs. 21-1, 21-2. However, a review of the versions reveal that the relevant provisions are substantially the same. Further, as plaintiff was granted leave to file a sur-reply, and the sur-reply was considered in evaluating defendants' motion, plaintiff has been afforded the opportunity to respond to all arguments before the Court. The Court will thus look to the versions of these key documents that defendants attached to their reply.

*Corp.*, 748 F.3d 631, 635 (5th Cir. 2014).   Here, plaintiff's amended complaint repeatedly references the BMS Program Handbook and Tulane's Equal Opportunity Policy.  Such papers are central to plaintiff's breach of contract claim.  Accordingly, the Court may consider these papers without transforming the present 12(b)(6) motion into a motion for summary judgment.

Pretermitting whether the BMS Program Handbook constitutes a binding contract, plaintiff's breach of contract claim based on the cited sections of the BMS Handbook fails because the sections did not create the obligations that plaintiff's claim rests upon.  Plaintiff's claim relating to the BMS handbook invokes three key groups of provisions: sections II.B.7–8, sections IV.G.9–11, and section III.E.  The Court begins with sections II.B.7–8.

Plaintiff claims that Crosslin's absence from campus, failure to maintain supervisory contact, prolonged unavailability, failure to supervise plaintiff's IDP plan, and unilateral removal of plaintiff from Crosslin's laboratory breached §§ II.B.7–8 of the handbook.[60]  These sections provide in relevant part:

> **§ II.B.7 Individual Development Plan and Student Tracking Record**

---

[60]     *Id.* at ¶ 152.

The Individual Development Plan (IDP) provides students with opportunities to think about training objectives, review progress, and set academic and career goals.  In years 2 and beyond, students should complete an IDP annually, and review with the Dissertation Advisor.  Students should also submit a completed Student Tracking Record form annually.  Faculty mentors are required to complete an Annual Review of PhD Student Progress each year to review progress and set academic and career goals.  Students should provide their faculty mentors with this form, and review at the same time as the IDP.

Deadline: Students should submit a completed IDP, Student Tracking Record, and faculty Annual Review of PhD Student Progress forms by June 30 each year through Canvas.  Failure to submit these forms by the deadline will result in disciplinary action, such as academic probation.

### § II.B.8.  Ph.D. Milestones and Timelines

. . .

b) Choosing a Dissertation Advisor: Students should choose a Dissertation Advisor by the end of the second semester and must begin their dissertation research during the summer of their first year.  If the student fails to choose a Dissertation Advisor by the end of the second semester of their first year, they must explain the delay to their temporary advisor and BMS Leadership and perform additional research rotations during the summer semester.  In this case, a student must choose a Dissertation Advisor by the end of the summer semester. Failure to match with a Dissertation Advisor can lead to dismissal.

c) Choosing a Dissertation Committee: A Dissertation Committee should be chosen by the student in consultation with the Dissertation Advisor by the end of the 4th semester.  This Committee will participate in annual meetings with the student, approve the Prospectus, and approve the final written dissertation and oral thesis defense.  This Committee may also, but is not required, to serve as the Preliminary Examination Committee.

e) Annual Dissertation Committee Meetings

Students should meet at least annually with their Dissertation Committees.  Following the completion of the Preliminary Exam,

students should schedule a meeting with the Committee where they propose the dissertation project, review research progress, and receive feedback from the committee.[61]

Putting the Individual Development Plan ("IDP") to the side, these provisions do not support the obligations that plaintiff alleges were breached. Sections II.B.7–8 contain no requirement that supervisors regularly be present on campus, maintain supervisory contact, be available, or discuss a candidate's removal from the supervisor's own laboratory with the candidate's dissertation committee. Crosslin's conduct cannot constitute a breach of Sections II.B.7–8 of the BMS Handbook because those sections did not impose on Crosslin obligations to behave in the way plaintiff desired.

Returning to the IDP, plaintiff's allegation that Crosslin did not "fulfill his supervisory obligations" regarding the IDP plan is conclusory and fails to allege facts plausibly stating a contract claim. Section II.B.7 places the burden on the student to complete the IDP and submit it for review by June 30. Plaintiff alleges he emailed Crosslin about his IDP several times,[62] but he has not alleged that he submitted his IDP on time or ever. If the BMS Handbook establishes a contractual obligation on Crosslin to review the IDP, plaintiff fails to allege that he triggered that obligation by submitting the IDP.

---

[61]    R. Doc. 21-2 at 11–18.
[62]    R. Doc. 13 at ¶ 25.

Beyond the IDP, the only obligation Section II.B.7 places on dissertation advisors is to "complete an Annual Review of PhD Student Progress." Plaintiff does not allege that Crosslin failed to complete this form. Plaintiff's allegations are simply insufficient to form the basis of a breach of contract claim.

Plaintiff additionally alleges that Crosslin breached sections IV.G.9–11 by imposing adverse academic consequences without notice, a hearing, committee review, or an appeal. Sections IV.G.9–11 provide:

> **§ IV.G.9 Academic Probation**
> A Student may be placed on academic probation for the following reasons:
> - Failure to meet Academic Performance Standards[.]
> - Failure to meet Technical Performance Standards[.]
> - Failure to complete Milestones in accordance with the timeline given[.]
> - Failure to submit required annual paperwork, or other degree requirements[.]
> - Violation of the expectations of professional behavior.
> - Other reasons at the discretion of BMS Leadership.
>
> The terms of the probation will be established by BMS leadership in consultation with the Steering Committee. Students on academic probation are ineligible to obtain a letter of good standing, which may affect student fellowship applications and foreign student visa renewals.
>
> **§ IV.G.10 Dismissal**
> A student may be dismissed for any of the following academic or non-academic reasons:
> - Failure to meet Academic Performance Standards[.]
> - Failure to meet Technical Performance Standards[.]
> - Violation of the honor code or other misconduct.

- Possibility of danger to the health of the student or to other students if enrollment is continued.
- Violation of the expectations of professional behavior.
- Other reasons at the discretion of BMS leadership.

The University reserves the right to forbid any student's continued enrollment without assignment of reason. An appellate procedure has been established in cases involving academic performance or possible infringement of academic freedom. The BMS Program also has appellate procedures in cases involving non-reappointment of fellowships or scholarships when the formal terms of the first award have given reasonable expectation of renewal. Such procedures may also apply to cases in which a graduate, teaching, or research assistant, is relieved of a position before the end of the term of the appointment or is not reappointed when the formal terms of the first appointment have given reasonable expectation of reappointment. Detailed procedures can be obtained from the BMS Program.

If a student being considered for probation or dismissal receives a stipend, the stipend will be automatically discontinued if they are dismissed. This change will be in effect within one pay cycle of the final decision being issued.

### § IV.G.11 Student Appeals and Grievances
These procedures do not apply to cases under the Code of Academic Conduct or the Code of Student Conduct. The timelines described are not absolute and exceptions may be made under certain circumstances. Deviations from the appeal process timelines must be approved by BMS Leadership.
. . .
b) Dismissals and other Appeals
If a student has been dismissed for academic reasons, they have the right to appeal that decision.[63]

Sections IV.G.9–11 do not impose obligations that plaintiff asserts

---

[63]   R. Doc. 21-1 at 33–35.

Crosslin failed to satisfy.  Plaintiff does not allege that he was placed on academic probation, covered by IV.G.9, or dismissed, covered by IV.G.10. Instead, he alleges that he was removed from Crosslin's laboratory and lost his associated research access and stipend.  These provisions are silent as to laboratory placement and associated benefits.

Finally, plaintiff looks to section III.E. of the handbook.  This section provides:

> **III.E. Stipends**
> All PhD students receive an annual stipend while enrolled as full-time students in the BMS Program.  The stipend is continued as long as the student is making progress toward the degree. Stipends are coordinated by the BMS Office and require direct deposit.   All fellowships, scholarships, and any type of assistantships require full-time residence status and maintaining an academic level of performance satisfactory to both the department and BMS leadership.
>
> Student stipends are funded by the BMS program until July of their second year in the program.  This funding normally includes both a Fellowship and a Teaching Assistantship stipend. Dissertation Advisors are responsible for stipend funding and T-SHIP beginning July of the 2nd year until graduation.  Stipends provided by the Dissertation Advisor are Research Assistantships.[64]

Plaintiff alleges that Crosslin breached this provision by retroactively terminating plaintiff's stipend.  This allegation finds no support in the provision as provided above.  Section III.E clearly states that stipends for

---

[64]     R. Doc. 21-1 at 29.

students provided by their Dissertation Advisors are "Research Assistantships," and not "programmatic financial support" as plaintiff contends. The section creates no restriction on Crosslin's ability to control the research assistants in his lab, and the section does not provide any requirement that dissertation advisors provide funding for PhD candidates that are not research assistants for that advisor. In sum, plaintiff has failed to provide provisions of the BMS Handbook that support the obligations underlying his breach of contract claim.

The Court now turns to Tulane's Equal Opportunity Policy ("EOP")—specifically section 3.1, which describes reporting obligations.[65] Plaintiff claims that Tulane, through defendants Machado and Hamm, breached the EOP by failing to report plaintiff's complaints regarding Crosslin to Tulane's Office of Institutional Equity ("OIE").[66] He further claims that Tulane breached the EOP because the OIE did not complete an investigation into plaintiff's complaint in sixty days.[67]

Section 3.1 states that, to report allegations of discrimination or retaliation, "[e]mployees may . . . contact a department head/director, or other similar Administrator, whose responsibility it will be to refer the

---

[65]    *See* R. Doc. 21-2 at 4–6.
[66]    R. Doc. 13 at ¶ 154.
[67]    *Id.* at ¶ 156.

concern to the Equal Opportunity & Resolution Management Department for appropriate action."[68]

Plaintiff has not alleged facts suggesting that Machado breached the EOP.  He has not alleged that the facts underlying his discrimination and retaliation claims were known to Machado before he filed what he variously refers to as a "formal demand letter" and "formal grievance."  He alleges that Machado knew of his claimed disability and his requested accommodation, and of his later removal from Crosslin's lab; but he does not allege that Machado knew of his allegation that his removal was *because of* his claimed disability and accommodation.  Plaintiff made this allegation known to defendants only when he sent his formal demand letter to Hamm.[69]

Plaintiff has alleged facts indicating that Hamm may have breached the EOP, but he has not alleged facts plausibly suggesting damages suffered from this breach.  When Hamm allegedly received plaintiff's formal demand letter, Hamm had a responsibility under section 3.1 promptly to refer the concern to the Equal Opportunity and Resolution Management Department for appropriate action.  Plaintiff alleges that, instead, an attorney for Tulane, Branden Greene, contacted plaintiff's attorney a week later to offer plaintiff

---

[68]    R. Doc. 21-2 at 5.
[69]    *See id.* at ¶ 43.

an additional 21 days in which to find a new advisor.[70]   Plaintiff alleges he promptly rejected the offer, and then Greene instructed plaintiff to engage with Tulane's OIE himself.[71]  Plaintiff alleges that it was his contact with OIE, not Hamm's, that initiated an equal opportunity investigation.[72]  But to the extent that plaintiff claims that Hamm did not satisfy his reporting obligations, plaintiff has alleged no harm from any breach of the EOP.  The end result of plaintiff's initial interaction with Hamm was consideration of plaintiff's allegations by OIE.  Plaintiff has not alleged any damages caused by any delay in OIE's consideration of his allegations as a result of Hamm's alleged failure to report plaintiff's allegations earlier.

Further, Tulane did not breach the EOP by failing to conclude the equal opportunity investigation within 60 days.  Section 3.1 makes no mention of plaintiff's alleged "sixty-day" deadline.  Section 8.5.1, which provides an overview of the investigation process does state:

> Investigations will be conducted as expeditiously as possible and are usually completed within a reasonable period, typically 60 days, *though this may vary* based on the availability of parties and witnesses, breaks in the academic calendar, scope of the investigation, or unforeseen or exigent circumstances.[73]

---

[70]     *Id.* at ¶ 47.
[71]     *Id.* at ¶¶ 48, 53.
[72]     *Id.* at ¶ 54.
[73]     R. Doc. 21-2 at 17 (emphasis added).

This language is plainly insufficient to find that Tulane was contractually required to complete an investigation within sixty days.

Regarding Tulane's Written Disability Accommodation Policies and Crosslin's Approval of Plaintiff's Disability Accommodation, plaintiff makes no specific allegations.  Plaintiff does not identify any provision, nor any action that breached such a provision.

Plaintiff has failed to properly allege a breach of any contract. Accordingly, the Court must grant defendants' motion to dismiss as to this claim.  The Court dismisses count III of plaintiff's amended complaint.

### D.    Intentional Infliction of Emotional Distress

To establish a claim for intentional infliction of emotional distress ("IIED"), a plaintiff must prove: "(1) that the conduct of defendant was extreme and outrageous; (2) that the emotional distress suffered by plaintiff was severe; and (3) that the defendant desired to inflict severe emotional distress or knew that severe emotional distress would be certain or substantially certain to result from its conduct." *Eng. v. Crochet*, 154 F.4th 369, 374 (5th Cir. 2025) (cleaned up); *see also White v. Monsanto Co.*, 585 So. 2d 1205, 1209 (La. 1991).  "The conduct must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized

28

community." *Eng.*, 154 F.4th at 374.

Plaintiff alleges that Crosslin initially approved plaintiff's remote work and travel request and then revoked that approval after plaintiff had already left the country for the medical evaluation underlying the remote work and travel request.[74]  He alleges that as a result of defendant's actions he has suffered emotional distress, including MDD.[75]  And he alleges that Crosslin acted with the intent to cause plaintiff emotional distress or with reckless disregard of the probability of causing such distress.[76]

Plaintiff's allegations do not meet the high threshold for IIED claims. *See Nicholas v. Allstate Ins. Co.*, 765 So. 2d 1017, 1024–25 (La. 2000).  The conduct alleged plainly does not meet the standard for "extreme and outrageous."  Extreme and outrageous is a high bar; "[p]ersons must necessarily be expected to be hardened to a certain amount of rough language, and to occasional acts that are definitely inconsiderate and unkind." *Almerico v. Dale*, 927 So. 2d 586, 592 (La. App. 5 Cir. 2006) (quoting *White*, 585 So. 2d at 1209).  Indeed, even "[c]onduct which is merely tortious or illegal does not rise to the level of being extreme and outrageous." *Nicholas*, 765 So. 2d at 1025.  Crosslin's revocation of plaintiff's lab

---

[74]    R. Doc. 13 at ¶ 163.
[75]    *Id.* at ¶ 166.
[76]    *Id.* at ¶ 169.

placement may well be "inconsiderate and unkind," *id.*, but was certainly not so extreme and outrageous "as to be regarded as atrocious and utterly intolerable in a civilized community." *Eng.*, 154 F.4th at 374.

Plaintiff's IIED claim must be dismissed. The Court grants defendants' motion as to this claim and dismisses count IV of plaintiff's amended complaint.

### E.    Fraudulent Inducement

Plaintiff alleges that he was fraudulently induced into traveling to, and working remotely from, China on the belief that doing so was approved by Crosslin and Tulane.[77]    Plaintiff alleges that he foreseeably relied on Crosslin's representations and suffered consequences when Crosslin reversed course.

To establish a claim for fraudulent inducement under Louisiana law, a plaintiff must show: "(1) a misrepresentation, suppression, or omission of true information; (2) the intent to obtain an unjust advantage or to cause damage or inconvenience to another; and (3) the error induced by a fraudulent act must relate to a circumstance substantially influencing the victim's consent to (a cause of) the contract." *Shelton v. Standard/700 Assocs.*, 798 So. 2d 60, 64 (La. 2001). To bring a fraudulent inducement

---

[77]    *Id.* at ¶¶ 176–81.

claim, there must be a direct contract. *Bohnsack v. Varco, L.P.*, 668 F.3d 262, 277 (5th Cir 2012).

Additionally, pursuant to Federal Rule of Civil Procedure 9(b), when a plaintiff alleges fraud or mistake, plaintiff "must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). The Fifth Circuit interprets Rule 9(b) strictly. *See Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp.*, 565 F.3d 200, 207 (5th Cir. 2009). "Rule 9(b) requires the who, what, when, where, and how to be laid out." *Benchmark Elecs., Inc. v. J.M. Huber Corp.*, 343 F.3d 719, 724 (5th Cir. 2003) (internal quotations and citations omitted). In cases concerning silence or omission, a plaintiff must also show that there was a duty to disclose the information. *Kadlec Medical Center v. Lakeview Anesthesia Assoc.*, 527 F.3d 412, 418 (5th Cir. 2008); *Green v. Gulf Coast Bank*, 593 So.2d 630, 632 (La. 1992).

Plaintiff fails to allege a valid contractual relationship between himself and Tulane through Crosslin regarding his travel to China. Repeatedly stating, without providing any supportive allegations, that a contract exists is insufficient. Without this contractual relationship, plaintiff's fraudulent inducement claim fails. Moreover, plaintiff's claim is devoid of facts that would support the allegation that Crosslin/Tulane acted with the specific

31

intent to deceive, a necessary element of fraud.  *See Shelton*, 798 So. 2d at 64; *see also Henry v. Cisco Systems, Inc.*, 106 F. App'x 235, 239 (5th Cir. 2004).     Furthermore,  plaintiff's  bare-bones  statement  that  Crosslin "suppressed material truths and failed to disclose facts he had a duty to communicate"[78] does not meet Rule 9(b)'s heightened standard.  It is simply a threadbare recital of a required element of his claim.  Plaintiff has not shown that there was a duty to speak, nor has he alleged the circumstances constituting the alleged fraud.  Accordingly, the Court grants defendants' motion as to this claim and dismisses count V of plaintiff's amended complaint.

### F.    Negligent Supervision, Training, and Negligence

Plaintiff alleges that Tulane University owed him duties arising from its role as: (1) an educational institution; (2) an employer of faculty and administrators; and (3) a recipient and administrator of federal grant money.[79]  Plaintiff further alleges that these duties included supervising faculty and administrators and training faculty and administrators on ADA and Section 504 compliance.[80]  He alleges that Tulane breached its duty by failing to supervise Crosslin; failing to properly train Crosslin, Machado, and

---

[78]    R. Doc. 13 at ¶ 179.
[79]    *Id.* at ¶ 192.
[80]    *Id.* at ¶ 193.

Hamm; and failing to enforce its own policies.[81]  He additionally alleges that Hamm and Machado, as administrators, owed plaintiff a duty to intervene and that they breached that duty by failing to report Crosslin's behavior to the Office of Institutional Equity.[82]

"Louisiana courts have adopted a duty-risk analysis to determine whether liability for negligence exists under the particular facts of the case." *Mills v. Tarver*, 340 So. 3d 959, 970 (La. App. 1st Cir. 2021).  To establish negligence, plaintiff must prove: "(1) the defendant had a duty to conform his or her conduct to a specific standard of care; (2) the defendant failed to conform his or her conduct to the appropriate standard of care; (3) the defendant's substandard conduct was a cause-in-fact of the plaintiff's injuries; (4) the defendant's substandard conduct was a legal cause of the plaintiff's injuries; and (5) actual damages." *Id.* (citing *Brewer v. J.B. Hunt Transport, Inc.*, 35 So. 3d 230, 240 (La. 2010)).

Plaintiff's claim is essentially three claims: a claim against Tulane for failure to train and supervise, a claim against Tulane for failing to apply its own policies, and a claim against Hamm and Machado for failing to follow Tulane's policies.

---

[81]     *Id.* at ¶¶ 196–200.
[82]     *Id.* at ¶¶ 194–95, 201–03.

Assuming for the sake of argument that Tulane owed plaintiff a duty to train and supervise its faculty, including Hamm, Machado, and Crosslin, plaintiff nevertheless fails to allege a breach of this duty for two reasons. First, plaintiff does not allege that Tulane did not train these faculty members. His allegation that Tulane failed to provide adequate training to faculty and administrators is entirely conclusory. Further, plaintiff provides no details as to how Tulane failed to supervise Crosslin. Plaintiff's list of purported "warning signs" exhibited by Crosslin does not suffice. "Allegations of purported duties, absent accompanying factual allegations of how the duties were breached, are insufficient to present a cause of action." *Walker v. Dollar Tree Stores, Inc.*, 316 So. 3d 585, 591 (La. App. 2d Cir. 2021). Plaintiff's allegations are devoid of accompanying facts illustrating how Tulane breached its training and supervisory duties.

Second, plaintiff has not alleged the existence or breach of a duty by Crosslin that could give rise to claims of negligent hiring against his employer and supervisors. "[A]n employer can *only* be liable under theories of negligent hiring, supervision, training and retention, and negligent entrustment *if* the employee is at fault." *Martin v. Thomas*, 346 So.3d 238, 247 (La. 2022) (emphasis in original) (involving allegations of tortious conduct resulting in personal injury). "[N]o degree of negligence on the part

of the employer in hiring the employee would make the employer liable if the employee did not breach a duty to the plaintiff." *Id.* (citation modified). Because the Court finds that plaintiff has failed to allege a breach of any duty owed by Crosslin to plaintiff, Tulane cannot be negligent for failing to supervise Crosslin.

The Court now addresses plaintiff's allegations relating to Tulane's alleged failure to follow its own policies.  Plaintiff alleges that Tulane's offer of a 21-day extension to find a new advisor was an "unwritten, discretionary requirement" that breached Tulane's "duty of reasonable care" to plaintiff.[83] This allegation is conclusory.  The BMS Handbook required plaintiff to match with a dissertation advisor by the end of the summer or face dismissal.[84]  Crosslin removed plaintiff from his lab on July 31, and defendants gave plaintiff until September 5 to find a new advisor, then allowed plaintiff an additional 21 days to do so.  Plaintiff has not alleged facts sufficient to show that the defendants' imposition of this timeline was negligent.

Moreover, plaintiff's allegations are premised upon academic decisions.  "It is not the place of the court system to micro-manage the

---

[83]     R. Doc. 13 at ¶ 200.
[84]     R. Doc. 21-1 at 12.

adequacy of instruction or management at institutions of higher learning . . . .  This is a task best handled by the universities themselves." *Miller v. Loyola Univ. of New Orleans*, 829 So. 2d 1057, 1061 (La. App. 4th Cir. 2002), *writ denied*, 839 So. 2d 38 (La. 2003); *see also Guidry v. Our Lady of the Lake Nurse Anesthesia Program through Our Lady of the Lake College*, 170 So. 3d 209, 214 (La. App. 1st Cir. 2015).  Tulane's actions fall squarely within the realm of academic and administrative judgment.  It is not this Court's place to "micro-manage" Tulane's academic and administrative decisions.  *See Miller*, 829 So. 2d at 1061.

Finally, the Court considers Machado's and Hamm's alleged failures to adhere to Tulane's own policies.  Plaintiff alleges that Machado and Hamm breached non-delegable duties to report discrimination to the OIE.   This claim is little more than a repeat of plaintiff's breach of contract claim that the Court has found plaintiff has not properly pled.  Plaintiff has not pled a breach of contract claim for failure to follow Tulane's mandatory reporting policies; he therefore cannot have pled a claim for negligence for failing to follow those same policies.

Plaintiff has failed to state a claim for negligence under either of his theories.  Accordingly, the Court grants defendants' motion as to this count and dismisses count VI of plaintiff's amended complaint.

## G.    Defamation

To establish a claim for defamation under Louisiana law, a plaintiff must prove the following elements: "(1) a false and defamatory statement concerning another; (2) an unprivileged publication to a third party; (3) fault (negligence or greater) on the part of the publisher; and (4) resulting injury." *Kennedy v. Sheriff of East Baton Rouge*, 935 So. 2d 669, 674 (La. 2006). A plaintiff's failure to establish any of the elements is fatal. Truth, justification, and privilege are absolute defenses to a defamation claim. *Elmer v. Coplin*, 485 So. 2d 171, 176 (La. App. 2d Cir. 1986).

Here, plaintiff alleges that Crosslin defamed plaintiff by emailing Machado that plaintiff "was not working remotely" and did not attend a meeting.[85]

Regardless of whether the allegedly defamatory statements were false or merely subjective opinions regarding plaintiff's work, plaintiff has failed to allege that an unprivileged publication was made. "[S]tatements between employees, made within the course and scope of their employment, are not statements communicated or publicized to third persons so as to constitute a publication.." *Doe v. Grant*, 839 So. 2d 408, 416 (La. App. 4 Cir. 2003) (quoting *Bell v. Rogers*, 698 So. 2d 749, 756 (La. App. 2 Cir. 1997)).

---

[85]    R. Doc. 13 at ¶¶ 210−14.

Plaintiff's defamation allegations rise and fall on communications between one employee of Tulane's BMS Department to an administrator in that department regarding the work performance of a BMS PhD student. Crosslin's allegedly defamatory statements were therefore not published as required for a defamation claim.  Plaintiff has failed to state a claim for defamation.  The Court grants defendants' motion as to this claim and dismisses count VII of plaintiff's amended complaint.

### H.    Abuse of Rights

"Under the abuse of rights doctrine, the holder of an individual right may not exercise that right to the detriment of another simply for the sake of exercising it." *Lilawanti Enterprises, Inc. v. Walden Book Co.*, 670 So. 2d 558, 561 (La. App. 4th Cir. 1996).  To establish a claim under the "abuse of rights" doctrine, a plaintiff must show that: "(1) the predominant motive for the exercise of the right is to cause harm; (2) there is no serious or legitimate motive for the exercise of the right; (3) the exercise of the right violates moral rules, good faith, or elementary fairness; or (4) the exercise of the right is for a purpose other than that for which it was granted." *Sartisky v. La. Endowment for the Hums.*, 2014 WL 5040817, at *3 (E.D. La. Sept. 26, 2014) (Engelhardt, J.) (citing *Steier v. Heller*, 732 So. 2d 787, 791 (La. App. 2d Cir. 1999)).  "The abuse of rights doctrine has been applied sparingly in

Louisiana . . . ."  *Clark v. Glidden Coatings & Resins, Div. of SCM Corp.*, 666 F. Supp. 868, 871 (E.D. La. 1987) (citing *Illinois Central Railroad Co. v. International Harvester Co.*, 368 So. 2d 1009 (La. 1979)).  Courts will find an abuse of rights "only in limited circumstances because its application renders unenforceable one's otherwise judicially protected rights." *Truschinger v. Pak*, 513 So. 2d 1151, 1154 (La. 1987).

Plaintiff's allegations are insufficient to establish that one of the four required situations is met here.  He has not pled specific facts that support the conclusion that Crosslin's actions: (1) were predominantly motivated by an interest in causing plaintiff harm; (2)  had no serious or legitimate motivation; (3) were violative of moral rules, good faith, or elementary fairness; or (4) were undertaken for a purpose other than for which the right was granted.  The Court therefore grants defendants' motion to dismiss as to this claim and dismisses count VIII of plaintiff's amended complaint.

## I.     National Origin Discrimination

Title VI of the Civil Rights Act of 1964 provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits oof, or be subjected to discrimination under any program or activity receiving Federal financial assistance."  42 U.S.C. § 2000d.  A private right of action exists under Title

39

VI only for violations involving intentional discrimination. *See Bhombal v. Irving Indep. Sch. Dist.*, 809 F. App'x 233, 236 (5th Cir. 2020) ("The statute 'prohibits only intentional discrimination.'") (quoting *Alexander v. Sandoval*, 532 U.S. 275, 280 (2001)).

Title VI does not protect individuals from unfair decisions, but only from decisions based on unlawful discrimination. *See Nieto v. L & H Packing Co.*, 108 F.3d 621, 624 (5th Cir. 1997); *see also Mohamed v. Irving Indep. Sch. Dist.*, 252 F. Supp. 3d 602, 627 (N.D. Tex. 2017).  Thus, to adequately plead a Title VI claim, a plaintiff must include allegations of acts of intentional discrimination committed by defendant.  *Mohamed*, 252 F. Supp. 3d at 627.  Further, in cases where the plaintiff does not allege any official policy of intentional discrimination, to receive damages, plaintiff must allege that "an official authorized to institute corrective measures[] had actual knowledge of the discrimination and responded with deliberate indifference." *Bhombal*, 809 F. App'x at 237 (quoting *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998)) (citation modified).

Here, plaintiff alleges that Tulane, through its agent Crosslin, discriminated against him on the basis of his national origin by taking adverse action against him while he was in his home country and by granting

greater academic and travel accommodations to U.S.-born students.[86]

Plaintiff has not alleged facts plausibly showing the intent required for an intentional discrimination claim. Plaintiff's claim that Crosslin deliberately timed his removal of plaintiff from his lab to exploit plaintiff's absence from the country and immigration status is conclusory. In addition, plaintiff does not allege any official policy of intentional discrimination. He must, therefore, allege that a person with authority had actual knowledge of the discrimination based on national origin and responded with deliberate indifference. *Id.* Plaintiff has not done so. He does not allege that any person at Tulane with the authority to institute corrective measures had actual knowledge of the alleged national-origin discrimination or that this person with authority responded with deliberate indifference.

Further, plaintiff has not alleged facts plausibly showing the discrimination required for an intentional discrimination claim. His allegation that U.S.-born PhD students were treated differently than himself is conclusory. Plaintiff's complaint is devoid of any facts suggesting situations comparable to his own in which similarly situated U.S.-born students received better treatment than plaintiff.

Dismissal of this claim is appropriate. Accordingly, the Court grants

---

[86]   R. Doc. 13 at ¶¶236–43.

41

defendants' motion as to plaintiff's Title VI claim and dismisses count IX of plaintiff's amended complaint.

### J.    Leave to Amend

A plaintiff must "expressly request leave to amend." *Law v. Ocwen Loan Servicing, L.L.C.*, 587 F. App'x 790, 796 (5th Cir. 2014) (quoting *United States ex rel. Willard v. Humana Health Plan of Tex. Inc.*, 336 F.3d 375, 387 (5th Cir. 2003)) (internal quotations omitted). Plaintiff has not requested leave to amend his complaint. Moreover, plaintiff has already filed an amended complaint in response to detailed motions to dismiss and has failed to cure the defects in his pleadings. The Court therefore dismisses plaintiff's amended complaint without leave to amend. *Cf. Martin v. Hutson*, 2024 WL 3011014, at *6 (E.D. La. June 14, 2024) (dismissing plaintiff's claims without leave to amend when plaintiff had not requested leave to amend the complaint), *aff'd*, 2025 WL 1432699 (5th Cir. May 19, 2025); *Brewster v. Dretke*, 587 F.3d 764, 768 (5th Cir. 2009) (holding that "[g]ranting leave to amend is not required . . . if the plaintiff has already pleaded his best case") (citation modified).

## IV.   CONCLUSION

For the foregoing reasons, the Court grants defendants' motions and DISMISSES WITH PREJUDICE plaintiff's amended complaint.

New Orleans, Louisiana, this 16th day of June, 2026.

_____
SARAH S. VANCE
UNITED STATES DISTRICT JUDGE